10.505.02

1    JAMES A. PATTEN
     PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC
2    Suite 300, The Fratt Building
     2817 Second Avenue North
3    Billings, MT 59101-2041
     Telephone: (406) 252-8500
4    Facsimile: (406) 294-9500
     email:      apatten@ppbglaw.com
5
6    STEPHAN C. VOLKER (CSB #63093) (Pro hac vice pending)
     ALEXIS E. KRIEG (CSB #254548) (Pro hac vice pending)
     STEPHANIE L. CLARKE (CSB #257961) (Pro hac vice pending)
7    DANIEL P. GARRETT-STEINMAN (CSB #269146) (Pro hac vice pending)
     JAMEY M.B. VOLKER (CSB #273544) (Pro hac vice pending)
8    LAW OFFICES OF STEPHAN C. VOLKER
     950 Gilman Street, Suite 100
9    Berkeley, California 94710-1462
     Telephone: (510) 496-0600
10   Facsimile: (510) 559-9654
     email:      svolker@volkerlaw.com
11               akrieg@volkerlaw.com
                 sclarke@volkerlaw.com
12               dgarrett@volkerlaw.com
                 jvolker@volkerlaw.com
13
     Attorneys for Plaintiffs
14   INDIGENOUS ENVIRONMENTAL NETWORK
     and NORTH COAST RIVERS ALLIANCE
15

16                  IN THE UNITED STATES DISTRICT COURT

17                    FOR THE DISTRICT OF MONTANA

18                         GREAT FALLS DIVISION

19   INDIGENOUS ENVIRONMENTAL NETWORK      ) Civ. No. _____
     and NORTH COAST RIVERS ALLIANCE,      )
20                                         ) **COMPLAINT FOR**
                   Plaintiffs,             ) **DECLARATORY AND**
21                                         ) **INJUNCTIVE RELIEF**
             vs.                           )
22                                         )
     UNITED STATES DEPARTMENT OF STATE;    )
23   THOMAS A. SHANNON, JR., in his official capacity )
     as U.S. Under Secretary of State; UNITED STATES )
24   FISH AND WILDLIFE SERVICE, a federal agency; )
     JAMES W. KURTH, in his official capacity as Acting )
25   Director of the U.S. Fish and Wildlife Service; and )
     RYAN KEITH ZINKE, in his official capacity as )
26   U.S. Secretary of the Interior,       )
                                           )
27                 Defendants.             )
                                           )
28   _____)

**INTRODUCTION**

1.    On March 23, 2017, the U.S. Department of State ("State Department") rendered its decision to issue a Presidential Permit ("Permit") to TransCanada Keystone Pipeline, L.P., a limited Delaware partnership owned by affiliates of TransCanada Corporation of Canada, to construct, connect, operate, and maintain an 875-mile long pipeline and related facilities commonly known as the Keystone XL Pipeline (the "Project") to transport up to 830,000 barrels per day ("BPD") of crude oil from Alberta, Canada and the Bakken shale formation in Montana to existing pipeline facilities near Steele City, Nebraska.  From there, the oil would eventually be delivered to Cushing, Oklahoma and the Gulf Coast region.  The Project would pose grave risks to the environment, including the climate, water resources and wildlife, and to human health and safety.

2.    Plaintiffs the Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA") (collectively, "plaintiffs") challenge the approval of the Project by defendants UNITED STATES DEPARTMENT OF STATE and Under Secretary of State THOMAS A. SHANNON, JR. (collectively, "State Department"), and Secretary of the Interior RYAN KEITH ZINKE, Acting Director of the United States Fish and Wildlife Service JAMES W. KURTH, and the UNITED STATES FISH AND WILDLIFE SERVICE (collectively, "FWS") for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. section 4321 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. section 1531 *et seq.*, the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. section 701 *et seq.*, the Bald Eagle and Golden Eagle Protection Act ("Eagle Act"), 16 U.S.C. 24 section 668, the Administrative Procedure Act ("APA"), 5 U.S.C. section 701 *et seq.*, and regulations promulgated thereunder.  The State Department's approval of the Permit violates four principal environmental laws.

3.    First, the State Department's NEPA review of the Project was inadequate. The State Department's Final Supplemental Environmental Impact Statement ("FSEIS") fails to (1) provide a detailed and independent Project purpose and need, (2) analyze all

1    reasonable alternatives to the Project, (3) study the Project's transboundary effects, (4)
2    disclose and fully analyze many of the Project's adverse environmental impacts, (5)
3    formulate adequate mitigation measures, and (6) respond adequately to comments.  In
4    addition, the FSEIS was irredeemably tainted because it was prepared by Environmental
5    Resources Management ("ERM"), a company with a substantial conflict of interest.  The
6    State Department violated its own guidelines when it selected ERM, and this selection
7    was therefore arbitrary and capricious, in violation of the APA.

8       4.  Second, the State Department and FWS violated the Endangered Species Act
9    ("ESA"), 16 U.S.C. section 1531 *et seq.*, because they failed to fully analyze the Project's
10   potential effects on threatened and endangered species, failed to use the best scientific
11   and commercial data available, and entirely failed to consider the Project's effects on the
12   endangered northern swift fox, contrary to 16 U.S.C. section 1536(a)(2).  The FWS'
13   violation of ESA is ripe for adjudication under the APA.  The State Department's
14   violation of ESA will become ripe for adjudication following plaintiffs' compliance with
15   ESA's 60-day notice requirement.  Plaintiffs are transmitting a 60-day notice of their
16   intent to sue the State Department for this violation and will amend this Complaint to
17   allege this violation when that notice matures.

18      5.  Third, the State Department violated the MBTA by allowing un-permitted
19   taking of the numerous protected migratory bird species that the Project will harm,
20   contrary to 16 U.S.C. section 703(a).

21      6.  Fourth, the State Department violated the Eagle Act by allowing the un-
22   permitted taking of bald and golden eagles and failing to secure a permit for the take of
23   those eagles, contrary to 16 U.S.C. section 668(b).

24      7.  Accordingly, plaintiffs seek orders from this Court:  (1) granting preliminary
25   injunctive relief restraining defendants from taking any action that would result in any
26   change to the physical environment in connection with the Project pending a full hearing
27   on the merits; (2) declaring that defendants violated NEPA; (3) declaring that defendants
28   violated ESA; (4) declaring that defendants violated the MBTA; (5) declaring that

1  defendants violated the Eagle Act; (6) declaring that defendants violated the APA; and

2  (7) granting permanent injunctive relief overturning defendants' Project approvals

3  pending defendants' compliance with NEPA, the MBTA, the Eagle Act, and the APA.

4  **JURISDICTION AND VENUE**

5  8.    The Court has jurisdiction over this action under 28 U.S.C. sections 1331

6  (federal question), 1337 (regulation of commerce), 1346 (U.S. as defendant), 1361

7  (mandamus against an officer of the U.S.), 2201 (declaratory judgment), and 2202

8  (injunctive relief); under the Administrative Procedure Act ("APA"), 5 U.S.C. sections

9  701-706 (review of final agency action); and under the ESA, 16 U.S.C. section

10  1540(g)(1)(C) because (1) the action arises under the APA, NEPA, the MBTA, the Eagle

11  Act, and ESA; (2) the State Department and FWS are agencies of the U.S. government

12  and the individual defendants are sued in their official capacities as officers of the U.S.;

13  (3) the action seeks a declaratory judgment voiding the State Department's grant of the

14  Permit; and (4) the action seeks further injunctive and mandamus relief until the State

15  Department and FWS comply with applicable law.

16  9.    Venue is proper in this judicial district pursuant to 28 U.S.C. section

17  1391(e)(1)(B) and Montana Local Civil Rules 1(c)(3) and 3.2(b)(1)(A) because the

18  proposed pipeline would cross the international border in Phillips County.  Since this

19  border crossing triggers the Presidential permit requirement, "a substantial part of the

20  events . . . giving rise to the claim occurred" in this judicial district.  28 U.S.C. §

21  1391(e)(1)(B); Mont. Civ.R. 3.2(b)(1)(A).

22  10.    There exists now between the parties hereto an actual, justiciable controversy

23  in which plaintiffs are entitled to have a declaration of their rights, a declaration of the

24  State Department's obligations, and further relief because of the facts and circumstances

25  hereinafter set forth.

26  11.    This Complaint is timely filed within the applicable six-year statute of

27  limitations set forth in 28 U.S.C. section 2401(a).

28  12.    Plaintiffs have standing to assert their claims and, to the extent required,

1  have exhausted all applicable remedies.

2                              **PARTIES**

3       13.    Plaintiff Indigenous Environmental Network ("IEN") is incorporated under

4  the non-profit organizational name of Indigenous Educational Network of Turtle Island.

5  Established in 1990, IEN a network of indigenous peoples from throughout North

6  America who are empowering their Indigenous Nations and communities toward

7  ecologically sustainable livelihoods, long-denied environmental justice, and full

8  restoration and protection of the Sacred Fire of their traditions.  Its members include

9  chiefs, leaders and members of Indigenous Nations and communities who inhabit the

10  states and province through which the Project is proposed to be built and who would be

11  directly and irreparably harmed by its many severe adverse environmental and cultural

12  impacts.  IEN has been involved in grassroots efforts throughout the United States and

13  Canada to mobilize and educate the public regarding the harmful environmental and

14  cultural impacts of the Project.

15       14.    Plaintiff North Coast Rivers Alliance ("NCRA") is an unincorporated

16  association of conservation leaders from the western and northern United States and

17  Canada.  NCRA has participated in public education, advocacy before legislative and

18  administrative tribunals, and litigation in state and federal court to enforce compliance by

19  state and federal agencies with state and federal environmental laws.  NCRA's members

20  use the land and water resources that the Project would affect and therefore would be

21  materially harmed by the construction and operation of the pipeline.

22       15.    Plaintiffs' injuries are fairly traceable to the State Department's and FWS'

23  actions.  Construction and operation of the Project and connected actions will harm

24  plaintiffs' use of the Project area for recreational, cultural and spiritual activities

25  including nature study, wildlife and wildflower viewing, scenic enjoyment, photography,

26  hiking, family outings, star gazing and meditation.  These injuries are actual, concrete,

27  and imminent.  Plaintiffs have no plain, speedy, or adequate remedy at law.  Accordingly,

28  plaintiffs seek injunctive, mandamus, and declaratory relief from this Court to set aside

1 the State Department's and FWS' unlawful acts and redress plaintiffs' injuries.

2     16.    Defendant UNITED STATES DEPARTMENT OF STATE ("State

3 Department") is a federal executive agency headquartered in Washington, D.C.  Under

4 Executive Order 13337, the State Department is responsible for determining whether

5 granting a Presidential permit for the Project would serve the national interest.

6     17.    Defendant THOMAS ALFRED SHANNON is the U.S. Under Secretary of

7 State, and, in that capacity, is responsible for issuing Presidential permits for energy

8 facilities that cross the United States-Canada border, including the Presidential Permit at

9 issue here, where, as here, the Secretary of State has recused himself from the matter.

10     18.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("FWS") is

11 an agency within the U.S. Department of the Interior.  Under ESA, FWS is charged with

12 the preservation of endangered and threatened species and their habitat, including the

13 species that will be harmed by the Project.

14     19.    Defendant JAMES W. KURTH is the Acting Director of FWS, and is

15 therefore responsible for preserving endangered and threatened species and their habitat.

16     20.    Defendant RYAN KEITH ZINKE is the Secretary of the U.S. Department of

17 the Interior, and, in that capacity, is the federal official charged with responsibility for the

18 proper management of FWS and is responsible for the actions of FWS challenged herein.

19 **BACKGROUND**

20     21.    On May 4, 2012, the Department of State received an application from

21 TransCanada Corporation, a Canadian public company organized under the laws of

22 Canada. for a Presidential permit for a proposed pipeline that would run from the

23 Canadian border to connect to a pipeline in Steele City, Nebraska.

24     22.    On March 1, 2013, the Department of State released a Draft Supplemental

25 Environmental Impact Statement ("DSEIS") for the new Presidential Permit application

26 for the proposed Keystone XL pipeline.

27     23.    On March 8, 2013, the U.S. Environmental Protection Agency (EPA)

28 announced the availability of the Draft SEIS on its website, starting the 45-day public

comment period.

24.    On April 18, 2013, the Department of State held a public meeting in Grand Island, Nebraska.

25.    On April 22, 2013, the comment period on the Draft Supplemental Environmental Impact Statement closed.

26.    On May 15, 2013, the FWS Service issued its Biological Opinion for the proposed Keystone XL pipeline to the Department of State.

27.    The State Department provided an additional 30-day opportunity for the public to comment during the National Interest Determination (NID) period that began with the February 5, 2014 notice in the Federal Register announcing the release the Final SEIS ("FSEIS").

28.    On November 6, 2015, Secretary of State John Kerry determined under Executive Order 13337 that issuing a Presidential permit for the proposed Keystone XL pipeline's border facilities would not serve the national interest, and denied the permit application.

29.    On January 24, 2017, President Donald Trump issued a Presidential Memorandum Regarding Construction of the Keystone XL Pipeline which, *inter alia*, invited the permit applicant "to resubmit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline."  On January 24, 2017, President Trump also issued an Executive Order on Expediting Environmental Reviews and Approvals for High Priority Infrastructure Projects in which he set forth the general policy of the Executive Branch "to streamline and expedite, in a manner consistent with law, environmental reviews and approvals for all infrastructure projects, especially projects that are a high priority for the Nation," and cited pipelines as an example of such high priority projects.

30.    On January 26, 2017, the State Department received a re-submitted application from TransCanada Keystone Pipeline, L.P. ("TransCanada"), a limited partnership organized under the laws of the state of Delaware and owned by affiliates of

1  TransCanada Corporation, a Canadian public company, for the proposed Project.  The re-

2  submitted application includes purportedly minor route alterations due to agreements with

3  local property owners for specific right-of-ways and easement access, ostensibly within

4  the areas previously included by the Department of State in its FSEIS.

5      31.   On March 23, 2017, the State Department granted a Presidential Permit to

6  TransCanada, allowing its construction and operation of the Project.

## FIRST CLAIM FOR RELIEF

(Violation of the National Environmental Policy Act)

(Against All Defendants)

10     32.   The paragraphs set forth above are realleged and incorporated herein by

11  reference.

12     33.   By granting the Presidential Permit to TransCanada based on an inadequate

13  FSEIS, the State Department violated NEPA, 42 U.S.C. section 4321 *et seq.,* and its

14  implementing regulations, 40 C.F.R. § 1500 *et seq.*  By approving the Project without

15  complying with NEPA, the State Department failed to proceed in accordance with law in

16  violation of the APA, 5 U.S.C. § 706(2)(A) and (D).

## PROJECT PURPOSE AND NEED

18     34.   The FSEIS' purpose and need statement falls short of NEPA's

19  requirements because the stated Project objectives are far too narrow.  The FSEIS states

20  that "the primary purpose of the proposed Project is to provide the infrastructure to

21  transport [Western Canadian Sedimentary Basin ("WCSB")] crude oil from the border

22  with Canada to existing pipeline facilities" in Nebraska, for eventual delivery to refineries

23  on the Gulf Coast.  FSEIS 1.3-1.

24     35.   By needlessly narrowing the Project's scope, the FSEIS unduly constrains

25  the available options to those that are preemptively locked into fossil fuel dependence.

26  Therefore, the FSEIS only examines options that address moving oil from the WCSB and

27  the Bakken shale formation to market, without discussing myriad other potential ways to

28  meet global energy needs.  Its narrow purpose and need statement led the State

1  Department to unreasonably restrict the range of alternatives considered, omitting feasible
2  and much more environmentally beneficial renewable energy and energy efficiency
3  alternatives.  This violates NEPA.  *National Parks & Conservation Association v. Bureau*
4  *of Land Management* ("*NPCA v. BLM*"), 606 F.3d 1058, 1070 (9th Cir. 2010).

## ALTERNATIVES

6       36.    NEPA requires that an EIS "[r]igorously explore and objectively evaluate all
7  reasonable alternatives" so that "reviewers may evaluate their comparative merits."  42
8  U.S.C. §4332(2)(C)(iii), (E); 40 C.F.R. § 1502.14.  Furthermore, "[a]n agency may not
9  define the objectives of its action in terms so unreasonably narrow that only one
10 alternative among the environmentally benign ones in the agency's power would
11 accomplish the goals of the agency's action, and the EIS would become a foreordained
12 formality."  *NPCA v. BLM*, 606 F.3d at 1070 (internal quotations and citations omitted).
13 "The existence of a viable but unexamined alternative renders an environmental impact
14 statement inadequate."  *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038
15 (9th Cir. 2008).

16      37.    Here, the State Department *entirely* failed to consider the feasible and
17 environmentally beneficial alternatives of adopting aggressive renewable energy and
18 energy efficiency measures to obviate the claimed need for more crude oil.  The EPA
19 raised this objection in its comments on the Keystone XL DSEIS, and the FSEIS fails to
20 remedy the DEIS', FEIS', and DSEIS' failure to analyze renewable energy and energy
21 efficiency alternatives.  Rather, after a cursory discussion, the FSEIS states that "use of
22 alternative energy sources and energy conservation in meeting needs for transportation
23 fuel have not been carried forward for further analysis as an alternative to the proposed
24 Project."  FSEIS 2.2-44.  As EPA concluded in assigning the DSEIS a failing grade of
25 "insufficient," this violates NEPA.  40 C.F.R. § 1502.14; *NPCA v. BLM*, 606 F.3d at
26 1070; *Friends of Yosemite Valley*, 520 F.3d at 1038.

## ENVIRONMENTAL IMPACTS

28      38.    An EIS must take a "hard look" at the environmental impacts of proposed

1  major federal actions and provide a "full and fair discussion" of those impacts.  40 C.F.R.

2  § 1502.1; *National Parks & Conservation Association v. Babbitt* ("*NPCA v. Babbitt*"),

3  241 F.3d 722, 733 (9th Cir. 2001).  Here, however, the FSEIS' discussion of many

4  environmental and cultural impacts is absent or inadequate, as explained below.

5  **A.      Extraterritorial Impacts**

6          39.     Federal agencies must consider the international impacts of their proposed

7  actions. *Backcountry Against Dumps v. Chu*, ___ F.Supp.3d ___, 2015 WL 12697959 *7

8  (S.D. Cal. 2015) ("under NEPA, agencies must analyze extraterritorial effects of actions

9  before they can issue a permit"); *Government of the Province of Manitoba v. Salazar*, 691

10  F.Supp.3d 37, 51 (D.D.C. 2010) (federal agencies must consider the effects of their

11  actions taken within the United States that are felt across sovereign borders, such as in

12  Canada); *Border Power Plant Working Group v. Department of Energy*, 260 F.Supp.2d

13  997 (S.D. Cal. 2003) (same); *Hirt v. Richardson*, 127 F.Supp.2d 833, 844 (W.D. Mich.

14  1999) (holding that "the facts in this case warrant extraterritorial application of NEPA");

15  *National Organization for Reform of Marijuana Laws v. United States Department of*

16  *State*, 452 F.Supp. 1226, 1232-33 (D.D.C. 1978) (court "assume[d] without deciding, that

17  NEPA is fully applicable to the Mexican herbicide spraying program" in which the U.S.

18  was participating, and required an analysis of the program's impacts in Mexico); *Sierra*

19  *Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) ("[i]n view of the conclusions we

20  reach in this case, we need only assume, without deciding, that NEPA is fully applicable

21  to construction in Panama"); *Wilderness Society v. Morton*, 463 1261 (D.C.Cir. 1972)

22  (holding that Canadian citizens had standing to intervene in a NEPA-based suit on the

23  basis of their claims that possible oil spills from the Trans-Alaskan oil pipeline might

24  cause damage to Canada).

25          40.     Here, the State Department claims that it is not legally required to "conduct

26  an in depth assessment of the potential impacts of the Canadian portion of the proposed

27  pipeline," but that, "as a matter of policy," the State Department included information

28  regarding potential impacts in Canada." FSEIS 4.15-93. However, the State Department

1   is wrong in its assertion that it need not analyze the Project's effects in Canada, and its

2   proffered "information" falls far short of the "hard look" that NEPA requires.  *Natural*

3   *Resources Defense Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972).

4       41.    Among the extraterritorial impacts that should have been – but were not –

5   fully analyzed in the EIS are the impacts of an increase in bitumen tar sands mining in

6   Canada that will result from the Project.  The very premise of the FSEIS' limited

7   discussion of the impacts of oil sands extraction – that the "Project would not contribute

8   to cumulative impacts associated with bitumen extraction activities" – is fundamentally

9   incorrect.  FSEIS 4.15-104.  It defies logic to claim, as does the FEIS, that because the

10   pipeline (which will carry bitumen) is located slightly southeast of the point of extraction

11   of the bitumen it will carry, the pipeline bears no relation to that extraction.  FSEIS 4.15-

12   104.

13       42.    In addition, to the extent that the FSEIS does superficially analyze the

14   impacts of oil sands extraction, it profoundly understates those impacts.  For example, the

15   FEIS and DSEIS claim that 232 square miles "have been disturbed by oil sands mining

16   activity," and the FSEIS slightly increases this number, admitting that 276 square miles

17   "of land have been disturbed."[1]  FSEIS 4.15-107.  However, Google Earth imagery shows

18   that the area of land disturbed by oil sands mining is already an order of magnitude

19   greater – an impact that will grow far greater still if the Project is allowed to operate.

20       43.    The FSEIS also implies that tar sands mining sites can be and are being

21   reclaimed.  To the contrary, in fact such sites cannot be reclaimed within a human

22   lifetime, if ever.

23

24       [1] According to the statistics provided in the DSEIS, the number of square miles

25   (232) that had been disturbed by oil sands mining activity and the number of square

26   miles that were in the process of reclamation (26) did not change between the time of

the release of the original FEIS in August, 2011 and the release of the DSEIS *19*

27   *months later* in March, 2013.  DSEIS 4.15-113; FEIS 3.14-63. This is untrue, and is

28   emblematic of the State Department's failure to provide accurate information regarding

the Project's severe impacts in Canada and elsewhere.

44.     The FSEIS also fails to analyze the fact that tar sands mining releases massive amounts of sulfur dioxide and elemental sulfur into the surrounding environment, including both soil and water, harming birds and other wildlife.

45.     Finally, the FSEIS fails to adequately analyze the severe environmental hazards posed by tailings ponds, which contain a witches' brew of toxic tar sands and other contaminants, clay, sand, hydrocarbons, sulfur, and heavy metals and remain for decades after the oil extraction process.  Such ponds pose massive risks to wildlife, especially birds that are attracted to and land on the ponds.  For example, Syncrude Canada, the largest tar sands oil extraction company in Canada, runs one lake-sized reservoir that killed over 1,600 birds in 2008 alone.[2]  FSEIS 4.15-113.  In light of their significant risks, tailings ponds should be fully addressed in the FSEIS' analysis of environmental impacts, not simply mentioned as posing an unstudied "exposure risk" for birds, FSEIS 4.15-110, and discussed in three broad overview paragraphs – paragraphs that focus on efforts to mitigate risks of harm, rather than disclosing and analyzing the full extent of the harms themselves.  FSEIS 4.15-113.

46.     By failing to analyze the Project's foreseeable and harmful extraterritorial impacts, the FSEIS violates NEPA.

**B.     Hydrologic Impacts**

47.     The new pipeline route purportedly skirts some of the ecologically sensitive Nebraska Sandhills.  However, it still traverses northern Holt Country, which has permeable soil and a high water table – precisely the characteristics that made the Sandhills too risky an area to cross.  Therefore, any spill or release of oil or other chemicals would still pose grave risks to groundwater.  Indeed, the FSEIS admits that the Project will cross areas with sandy soils similar to those in the Sandhills, and that those soils "could be potential recharge areas for underlying aquifers."  FSEIS PC-71.  The FSEIS dismisses this concern, claiming that preventive action and other laws would

---

[2] White, Patrick, October 26, 2010, "Toxic Syncrude tailings pond kills hundreds more ducks," *The Globe and Mail*.

1 | mitigate oil spill risks. *Id.* However, no number of preventive measures could eliminate
2 | the profound risks posed to these vulnerable and critically needed aquifers, and no known
3 | mitigation measures can fully remediate and restore an aquifer contaminated by a crude
4 | oil spill.

5 | 48. The FSEIS also inadequately analyzes the risks posed by the mixture of tar
6 | sands and diluents used in the transport of tar sands bitumen commonly referred to as
7 | "dilbit." While the FSEIS includes some material describing how spilled dilbit would
8 | behave in an aquifer (*see, e.g.,* FSEIS 4.3-12), the discussion lacks the necessary detail,
9 | and admits risks that are simply too great to countenance. *See, e.g.,* FSEIS 4.13-84 ("The
10 | release of dilbit to a river or other aquatic environment introduces the potential for
11 | additional impacts and additional recovery challenges for responders of such an event to
12 | the environment.")

13 | 49. Furthermore, to date there has been *no* modeling of the effects of dilbit, and
14 | its movement within, the Northern High Plains Aquifer System. The FSEIS admits that
15 | "[n]o information regarding conditions related to large-scale petroleum releases was
16 | readily accessible for the alluvial aquifers or [Northern High Plains Aquifer] along the
17 | proposed pipeline area," and that the FSEIS therefore relies solely on information from a
18 | *non-dilbit* crude oil spill in Bemidji, Minnesota. FSEIS 4.3-15. This renders the FSEIS'
19 | groundwater impact analysis inadequate under NEPA.

20 | 50. The fact that "[n]o information related to" large spills in the specific
21 | conditions of the Project are "was readily accessible" does not mean that the State
22 | Department was excused from addressing this issue. Rather, when "there is incomplete or
23 | unavailable information" that is "essential to a reasoned choice among alternatives and
24 | the overall costs of obtaining it are not exorbitant, the agency shall include the
25 | information in the [EIS]." 40 C.F.R. §1502.22; *Foundation for North American Wild*
26 | *Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1179 (9th Cir. 1982) ("[T]he
27 | very purpose of NEPA's requirement that an EIS be prepared for all actions that may
28 | significantly affect the environment is to obviate the need for . . . speculation by insuring

1   that available data is gathered and analyzed prior to the implementation of the proposed

2   action"); *Oregon Natural Desert Association v. Singleton* ("*ONDA*"), 47 F.Supp.2d 1182,

3   1194 (D.Or. 1998) ("NEPA requires that the agency develop the data first, and then make

4   a decision, not make a decision and then develop the data," internal quotations and

5   citation omitted); *Oregon Environmental Council v. Kunzman*, 614 F.Supp. 657, 663

6   (D.Or. 1985).  Therefore, NEPA requires that the State Department conduct or fund a

7   study that models dilbit's movement within the Northern High Plains Aquifer System.

8       51.   Finally, the FSEIS fails to give the public any assurances – let alone

9   demonstrate with evidentiary support – that the many trade-secret chemicals that would

10  be used as diluents in the dilbit would not behave unexpectedly and cause significant

11  health and environmental problems if released into an aquifer or surface waters.

12      52.   In addition to these informational deficiencies, the FSEIS also does not

13  accurately identify or evaluate the potential impacts of oil spills or pipeline leaks on the

14  surface and subsurface water resources of the Central Plains states of Montana,

15  Wyoming, South Dakota, Nebraska, Kansas, Oklahoma, or Texas, and fails to disclose

16  and discuss how extensively interconnected are the water resources put at risk by the

17  Project.  The FSEIS also fails to account for and analyze the impacts of an oil spill to the

18  thousands of unrecorded and unsealed wells in the rural areas through which the Project

19  would pass.

20  **C.   Cultural Resource Impacts and Environmental Justice**

21      53.   NEPA mandates that agencies analyze cultural resources impacts in

22  environmental impact statements.  40 C.F.R. §§ 1502.16(f), 1508.8.  In addition,

23  Executive Order 12898 (February 11, 1994) requires that federal agencies, including the

24  State Department, "make achieving environmental justice part of [their] mission[s] by

25  identifying and addressing, as appropriate, disproportionately high and adverse human

26  health or environmental effects of [their] programs, policies, and activities on minority

27  populations," including indigenous peoples.

28      54.   The Project would irreparably and disproportionately harm indigenous

1   peoples and other under represented minority populations, while restricting its claimed
2   economic benefits primarily to the corporate proponents of the Project and Canadian tar
3   sands mining.  The Project's social, cultural, and health impacts would extend from the
4   tar sands mining areas in Canada, along the length of the Keystone XL Pipeline, and
5   down into Texas where the tar sands dilbit would be processed and exported.  Yet in
6   violation of both NEPA and Executive Order 12898, the State Department inadequately
7   addressed these environmental justice and cultural resource impacts.

8        55.    The FSEIS claims that "mitigation measures" would limit the Project's
9   cultural impacts, but those measures would be ineffectual.  *See, e.g.,* FSEIS 4.11-4
10  (suggesting that impacts to cultural resources could be mitigated by protecting "a similar
11  resource nearby," "detailed documentation of the resource," or establishing "interpretive
12  exhibits").

13  **D.     Climate Impacts**

14       56.    The FSEIS admits that the Project would emit .24 million metric tons of
15  carbon dioxide equivalents ("MMTCO$_2$e") during construction, and an annual 148-170
16  MMTCO$_2$e due to operation and production, refining, and combustion of oil sands crude
17  oil transported through the Project.  FSEIS 4.14-4.  The FSEIS tries to downplay the
18  Project's climate impacts by inexplicably claiming that approval of the Project is
19  "unlikely to significantly impact the rate of extraction in the oil sands, or the continued
20  demand for heavy crude oil at refineries in the U.S."  FSEIS 1.4-10.  Both of these claims
21  are without basis, and are therefore arbitrary and capricious.

22       57.    The FSEIS' premise that tar sands in Alberta will be fully exploited
23  regardless of whether the Project is approved improperly minimizes the climate change
24  impacts of the Project by assuming that all climate change impacts of tar sands mining
25  will take place whether or not the Project is approved and constructed.  This premise is
26  incorrect and is without logical or factual basis.

27       58.    Despite the FSEIS' claims to the contrary, the Project will increase the rate
28  of extraction in the oil sands.  It is axiomatic that adding a major mode of transport – one

that could carry 830,000 barrels of oil per day – would allow *more* oil to be brought from the tar sands to market, thereby increasing "the rate of extraction in the oil sands." FSEIS 1.4-10. Other potential modes of transport, including rail and tanker, are limited. See, e.g, FSEIS 1.4-36 (noting that "transportation bottlenecks" are causing lower pricing). The Keystone XL pipeline would increase *overall* transport capacity from the tar sands, and therefore increase the *rate* of extraction.

59.    Moreover, the State Department's conclusions were largely based upon its assumptions that rail transport capacity would increase sufficiently to transport as much oil as could be extracted from the tar sands. However, those predictions of rapid development of rail transport have not come to pass. In its March DSEIS, the State Department predicted that in 2013, rail shipments of Canadian tar sands crude to the U.S. Gulf Coast would reach at least 200,000 barrels per day. In fact, total Canadian crude rail shipments to *all* locations in 2013 totaled only 180,000 barrels per day, with *less than 30,000 barrels per day going to the Gulf Coast.*

60.    The State Department's claims about the feasibility of shipping oil by rail were also inflated because they failed to incorporate higher costs associated with potential new regulations intended to address risks posed by the increasing practice of transporting oil by rail. These regulations were recently recommended by the National Transportation Safety Board and the Canadian Transportation Safety Board.

61.    The FSEIS itself recognizes that at a certain price point, transporting oil by pipeline would still be profitable, while transporting it by rail would *not.* FSEIS 1.4-8. According to the FSEIS, if the price dropped below $65 per barrel, oil sands extraction might not be economically viable no matter the transportation method, mooting the distinction between rail and pipeline transportation. If oil prices – which currently fluctuate in the $50 range – return to levels above $65 per barrel, however, the Project would mean the difference between extracting, processing, and burning some of the most carbon-intensive – and thus climate change-inducing -- fuel on the planet, and leaving it in the ground.

62.     The FSEIS seems to conclude that it is unlikely that oil prices will fall to between $65 and $75 per barrel, see FSEIS 1.4-105, but there is no basis for this conclusion.  First, the FSEIS itself notes that oil prices are volatile, difficult to predict, and driven by a variety of factors. FSEIS 1.4-8.  Second, of course, in fact the price of oil *has* fallen below $75 per barrel and is currently fluctuating in the range of $50 per barrel. Without the Project, falling prices are even more likely.  See, e.g., FSEIS 1.4-36 (noting that "transportation bottlenecks" are causing lower pricing).  Therefore, the FSEIS' conclusion that transporting oil by rail will remain profitable is unfounded.

63.     The FSEIS also ignores other factors pushing the Project's total contribution to greenhouse gas levels upward.  For example, extracting the heavy oil for the tar sands is energy intensive.  Additional carbon emissions result from the energy, usually natural gas, used to extract the oil, increasing the carbon footprint of the whole process by 23% to 41%.  Due to the amount of energy needed to extract the oil, oil sands development also drives up demand for natural gas, displacing its use in electrical generation and making it more likely that coal will be burned for such purposes.  Therefore, considering advancing extraction technologies and energy usage, the total carbon production for the oil sands transported by the Project could be more than 230 gigatonnes.  This carbon production must be, but is not, taken into account in the FSEIS as a climate impact and as a foreseeable and related cumulative impact.

64.     The FSEIS also fails to support its assertion that approval of the Project would not affect "the continued demand for heavy crude oil at refineries in the U.S." FSEIS 1.4-10.  The Project may not affect the overall global demand for energy. However, because the Project would allow more oil to be transported more cheaply (see, e.g., FSEIS 1.4-10 ("other modes of transportation, such as rail . . . would probably (but not certainly) be more expensive")), it would disincentivize investment in and use of alternative energy sources, including various forms of renewable energy.  Therefore, it would cause demand for oil to remain higher than it would if alternative energy sources were more available and affordable.

1

**INADEQUATE MITIGATION MEASURES**

2    65.    NEPA requires that an EIS include a "detailed discussion of possible

3 mitigation measures." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-

4 52 (1989); 40 C.F.R. §1502.14(f).  "[O]mit[ting] a reasonably thorough discussion of

5 mitigation measures . . . would undermine the action-forcing goals of [NEPA]." *City of*

6 *Carmel-By-The-Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1154 (9th Cir.

7 1997).  The FSEIS fails to adequately mitigate the Project's substantial risks.

8    66.    For example, the FSEIS acknowledges that the risk of releases, spills, or

9 leaks poses dangers to the environment, but it fails consider multiple available and

10 feasible mitigation measures, including, for example, the sensors used by the Longhorn

11 pipeline in Texas, and more frequent foot and aerial inspections.  See, e.g., FSEIS 4.13-4.

12    67.    The FSEIS also implies that the impacts to birds from the Alberta tar sands

13 tailings ponds are sufficiently mitigated because "[t]ailings settling ponds are designed

14 and located after environmental review and bird deterrents are used to prevent birds from

15 landing on tailings ponds."  FSEIS 4.15-108.  But the facts show otherwise.  For example,

16 over 1600 ducks died in a single tailings pond in 2008 despite highly vaunted "bird

17 deterrents" that proved to be completely ineffectual.  The FSEIS' conclusory one-

18 sentence description of measures to reduce these well documented and continuing

19 impacts lacks "sufficient detail to ensure that environmental consequences have been

20 fairly evaluated." *Robertson*, 490 U.S. at 353; *South Fork Band Council v. U.S.*

21 *Department of Transportation*, 588 F.3d 718, 727 (9th Cir. 2009).

22

**INADEQUATE RESPONSE TO COMMENTS**

23    68.    NEPA requires that agencies solicit the public's comments on draft

24 environmental impact statements and respond to those comments.  40 C.F.R. §§

25 1502.9(b), 1503.1(a)(4), 1503.4(a) (agency "shall assess and consider comments both

26 individually and collectively, and shall respond, . . . stating its response in the final

27 statement").  If the agency decides that a comment "do[es] not warrant further agency

28 response," the agency must provide an explanation for this decision.  40 C.F.R. §

1503.4(a)(5).  *See also, e.g., California v. Block*, 690 F.2d 753, 773-774 (9th Cir. 1982); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1183 (9th Cir. 2011) (EIS must "address[] substance of public comments").

69.     The State Department failed to adequately respond to the public's comments on the DSEIS.  First, the FSEIS repeatedly offered completely irrelevant answers to plaintiffs' comments. See, e.g., FSEIS PC-1436, PC-53 through PC-54 (responding to plaintiffs' comment that the purpose and need statement was impermissibly narrow with a paragraph that does not address the narrowness of the purpose and need statement at all), FSEIS PC-1433 through PC-1434, PC-162, PC-168 (failing to respond to plaintiffs' comments regarding the discrepancy between the claimed and actual footprint of oil sands development, sulfur dioxide, and the infeasibility of reclaiming mining sites), FSEIS PC-1433, PC-163 (referring plaintiffs to a response that is completely irrelevant to their comments regarding inadequate mitigation measures).

70.     Second, the FSEIS responded to numerous comments with the acronym "ACK," rather than responding substantively – or at least referring those commentors to the "Theme Codes" for responses. See, e.g., FSEIS PC-818, PC-819, PC-821, PC-822, PC-823.  The acronym "ACK" is not defined.  See FSEIS PC-iii (list of acronyms). These comments raised significant issues, including the effects of facilitating tar sands mining (FSEIS PC-818, PC-819), the Project's indirect effects on the boreal forest and the migratory songbirds that it supports (FSEIS PC-819),  the questionable safety of waste disposal procedures (FSEIS PC-821), and the risks of water pollution and oil spills (FSEIS PC-822).  Responding to such comments with only an undefined acronym and no substantive discussion violates NEPA.

## THE ENVIRONMENTAL REVIEW PROCESS WAS IRREDEEMABLY TAINTED BY AN ILLEGAL CONFLICT OF INTEREST

71.     Federal law prescribes specific procedures to ensure that contractors preparing EISs are free of any conflicts of interest that may taint the review.  40 C.F.R. section 1506.5(c) provides that the contractor "shall execute a disclosure statement . . .

1  specifying that they have no financial or other interest in the outcome of the project." See

2  also Kate M. Manuel, "Responsibility Determinations Under the Federal Acquisition

3  Regulation: Legal Standards and Procedures," Congressional Research Service, January

4  4, 2013 (describing "unavoidable and unmitigated organizational conflicts of interest" as

5  an issue that would preclude the government from contracting with a given company).

6      72.    The State Department selected Environmental Resources Management

7  ("ERM") to prepares the SEISs for the Project. This selection process was rife with

8  problems. ERM misled the State Department regarding its potential conflicts of interest

9  and its extensive ties to the oil and gas industry. In addition, ERM failed to disclose that

10  it was working on another TransCanada project during the period covered by the conflict

11  of interest disclosure statement, and that it had relationships with a number of companies

12  that stand to benefit from approval of the Project. The State Department ignored both its

13  own Interim Guidance procedures and the Office of the Inspector General's ("OIG's")

14  recommendations, failed to conduct any independent inquiry into ERM's potential

15  conflicts of interest, and selected ERM based on TransCanada's recommendation.

16      73.    The State Department required ERM to fill out a questionnaire aimed at

17  ensuring that the company did not have any conflicts of interest. ERM intentionally

18  misled the State Department by changing the multiple-choice questions provided on the

19  form. One question asked:

20          Within the past three years, have you (or your organization)
            have a direct or indirect relationship (financial, organizational,
21          contractual or otherwise) with any business entity that could be
            affected in any way by the proposed work?
22

23  The questions provided answers of "no" or "yes," and requested more information if the

24  answer was yes. But ERM *altered* the question by unilaterally changing the "no" option

25  by adding "ERM has no existing contract or working relationship with TransCanada,"

26  thus significantly narrowing the scope of information that it would have to disclose.

27      74.    ERM's alteration of the questionnaire was improper for several reasons.

28  First, while the State Department's question clearly asked about relationships any time

during the past three years, ERM's response was limited to *existing* relationships. Second, while the State Department's question inquired broadly into any "direct or indirect" relationships, ERM's answer was confined to "contract" or "working relationship." By refusing to answer the actual question that the State Department asked, ERM failed to disclose (until it submitted an addendum in August, 2012), that an ERM affiliate, OASIS Environmental, Inc., worked for URS on TransCanada's Alaska Pipeline Project from 2010 through 2012. ERM also later disclosed that its affiliate ERM-West had also worked on the Alaska Pipeline Project in 2010 and 2011.

75.    Third, the State Department inquired broadly into the relationships of the person filling out the questionnaire, as well as that person's "organization." ERM confined the scope of its answer only to ERM, conveniently omitting the fact that multiple ERM staff members have connections to TransCanada and other oil and pipeline companies. For example, ERM's Steven Koster played a prominent role in obtaining permits for an expansion of the Wolverine Pipeline System and conducting environmental review and permitting of the Mariner West Pipeline. ERM's Mark Jennings was a consultant to ExxonMobil on the Alaska Pipeline Project.

76.    Finally, the State Department's question asked about ERM's relationships with "any business entity that could be affected in any way by the proposed work," but ERM limited its answer to relationships with TransCanada itself. ERM failed to disclose that it has a number of clients in the oil and gas industry, including Shell, Syncrude Canada, Saudi Aramco, and Total. Chevron is another ERM client, and owns oil sands projects in Canada and refineries in the U.S. that process oil from the tar sands. Another ERM client is Plains All American Pipeline, an oil and gas transportation firm that operates a storage facility in Cushing, Oklahoma, which could be directly connected to the Keystone XL Pipeline. ERM failed to disclose these relationships, despite the fact that those companies are clearly "business entit[ies] that could be affected . . . by the proposed work."

77.    The State Department's questionnaire also asked whether ERM was an

1  "energy concern," defined as including any person "significantly engaged in the business
2  of conducting research" on "developing, extracting, producing, refining, [or] transporting
3  by pipeline" minerals for energy. ERM inexplicably answered "no" to this question.
4  However, ERM's own website proclaims that "[t]he oil and gas sector remains at the core
5  of our business," accounting for 34 percent of ERM's sales in 2013. In addition, ERM is
6  a member of at least five oil industry trade associations, including the American
7  Petroleum Institute ("API"), which is self-described as a group "open to corporations
8  involved in the oil and natural gas industry or an allied industry," with a goal of
9  "influenc[ing] public policy in support of a strong, viable U.S. oil and natural gas
10 industry." API spent between 16 and 22 million dollars on its lobbying efforts in favor of
11 Keystone XL. ERM did not explain how it could be a member of multiple oil industry
12 trade associations, but not be an "energy concern" as defined by the State Department's
13 questionnaire.

14      78.    The State Department ignored OIG's recommendation that the State
15 Department minimize TransCanada's role in selecting a contractor to prepare the SEIS.
16 TransCanada prepared the Request for Proposals seeking third party contractors that the
17 State Department released, and provided the State Department with a list of potential
18 contractors, including ERM.

19      79.    Under its own rules, as well as according to the OIG, the State Department is
20 required to independently review and evaluate the statements that contractors make in
21 their conflict-of-interest disclosures. Interim Guidance for the Use of Third-Party
22 Contractors in Preparation of Environmental Documents by the Department of State
23 (noting that 40 C.F.R. § 1506.5(c) requires that the agency "'independently evaluate' the
24 disclosure statement specifying that the contractor has no financial or other interest in the
25 outcome of the project"). The State Department failed to follow up on a number of red
26 flags raised by ERM's responses.

27      80.    For example, the State Department should have inquired as to why ERM
28 substantially narrowed the scope of the State Department's question regarding ERM's

potential conflicts of financial interest, as described above.  In addition, the State Department seems to have done no investigation into ERM.  If it had, it would have discovered that ERM is a member of API and other oil industry trade associations, and that it has clients that stand to benefit from the Project.  At the very least, ERM's membership in an organization whose purpose is to promote the interests of the oil and gas industry should have prompted the State Department to investigate whether this membership made ERM an "energy concern," and to analyze whether ERM could objectively evaluate the Project's impacts.

81.    Not only did the State Department fail to independently investigate ERM's potential conflicts of interest, as required – it also *actively concealed* such potential conflicts from the public.  When the State Department posted ERM's conflict of interest disclosures on its website, it redacted the biographical information about ERM's employees – information that revealed their relationships with TransCanada and their work on other pipeline projects.

82.    The State Department should not have relied on the FSEIS prepared by ERM.  ERM misled the State Department in its conflict of interest disclosures, and the State Department violated its own rules by failing to independently verify ERM's statements and ensure that ERM was capable of an objective review of the Project.  This was arbitrary and capricious and an abuse of discretion, and therefore violated the APA. The FSEIS and Project approval must be set aside.

## SECOND CLAIM FOR RELIEF

83.    Plaintiffs incorporate by reference all preceding paragraphs.

84.    The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of any endangered or threatened species.  16 U.S.C. § 1536(a)(2).  First, agencies authorizing activities such as the Project must consult with and prepare a biological assessment ("BA") for FWS.  16 U.S.C. § 1536(a).  This BA is used by FWS to prepare a biological opinion ("BiOp") assessing the project's impacts on endangered and

1 threatened species.  16 U.S.C. § 1536(c); 50 C.F.R. § 402.12.

2      85.    Here, the State Department's BA and FWS' BiOp failed to fully assess the
3 Project's risks to endangered and threatened species.  The agencies ignored impacts to
4 animals in Canada, understated the Project's risks, put undue confidence in the efficacy of
5 unproven mitigation measures, inappropriately deferred analysis of connected actions
6 such as power lines, and completely failed to analyze risks to the endangered northern
7 swift fox.  The agencies also failed to develop and use the "best scientific and commercial
8 data available" to assess the Project's adverse impacts on endangered species.  These
9 omissions violate ESA.

10      86.    Plaintiffs' ESA claims against FWS are ripe for adjudication under the APA.
11 Defendants' approval of the Project in violation of ESA is arbitrary, capricious, an abuse
12 of discretion and contrary to law in violation of APA, 5 U.S.C. §§ 701-706, and is subject
13 to judicial review thereunder.

14      87.    Plaintiffs will pursue ESA claims against the State Department pursuant to
15 the 60-day notice requirement of the citizen suit provision described at 16 U.S.C. §
16 1540(g)(2)(C), and amend this Complaint accordingly after the 60-day notice period
17 matures.

18                                     **THIRD CLAIM FOR RELIEF**

19                    (Violation of the Migratory Bird Treaty Act)

20                            (Against All Defendants)

21      88.    Plaintiffs incorporate by reference all preceding paragraphs.

22      89.    The Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. sections 701 *et seq.*,
23 directs that unless otherwise permitted, "it shall be unlawful at any time, by any means or
24 in any manner, to . . . take [or]  kill . . . any migratory bird . . . nest, or egg of any such
25 bird . . . included in the terms of the conventions between the U.S. and Great Britain . .
26 .the United Mexican States . . . the government of Japan . . . and the Union of Soviet
27 Socialist Republics for the conservation of migratory birds and their environments . . . ."
28 16 U.S.C. sections 703.

90.    MBTA applies with equal force to federal agencies as it does to private individuals. *Humane Society of the U.S. v. Glickman*, 217 F.3d 882, 884-88 (D.C.Cir. 2000); *American Bird Conservancy, Inc. v. F.C.C.*, 516 F.3d 1027, 1032 (D.C.Cir. 2008). And it may be enforced against the federal government by private citizens through the APA. *Id.* "[A]nyone who is 'adversely affected or aggrieved' by an agency action alleged to have violated the MBTA has standing to seek judicial review of that action." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203-1204 (9th Cir. 2004); *see, also, Mahler v. U.S. Forest Service*, 927 F. Supp. at 1573; *Humane Society, supra*, 217 F.3d at 885; *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 438-39 (1992); Exec. Order No. 13186, Responsibilities of Federal Agencies to Protect Migratory Birds, 66 Fed. Reg. 3853 (Jan. 17, 2001).  Under the MBTA, federal agencies must "seek authorization from the Secretary" of the Interior before approving activities – such as the construction and operation of the Project here – that directly kill migratory birds. *Id.* at 1225.

91.    At least 130 bird species protected by the MBTA breed in, or migrate through, habitat located in the tar sands area, including species of cranes, ducks, geese, sandpipers, egrets, herons, sparrows, thrushes, phoebes, flycatchers, chickadees, woodpeckers, wrens, swallows, and finches.  The Project will kill or injure many of these migratory birds during both the construction and operation phases.  Despite the fact that the Project is likely to kill many migratory birds during both the construction and operation phases, defendants have not applied for or secured any permits under the MBTA for killing migratory birds.  Nor did defendants condition their approvals on the applicant obtaining the necessary MBTA permits.  Accordingly, defendants violated the MBTA by approving a project that will kill MBTA-protected birds.

## FOURTH CLAIM FOR RELIEF

(Violation of the Bald Eagle and Golden Eagle Protection Act)

(Against All Defendants)

92.    Plaintiffs incorporate by reference all preceding paragraphs.

93.    The federal Bald and Golden Eagle Protection Act ("Eagle Act"), 16 U.S.C.

1  section 668, contains criminal and civil prohibitions against the taking of bald or golden

2  eagles without a permit issued by the Secretary of the Interior.  Subdivision (a) makes it a

3  criminal offense to "knowingly, or with wanton disregard for the consequences of his act

4  take . . . in any manner. . . any golden eagle . . . ."  16 U.S.C. § 668(a).  Subdivision (b)

5  makes it a civil offense to "take . . . in any manner. . . any golden eagle."  16 U.S.C. §

6  668(b).  Under the Eagle Act, "'take' includes . . . pursue, shoot, shoot at, poison, wound,

7  kill, capture, trap, collect, molest or disturb."  16 U.S.C. § 668c; *accord*, 50 C.F.R. § 22.3

8  ("[t]ake includes . . . pursue, shoot, shoot at, poison, wound, kill, capture, collect, or

9  molest or disturb"); FSEIS 4.6-11.  In *Gonzales v. Raich*, 545 U.S. 1, 26 n. 36 (2005) the

10  U.S. Supreme Court cited the prohibition on the take of eagles in the Eagle Act,

11  comparable to ESA's take provision, as an example of "a rational (and commonly

12  utilized) means of regulating commerce."  *See also* 16 U.S.C. § 668.

13       94.    Bald eagles occur throughout the proposed Project area.  Surveys in 2010

14  found five active nests, and surveys in 2009 identified twelve winter roost sites in the

15  Project area.  FSEIS 4.8-38.  Although the FSEIS lists a number of measures that would

16  supposedly *reduce* impacts to Bald eagles, FSEIS 4.8-38 through 4.8-39, the State

17  Department does not, and cannot, assure that it will eliminate those impacts and avoid

18  taking eagles, thereby violating the Eagle Act.

19       95.    The Project also poses risks to golden eagles, including collision with power

20  lines, disturbance to breeding and foraging areas, and loss of prey habitat.  FSEIS 4.8-43.

21  Surveys identified eight nest sites along the pipeline route.  *Id.*  The State Department

22  proposes to conduct pre-construction surveys and to restrict activity near active nests

23  between March and July *in Montana*, but not in any other state through with the pipeline

24  passes, despite the fact that six of the eight nests already found were in South Dakota.

25  The Eagle Act prohibits the State Department from allowing the Project to "take" Golden

26  eagles wherever they occur, regardless of any state's particular laws.  Therefore, this

27  inadequate mitigation is not enough to bring the State Department into compliance with

28  the Eagle Act.

**PRAYER FOR RELIEF**

1.      WHEREFORE, plaintiffs respectfully request that the Court:

2.      Adjudge and declare that the defendants acted in an arbitrary and capricious manner by certifying the Project's FSEIS and approving the Project because the FSEIS is legally inadequate under the National Environmental Policy Act ("NEPA"), 42 U.S.C. section 4321 *et seq.*, and approval of the Project violates NEPA and the Administrative Procedure Act, 5 U.S.C. section 701 *et seq.*;

3.      Order defendants to withdraw their FSEIS and Project approvals including the Presidential Permit until such time as the defendants have complied with the requirements of the NEPA and their implementing regulations;

4.      Adjudge and declare that the defendants' BiOp for the Project violated the Endangered Species Act and the Administrative Procedure Act, 5 U.S.C. section 701 *et seq.*, and order FWS to withdraw its BiOp for the Project until such time as FWS has complied with the requirements of the Endangered Species Act and its implementing regulations;

5.      Preliminarily and permanently enjoin all defendants from initiating any activities in furtherance of the Project that could result in any change or alteration of the physical environment unless and until defendants comply with the requirements of NEPA, MBTA, the Eagle Act, and their implementing regulations;

6.      Award plaintiffs their reasonable attorneys' fees and costs and expenses incurred in connection with the litigation of this action;

7.      Grant plaintiffs such additional relief as the Court may deem just and proper.

Dated: March 27, 2017         PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC

                              s/ *James A. Patten*
                              JAMES A. PATTEN

1   Dated: March 27, 2017          LAW OFFICES OF STEPHAN C. VOLKER

2

                                     *s/ Stephan C. Volker*

3                               STEPHAN C. VOLKER (Pro Hac Vice pending)

4                               Attorneys for Plaintiffs
                               INDIGENOUS ENVIRONMENTAL NETWORK

5                               and NORTH COAST RIVERS ALLIANCE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28