Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT  59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
        mstermitz@crowleyfleck.com
        jroth@crowleyfleck.com

*Counsel for TransCanada Keystone Pipeline, LP
    and TransCanada Corporation*

Peter R. Steenland
Lauren C. Freeman
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
Telephone: 202-736-8000
Email: psteenland@sidley.com
        lfreeman@sidley.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVER ALLIANCE,<br><br>          Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF STATE; THOMAS A. SHANNON, JR., in his Official Capacity as U.S. Under Secretary of State; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency; JAMES W. KURTH, in his official Capacity as Acting Director of the U.S. Fish and Wildlife Service; and RYAN KEITH ZINKE, in his official Capacity as Secretary of the Interior,<br><br>          Federal Defendants, | Cause No. 4:17-cv-00029-BMM<br><br><br>**MEMORANDUM IN SUPPORT OF MOTION BY TRANSCANADA KEYSTONE PIPELINE, LP AND TRANSCANADA CORPORATION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1), OR, 12(b)(6)** |

and

TRANSCANADA KEYSTONE
PIPELINE and TRANSCANADA
CORPORATION,

            Defendant-Intervenors.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF FACTS ........................................................................ 1

    I.    TransCanada's Proposed Keystone XL Pipeline and the Presidentially-Delegated Process for Permitting the Keystone XL Pipeline .......................................................................... 3

    II.   Federal Defendants' Issuance of a Presidential Permit and the Record of Decision/National Interest Determination (ROD/NID) ..................................................................... 8

    III.  Other Federal Actions Regarding Keystone XL ................................. 10

    IV.  Plaintiffs' Complaint .................................................................... 10

STANDARDS FOR A MOTION TO DISMISS ...................................... 12

ARGUMENT ....................................................................................... 12

    I.    This Court Lacks Jurisdiction to Adjudicate Any Challenge to the State Department's Compliance with NEPA or Its Issuance of the Presidential Permit Because the Permit Is Not Agency Action .................................................................................... 12

        A.   No Cause of Action Exists Under General Federal Jurisdiction Statutes ................................................... 13

        B.   Plaintiffs Cannot Establish a Private Right of Action under NEPA or the APA to Challenge the State Department's Exercise of Presidentially Delegated Authority ................................................................. 15

    II.   Plaintiffs' Second Claim Fails to State any Claim for which Relief Can Be Granted and thus Should Be Dismissed Pursuant to Federal Rule of Civil Procedure 12(b)(6) ....................................... 18

    III.  Plaintiffs' Third and Fourth Claims Fail To Identify a Private Cause of Action or Waiver of Sovereign Immunity, and thus Should Be Dismissed Pursuant to Rule 12(b)(1) ............................... 21

i.

A.    Even if Plaintiffs Attempt To Bring Their Third Claim
      Under the APA, the MBTA Does Not Apply to
      Government Agencies Acting in a Regulatory Capacity..........22

B.    There Is No Private Right of Action for IEN's Fourth
      Claim Involving the Bald and Golden Eagle Protection
      Act ..............................................................................................26

CONCLUSION ........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................19, 20, 21

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................18, 19, 20, 21

*Cal-Almond, Inc. v. U.S. Dep't of Agric.*,
    14 F.3d 429 (9th Cir. 1993) ..............................................................................17

*Citizens Interested in Bull Run, Inc. v. Edrington*,
    781 F. Supp. 1502 (D. Or. 1991) ......................................................................23

*Dalton v. Specter*,
    511 U.S. 462 (1994)...........................................................................................15

*Defenders of Wildlife v. EPA*,
    882 F.2d 1294 (8th Cir. 1989) ....................................................................21, 23

*DeVilbiss v. Small Bus. Admin.*,
    661 F.2d 716 (8th Cir. 1981) ............................................................................13

*FDIC v. Meyer*,
    510 U.S. 471 (1994)...........................................................................................14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)...........................................................................................15

*Jensen v. Nat'l Marine Fisheries Serv.*,
    512 F.2d 1189 (9th Cir. 1975) .....................................................................16, 17

*Lane v. Pena*,
    518 U.S. 187 (1996)...........................................................................................14

*Lehman v. Nakshian*,
    453 U.S. 156 (1981)...........................................................................................14

*Mahler v. U.S. Forest Serv.*,
    927 F. Supp. 1559 (S.D. Ind. 1996)..................................................................23

*Nat. Res. Def. Council v. U.S. Dep't of State (NRDC)*,
 658 F. Supp. 2d 105 (D.D.C. 2009)..............................................4, 13, 15, 17, 18

*Protect Our Communities Found. v. Black*,
 No. 14-2261, 2016 WL 4096070 (S.D. Cal. Mar. 29, 2016)..............................25

*Protect Our Communities Found. v. Jewell*,
 825 F.3d 571 (9th Cir. 2016) ..............................................................................24

*Protect Our Communities Found. v. Salazar*,
 12-CV-2211, 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013) ...............................23

*Protect Our Eagles' Trees v. City of Lawrence*,
 715 F. Supp. 996 (D. Kan. 1989).........................................................................26

*Protect Our Lakes v. U.S. Army Corps of Eng'rs*,
 No. 13-0402, 2015 WL 732655 (D. Me. Feb. 20, 2015)....................................26

*Public Emps. for Envtl. Responsibility v. Beaudreu*,
 25 F. Supp. 3d 67 (D.D.C. 2014).........................................................................25

*Salmon River Concerned Citizens v. Robertson*,
 32 F.3d 1346 (9th Cir. 1994) ..............................................................................15

*Schilling v. Rogers*,
 363 U.S. 666 (1960)..............................................................................................14

*Seattle Audubon Soc'y v. Evans*,
 952 F.2d 297 (9th Cir. 1991) ..............................................................................23

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State*,
 659 F. Supp. 2d 1071 (D.S.D. 2009) ..............................................12, 15, 17, 18

*Starr v. Baca*,
 652 F.3d 1202 (9th Cir. 2011) ............................................................................20

*Tulare County v. Bush*,
 306 F.3d 1138 (D.C. Cir. 2002)...........................................................................20

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
 438 F.3d 937 (9th Cir. 2006) ..............................................................................21

iv.

*United States v. Mitchell*,
   463 U.S. 206 (1983) ........................................................................14

*White Earth Nation v. Kerry*,
   No. 14-4726, 2015 WL 8483278 (D. Minn. Dec. 9, 2015) ................13

*Wild Equity Inst. v. U.S. Envtl. Prot. Agency*,
   147 F. Supp. 3d 853 (N.D. Cal. 2015) ..............................................20

**Statutes**

Pub. L. No. 112-78, title V, subtitle A ......................................................5

5 U.S.C. §§ 701-706................................................................1, 11, 12

5 U.S.C. § 702 ...........................................................................................15

15 U.S.C. §§ 717 *et seq.* ..........................................................................17

16 U.S.C. §§ 668-668d ............................................................................21

16 U.S.C. § 668 ...........................................................................................2

16 U.S.C. § 668c .......................................................................................26

16 U.S.C. §§ 701 *et seq.* ............................................................................2

16 U.S.C. §§ 703-712 ...............................................................................21

16 U.S.C. §§ 1531 *et seq.* ...................................................................2, 10

16 U.S.C. § 1540 .......................................................................................11

28 U.S.C. § 1331 ...........................................................................11, 13, 14

28 U.S.C. § 1337 .......................................................................................11

28 U.S.C. § 1346 .......................................................................................11

28 U.S.C. § 1361 .......................................................................................11

28 U.S.C. §§ 2201-2202 ...........................................................................14

28 U.S.C. § 2201 .......................................................................................11

28 U.S.C. § 2202 .................................................................................................11

30 U.S.C. § 185 ...................................................................................................10

33 U.S.C. § 408 ...................................................................................................10

33 U.S.C. § 1344 .................................................................................................10

42 U.S.C. §§ 4321 *et seq.* ...............................................................................1, 12

## Other Authorities

69 Fed. Reg. 25,299 (May 5, 2004) .....................................................................4

73 Fed. Reg. 11,456 (Mar. 3, 2008) .....................................................................4

76 Fed. Reg. 55,155 (Sept. 6, 2011) .....................................................................5

82 Fed. Reg. 8663 (Jan. 30, 2017) ........................................................................7

## STATEMENT OF FACTS

<u>Introduction</u>:  Acting on behalf of the President of the United States, the Department of State ("State Department" or "the Department") has determined that the issuance of a Presidential Permit for the Keystone XL Pipeline to cross the border between the United States and Canada serves the national interest of the United States.  In its March 23, 2017, Record of Decision and National Interest Determination ("ROD/NID"), the State Department found that the Keystone XL Pipeline has the "potential to bolster U.S. energy security," that it will support a significant number of U.S. jobs and provide increased revenues to local communities, that the pipeline will reinforce our bilateral relationship with Canada and will otherwise serve the national interest.  ROD/NID, § 6.

Plaintiffs Indigenous Environmental Network and North Coast Rivers Alliance (collectively "IEN") brought this action against Federal Defendants[1] to invalidate the Presidential Permit.  Plaintiffs assert the Department of State violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, by

---

[1] United States Department of State, Under Secretary of State Thomas A. Shannon, United States Fish and Wildlife Service, Acting Director of the United States Fish and Wildlife Service James Kurth, and Secretary of the Interior Ryan Zinke (collectively, the "Federal Defendants").

producing a Final Supplemental Environmental Impact Statement ("FSEIS") they proclaim is inadequate.  IEN also asserts that the Federal Defendants have violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, by preparing an inadequate biological assessment and biological opinion.  Finally, IEN claims that Federal Defendants violated:  (1) the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 701 *et seq.*, by approving a project that will harm MBTA-protected birds; and (2) the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668, because Federal Defendants' efforts to mitigate eagle "takings" have been inadequate.

TransCanada Corporation and its subsidiary TransCanada Keystone Pipeline, LP ("Keystone") (collectively "TransCanada") build and operate energy infrastructure.  The Keystone XL Pipeline ("Keystone XL" or "the Project") is a proposed multi-billion dollar oil pipeline from Hardisty, Alberta to Steele City, Nebraska,[2] that will contribute to America's economic strength and energy security.

---

[2] At Steele City, Nebraska, the Keystone XL Pipeline would connect to the existing Keystone Pipeline System, for which TransCanada Keystone Pipeline, LP, a wholly owned subsidiary of TransCanada Corporation, obtained a Presidential Permit in 2008.  The original Keystone Pipeline System extends from Hardisty, Alberta, across the U.S.-Canadian border, through Steele City, Nebraska, to an oil refinery and an oil terminal in Illinois, and to Cushing, Oklahoma.  The Keystone Pipeline System also includes the Gulf Coast Project and the Houston Lateral Project, which in combination extend from Cushing, Oklahoma to Houston, Texas. Another wholly owned TransCanada Corporation subsidiary, TC Oil Pipeline

**I.      TransCanada's Proposed Keystone XL Pipeline and the Presidentially-Delegated Process for Permitting the Keystone XL Pipeline**

In 2008, TransCanada proposed the Keystone XL Pipeline as an expansion to its existing Keystone Pipeline System.  It would transport up to a nominal 830,000 barrels per day of crude oil produced in Alberta and Montana to Illinois, Oklahoma and Texas.  TransCanada proposed making available approximately 100,000 barrels of that daily capacity to transporting crude oil extracted in Montana.  As proposed, the Project included a Canadian segment of some 327 miles from Hardisty, Alberta to the U.S.-Canada border, as well as three principal segments in the United States:  (i) a segment from the U.S.-Canadian border to Steele City, Nebraska, connecting with the Keystone Pipeline (approximately 850 miles); (ii) the Gulf Coast segment (approximately 478 miles extending from Cushing, Oklahoma to Nederland, Texas); and (iii) the "Houston Lateral" pipeline segment (approximately 47 miles long, extending from Liberty, Texas to Houston, Texas).  *See supra* at n.2.

In September, 2008, TransCanada applied to the State Department for a permit to construct facilities on and near the border, specifically the 1.2 mile segment from the U.S.-Canada border to the first pipeline isolation valve in

---

Operations, Inc., operates and maintains the Keystone Pipeline System. Hereinafter, references to "Keystone" include both TransCanada Keystone Pipeline, LP and TC Oil Pipeline Operations, Inc., and references to "TransCanada" include both those subsidiaries and their parent TransCanada Corporation.

Montana.  Because this segment would cross the U.S.-Canada border,

TransCanada's subsidiary needed a Presidential Permit authorizing the border

crossing as part of the overall construction and operation of the entire facility.  *See*

Declaration of Tony Palmer, ¶ 7, ("Palmer Decl.") (Dkt. 33, Exhibit A).  The

permit was required because the President historically has interpreted his inherent

Constitutional powers over foreign affairs to include the power to authorize the

construction, operation and maintenance of border crossing facilities such as oil

pipelines that cross international borders.  *See Nat. Res. Def. Council v. U.S. Dep't

of State (NRDC)*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009).  For oil pipeline

projects, the President has delegated this authority to the State Department.  More

specifically, the State Department is authorized to issue a border-crossing permit if

the project is found to serve the "national interest."  *See* Exec. Order 13,337, 69

Fed. Reg. 25,299 (May 5, 2004) ("E.O. 13337").[3]

As a matter of policy and in order to inform the Department's determination

regarding the national interest, the State Department coordinated an extensive,

multi-year review of the environmental impacts of the entire Keystone XL Project

---

[3]  TransCanada obtained a Presidential Permit in 2008 to construct the existing
Keystone Pipeline, after the State Department conducted extensive environmental
reviews and concluded that "the Keystone Pipeline Project [serves] the national
interest."  U.S. Dep't of State, Record of Decision (Feb. 28, 2008), 73 Fed. Reg.
11,456 (Mar. 3, 2008).  Thereafter, TransCanada expended approximately $6.2
billion to construct the existing Keystone Pipeline, which became operational in
2010 and currently can deliver up to 591,000 barrels of crude oil per day ("bpd").

in a manner consistent with NEPA.  This process resulted in a Final Environmental

Impact Statement issued by the State Department in August 2011.  *See* 76 Fed.

Reg. 55,155 (Sept. 6, 2011).

In November 2011, the State Department decided that before making a

national interest determination on the Keystone XL application, it would prepare a

supplement to the FEIS after controversy arose over the proposed pipeline route

within Nebraska.  *See* Palmer Decl. ¶ 8.  TransCanada reinitiated consultation with

state and federal officials regarding alternative routes in Nebraska.

As the events involving the pipeline route in Nebraska were unfolding,

President Obama, on December 23, 2011, signed tax legislation that included a

provision requiring him to grant a permit for the Keystone XL Project within 60

days, unless he determined that the Project would not serve the national interest.

Pub. L. No. 112-78, title V, subtitle A.  In response, on January 18, 2012, President

Obama denied the Keystone XL Project application, explaining that the 60-day

timeframe was not long enough to assess the then-unresolved issues concerning an

alternative route in Nebraska.

Shortly after that action by President Obama, TransCanada made two

important decisions.  First, TransCanada decided that it would go forward with the

Gulf Coast segment as a separate, stand-alone project because that segment had

immediate utility, independent of the segment between Hardisty, Alberta and

5

Steele City.  TransCanada informed the State Department of this conclusion by letter of February 27, 2012.  The Gulf Coast Pipeline was completed and placed in service in January 2014.  TransCanada also built the Houston Lateral Project, a 47-mile pipeline extension from the Gulf Coast Pipeline to the Houston refining market.

Second, in May 2012, TransCanada submitted a renewed application to the State Department for a Presidential permit for the proposed Keystone XL Pipeline. The facility still would cross the border in Phillips County, Montana and interconnect with the Keystone Pipeline at Steele City, Nebraska.  Palmer Decl. ¶ 11.  The pipeline route proposed in the May 2012 application would transit the same route as originally proposed through Montana and South Dakota. TransCanada also stated that it would supplement the application, once an alternative route through Nebraska was selected.

For its part, the Nebraska Department of Environmental Quality ("NDEQ") conducted a year-long public process to consider proposed alternative routes through Nebraska.  In December 2012, that state agency submitted a report to the Governor evaluating a route that would avoid the NDEQ-defined Sandhills areas.

6

The Governor approved the route in January 2013, and advised the President as well as the Secretary of State of his approval by letter dated January 22, 2013.[4]

In March 2013, the State Department released a Draft SEIS ("DSEIS"), reflecting the new route through Nebraska. The State Department issued its Final Supplemental Environmental Impact Statement ("SEIS") in January 2014. However, on November 6, 2015, the Obama Administration denied the border crossing permit for the Keystone XL Pipeline, based on the premise that approval would undermine U.S. climate leadership in the international arena.

On January 24, 2017, President Trump invited TransCanada to re-submit its application for a presidential permit. President Trump directed the Secretary of State to receive TransCanada's application, if submitted, and "take all actions necessary and appropriate to facilitate its expeditious review," including reaching a final permitting determination within 60 days. Memorandum of January 24, 2017: Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8663, § 3(i) (Jan. 30, 2017). The President also declared the January 2014 SEIS as satisfying to the maximum permitted by law all applicable requirements of NEPA. *Id.* at § 3(ii).

---

[4] Due to legal uncertainty regarding the Nebraska statute that authorized the Governor's approval of an alternate route, TransCanada filed an application for route approval with the Nebraska Public Service Commission ("PSC") on February 16, 2017. By statute, the PSC has until November 23, 2017 to rule on that application. For this and other reasons, TransCanada is not in a position to begin construction of the Keystone XL Pipeline for at least this year.

On January 26, 2017, TransCanada re-submitted its application for a border crossing permit for the Keystone XL Pipeline.  The route proposed in the re-submitted application is essentially the same route.

## II.   Federal Defendants' Issuance of a Presidential Permit and the Record of Decision/National Interest Determination (ROD/NID)

On March 23, 2017, more than eight years after TransCanada filed its original application, Thomas A Shannon, Jr., Under Secretary of State for Political Affairs, signed TransCanada's Presidential permit and a ROD/NID that expressly determined issuance of this permit to TransCanada for the Keystone XL Pipeline would serve the national interest.  The ROD/NID stated that although the State Department's review of TransCanada's Presidential permit application was conducted "in a manner consistent with NEPA," the determination to issue the permit "is Presidential action, made through the exercise of Presidentially delegated authorities, and therefore the requirements of [NEPA], the National Historic Preservation Act of 1966 (NHPA), the [ESA], the Administrative Procedure Act (APA), and other similar laws and regulations that do not apply to Presidential actions are also inapplicable here."  ROD/NID, § 1.0.   Although it found NEPA inapplicable, the State Department said that the March 2017 ROD/NID was informed by the January 2014 SEIS and the "Department has

reviewed the potential impacts of the proposed Project on the environment and cultural resources."  ROD/NID, § 5.0

The State Department identified several "key topics" that arose throughout the NEPA process as it explained in the ROD/NID why the SEIS "continues to inform the Department's national interest determination."  ROD/NID, § 5.0.  After a review of these topics and events that occurred since the SEIS was issued, the State Department concluded that these changes "do not represent substantial changes, do not present significant new information, and do not affect the continued reliability of the [SEIS]."  *Id.*  As such, the State Department determined there was no need to supplement the earlier SEIS.

The March 2017 ROD/NID went on to explain its "Basis for Decision."  The State Department concluded after "weigh[ing] multiple policy considerations," the proposed Keystone XL Pipeline's

> "potential to bolster U.S. energy security by providing additional infrastructure for the dependable supply of crude oil, its role in supporting, directly and indirectly, a significant number of U.S. jobs and provide increased revenues to local communities that will bolster the U.S. economy, its ability to reinforce our bilateral relationship with Canada, and its limited impact on other factors considered by the Department, all contribute to a determination that issuance of a Presidential permit for this proposed Project serves the national interest."  ROD/NID, § 6.0.

### III.   Other Federal Actions Regarding Keystone XL

In 2013, as the Department of State was releasing its Draft Supplemental EIS, it also issued a Biological Assessment and then engaged in consultation with the U.S. Fish and Wildlife Service ("FWS") according to the terms of Section 7(b) of the ESA, 16 U.S.C. §§ 1531 *et seq.*  That process concluded with the adoption of a Biological Opinion in May 2013.

TransCanada is awaiting final decisions by the U.S. Army Corps of Engineers on applications involving sections 404 and 408(a) the Clean Water Act ("CWA"), 33 U.S.C. §§ 408(a), 1344.  Also, because the Keystone XL route crosses approximately 46 miles of federal land administered by the Bureau of Land Management ("BLM") in Montana, including the border crossing facilities from Milepost 0.0 to Milepost 0.93, TransCanada must obtain a right-of-way and authorization from BLM under the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 185(a).  TransCanada's BLM application is also pending.  Palmer Decl. ¶ 16.

### IV.   Plaintiffs' Complaint

On March 27, 2017, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief (Dkt. 1) against the United States Department of State, FWS, and individual officials (collectively, "Federal Defendants") to challenge federal agency approvals for the Keystone XL Pipeline.

10

Plaintiffs make four claims for relief:  (1) Defendants violated NEPA and the APA by preparing an inadequate environmental analysis and by issuing the cross-border permit to Keystone XL (Complaint, ¶¶ 32-82); (2) Defendants violated the ESA by preparing an inadequate biological assessment and biological opinion (Complaint, ¶¶ 83-87); (3) Defendants violated the MBTA by approving a project that Plaintiffs predict "will kill MBTA-protected birds" (Complaint, ¶¶ 88-91); and (4) Defendants violated the Bald and Golden Eagle Protection Act because Federal Defendants' efforts to mitigate eagle "takings" have been inadequate (Complaint, ¶¶ 92-95).

Plaintiffs seek declaratory and injunctive relief that would invalidate Keystone XL's federal permits and approvals and prevent TransCanada from performing any activity in furtherance of construction or operation of Keystone XL.  Plaintiffs assert that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (regulation of commerce), 28 U.S.C. § 1346 (U.S. as defendant), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 5 U.S.C. §§ 701-706 (APA), and 16 U.S.C. § 1540(g)(1)(C) (ESA).  For the reasons stated below, Plaintiffs' claims should be dismissed pursuant to the Federal Rules of Civil Procedure Rules 12(b)(1) and 12(b)(6).

11

## STANDARDS FOR A MOTION TO DISMISS

The Federal Defendants' discussion at pages 5-6 of their Motion to Dismiss correctly sets forth the appropriate criteria for this Court to employ in ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) or Rule 12(b)(6).

## ARGUMENT

**I.   This Court Lacks Jurisdiction to Adjudicate Any Challenge to the State Department's Compliance with NEPA or Its Issuance of the Presidential Permit Because the Permit Is Not Agency Action**

Plaintiffs' first claim for relief alleges violations of NEPA, 42 U.S.C. §§ 4321 *et seq*., and the APA, 5 U.S.C. §§ 701-706.  Complaint, ¶¶ 32-82.  However, this Court does not have jurisdiction over this claim, and therefore, Plaintiffs' first claim should be dismissed pursuant to Rule 12(b)(1).[5]

The Plaintiffs did not write their complaint on a blank slate.  In the recent past, three different U.S. District Courts have found that a claim of NEPA violations in the context of the issuance of a Presidential permit for a trans-border oil pipeline is Presidential action and therefore not reviewable under the APA.  In *Sisseton-Wahpeton Oyate v. U.S. Dep't of State,* 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009), the court held that issuance of a Presidential permit was presidential action, not "agency action" subject to judicial review under the APA.  Similarly, in

---

[5] Alternatively, Plaintiffs' failure to demonstrate a right to judicial review could be dismissed under 12(b)(6).

*NRDC*, the court found that "agency action pursuant to a delegation of the President's inherent constitutional authority over foreign affairs is tantamount to an action by the President himself" and therefore, "presidential action is not subject to judicial review [under the APA]. 658 F. Supp. 2d at 113. Also, in *White Earth Nation v. Kerry,* No. 14-4726, 2015 WL 8483278 (D. Minn. Dec. 9, 2015), the court found that the State Department's interpretation of its Presidential permits for another trans-border oil pipeline was in fulfillment of Presidential authority delegated to the Department in E.O. 13337, and therefore was beyond the reach of the APA. For the reasons that follow, the Plaintiffs cannot surmount this unanimous body of precedent blocking their access to the Federal Courthouse.

As the United States asserted in its June 9 Motion to Dismiss (Dkt. 44-1, p. 6), because NEPA does not itself create a private right of action, Plaintiffs must identify another statute to establish this Court's jurisdiction to review the claim that the State Department's actions violate NEPA and the APA. Although Plaintiffs invoke the federal question statute, the declaratory judgment statute, and the APA, none of these statutes provides a source of jurisdiction.

**A.     No Cause of Action Exists Under General Federal Jurisdiction Statutes**

The federal question statute, 28 U.S.C. § 1331, does not by itself provide a cause of action. *See, e.g.*, *DeVilbiss v. Small Bus. Admin.*, 661 F.2d 716, 718 (8th

Cir. 1981) (section 1331 is "merely jurisdictional" and does "not create any substantive right enforceable against the United States") (*citing United States v. Testan*, 424 U.S. 392, 400-02 (1976) (remaining citations omitted)).  Similarly, the declaratory judgment statute, 28 U.S.C. §§ 2201-2202, "is not an independent source of federal jurisdiction" but rather a grant of an additional remedy "the availability of [which] presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citation omitted).

Moreover, because the Complaint raises claims against the United States and federal officials acting in their official capacity, Plaintiffs must demonstrate that the United States, as sovereign, has consented to being sued.  *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("the United States may not be sued without its consent and . . . the existence of consent is a prerequisite for jurisdiction."); *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981); *FDIC v. Meyer*, 510 U.S. 471 (1994).  A waiver of sovereign immunity must be explicit and is to be construed strictly and narrowly.  *See, e.g.*, *Lane v. Pena*, 518 U.S. 187, 192 (1996) (a waiver of "sovereign immunity must be unequivocally expressed in statutory text" and will be "strictly construed, in terms of scope, in favor of the sovereign.").  This requirement is independent from establishing subject matter jurisdiction.  Neither Section 1331, the declaratory judgment statute, NEPA, the APA, nor E.O. 13337 provides a waiver applicable to Plaintiffs' claims.  Thus,

14

Plaintiffs' failure to articulate a relevant waiver of sovereign immunity acts as an additional, independent barrier to establishing subject matter jurisdiction in this Court.

> **B.**   **Plaintiffs Cannot Establish a Private Right of Action under NEPA or the APA to Challenge the State Department's Exercise of Presidentially Delegated Authority**

NEPA and the APA fail to provide Plaintiffs with a private right of judicial review. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1353 n.13 (9th Cir. 1994); *see also NRDC*, 658 F. Supp. 2d at 108; *Sisseton*, 659 F. Supp. 2d at 1079. Therefore, in order to enforce NEPA in this case, Plaintiffs must bring their NEPA challenges under the APA. *See id.*

The APA authorizes review only of "final *agency* action" – but it is Presidential, not agency, action that is at issue in this case. 5 U.S.C. § 702. It is well-settled that the President is not an "agency" within the meaning of the APA. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). As a result, Presidential actions are not subject to APA review. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 470 (1994); *NRDC*, 658 F. Supp. 2d at 111. Thus, for example, APA Section 702 would not authorize judicial review of Plaintiffs' claims even if the President himself (rather than the State Department) made the national interest determination and issued the Presidential Permit.

The March 23, 2017 Record of Decision and National Interest Determination ("ROD/NID") explicitly stated as much, noting that although the State Department conducted its review of TransCanada's Presidential Permit application "in a manner consistent with NEPA," the determination to issue the permit "is Presidential action, made through the exercise of Presidentially delegated authorities, and therefore the requirements of [NEPA], [. . .], the [APA], and other similar laws and regulations that do not apply to Presidential actions are also inapplicable here."  ROD/NID, § 1.0.

Unlike some Executive Orders, E.O. 13337 is not tied to any statute, but is, instead, a delegation by the President of his inherent constitutional authority to manage foreign affairs.  Absent this Executive Order, the State Department would have no authority to issue a Presidential Permit for the Keystone Pipeline. Therefore, all of the actions undertaken pursuant to the Executive Order can only be subject to judicial review if the order creating these legal rights and responsibilities contemplates a private right of action to enforce its terms.  *See Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975) (holding that the APA does not provide a jurisdictional basis for judicial review of agency action taken pursuant to an executive order delegating Presidential foreign affairs power).

16

In fact, E.O. 13337 expressly provides that it does "not[] create any right . . . substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other persons." 69 Fed. Reg. at 25,301. This disclaimer is consistent with settled judicial treatment of executive orders. *See, e.g.*, *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 445 (9th Cir. 1993) (finding nearly identical language "evinces clear and unequivocal intent that agency compliance with [the Executive Order] not be subject to judicial review") (quotations and citations omitted). Moreover, because the Executive Order was not promulgated pursuant to statute and because Congress has not enacted a statutory scheme governing federal permitting for cross-border oil pipelines[6], the State Department's actions in issuing the ROD/NID and Presidential Permit fall within the set of cases where neither the APA nor any other statute provides a right of judicial review for the agency's compliance with NEPA. *See NRDC*, 658 F. Supp. 2d at 111-12; *Sisseton*, 659 F. Supp. 2d at 1081.

Simply put, the issuance of the Presidential Permit and the Department's compliance with NEPA are unreviewable Presidential actions. *See, e.g.*, *Jensen*,

---

[6] Unlike the construction of natural gas pipelines, which must be approved by the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act, 15 U.S.C. §§ 717 *et seq.*, Congress has not created a federal regulatory scheme for the construction of oil pipelines. Nor has Congress acted to provide statutory authority for any federal agency to approve construction of oil pipelines that cross international borders.

512 F.2d at 1191 ("[f]or the purposes of this [case] the Secretary [of State]'s actions are those of the President, and therefore by the terms of the APA the [action] at issue here is not reviewable"); *NRDC*, 658 F. Supp. 2d at 111-13 ("to challenge the issuance of a presidential permit, whether by the President himself or by the State Department as the President's delegee, is to challenge a presidential act, which is not reviewable under the APA"); *Sisseton*, 659 F. Supp. 2d at 1082 ("[t]he court finds that the actions taken pursuant to [E.O.] 13337 are presidential in nature, and therefore, do not confer upon the plaintiffs a private right of action under the APA").

Because Plaintiffs' Complaint fails to articulate an applicable private right of action, and therefore a basis for subject matter jurisdiction, this Court should dismiss with prejudice Plaintiffs' first claim for relief.

## II. Plaintiffs' Second Claim Fails to State any Claim for which Relief Can Be Granted and thus Should Be Dismissed Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Whether viewed as a failure to demonstrate standing to sue, or as defective under the principles of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), Plaintiffs' allegation that the FWS violated the ESA in adopting the Biological Opinion for the Keystone XL Pipeline must be dismissed.  Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

'give the defendant fair notice of what the . . . claim is and the grounds upon which

it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47

(1957)).  The complaint must plead "enough facts to state a claim to relief that is

plausible on its face." *Id.* at 570.  Without requiring at least facial plausibility,

"claim[s] would survive a motion to dismiss whenever the pleadings left open the

possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to

support recovery." *Id*. at 561.  Such a minimal pleadings standard would render

meaningless a court's "power to insist upon some specificity in pleading before

allowing a potentially massive factual controversy to proceed." *Id*. at 558 (quoting

*Associated Gen. Contractors of Cal., Inc. v. California State Council of*

*Carpenters*, 459 U.S. 519, 528 n.17 (1983)).  Thus, a complaint will only survive a

12(b)(6) motion "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This approach allows a

court to identify the factual allegations entitled to an assumption of truth, and then

determine "whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of

his 'entitlement to relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly*,

19

550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . [are] not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Wild Equity Inst. v. U.S. Envtl. Prot. Agency*, 147 F. Supp. 3d 853, 861–62 (N.D. Cal. 2015). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562.

Accordingly, pursuant to Rule 12(b)(6), the Court should dismiss Plaintiffs' second claim for relief. Under the holdings of the Supreme Court in *Iqbal* and *Twombly*, IEN must do more than merely state that the law has been violated – it must plead sufficient facts to show that it has a plausible claim for relief. IEN's complaint vaguely lists claims allegedly suggesting that the FWS's Biological Opinion failed to fully assess the Project's risks to endangered and threatened species. Complaint, ¶ 85. These imprecise and generalized allegations do not, however, identify the actual conduct alleged to be in violation of the ESA with sufficient specificity to state a claim under Rule 12(b)(6). *See, e.g., Tulare County*

*v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Although Tulare County refers to the existence of foresters on the ground, the complaint does not identify these foresters' acts with sufficient specificity to state a claim.").  By omitting how, when, or where these alleged violations occur, IEN fails to include sufficient information to apprise the Defendants of the claim asserted against them, making it impossible for Defendants to respond to Plaintiffs' claims.

Therefore, the Court should dismiss IEN's second claim because IEN fails to meet the basic pleading standards of the Federal Rules of Civil Procedure as clarified by the Supreme Court in *Iqbal* and *Twombly*.

## III.   Plaintiffs' Third and Fourth Claims Fail To Identify a Private Cause of Action or Waiver of Sovereign Immunity, and thus Should Be Dismissed Pursuant to Rule 12(b)(1)

Unlike the ESA, neither the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712, nor the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. §§ 668-668d, contains provisions for a private right of action.  Similarly, neither statute contains an express waiver of sovereign immunity that would entitle private parties to rely on it for enforcement against the government.  *See, e.g.*, *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 942 (9th Cir. 2006) (noting that MBTA does not have a private right of action); *Defenders of Wildlife v. EPA*, 882 F.2d 1294, 1298 (8th Cir. 1989) (explaining that neither BGEPA nor MBTA provide a private right of action).

21

Plaintiffs bring their third and fourth claims under the MBTA and BGEPA, respectively. Because there is no private right of action and no waiver of sovereign immunity under either statute, Plaintiffs' claims fail at the outset and must be dismissed.

**A.      Even if Plaintiffs Attempt To Bring Their Third Claim Under the APA, the MBTA Does Not Apply to Government Agencies Acting in a Regulatory Capacity**

It is possible that Plaintiffs believe reliance on the APA enables them to assert their MBTA claim against the Federal Defendants. Complaint, ¶ 90. But, even if the APA is found to provide some measure of initial viability as a jurisdictional matter, the APA does not transform the MBTA into a weapon private parties can wield when attacking an agency's regulatory action. Nothing in the APA allows a private plaintiff to challenge agency action solely on the grounds that the action may lead to future unlawful conduct by the recipient of a federal permit or license when the recipient is otherwise behaving lawfully. Thus, the MBTA cannot be "enforced" under the APA against government agencies acting in purely regulatory capacities.

Federal courts have repeatedly declined to extend the scope of the MBTA and APA to federal agency approvals of projects that plaintiffs alleged could *potentially* and *indirectly* result in the "taking" of migratory birds. These courts typically note the historical purpose of the MBTA as a tool to prevent hunters and

22

poachers from taking migratory birds. *See, e.g.*, *Protect Our Communities Found. v. Salazar*, 12-CV-2211, 2013 WL 5947137, at *18 (S.D. Cal. Nov. 6, 2013) ("[T]he MBTA was intended to prohibit conduct directed towards birds and did not intend to criminalize acts or omission[s] that are not directed but which incidentally cause bird deaths."); *Mahler v. U.S. Forest Serv*., 927 F. Supp. 1559, 1573-74 (S.D. Ind. 1996) ("The MBTA was designed to forestall hunting of migratory birds and the sale of their parts.  The court declines [Plaintiff]'s invitation to extend the statute well beyond its language and the Congressional purpose behind its enactment[]" to indirect activities like "habitat destruction and logging during nesting season . . . ."); *Citizens Interested in Bull Run, Inc. v. Edrington*, 781 F. Supp. 1502, 1510 (D. Or. 1991) (finding that "[i]n light of the Act's stated goal and overall purposes," the timber sale at issue "d[id] not constitute a 'taking' under the MBTA as the "Act was intended to apply to individual hunters and poachers," not habitat modification); *see also Defenders of Wildlife*, 882 F.2d at 1302-03 (refusing to entertain a collateral challenge to the MBTA using the APA).

Indeed, the Ninth Circuit has held that the MBTA applies only to direct taking, such as poisoning or hunting, not to indirect takes like habitat modification. *See, e.g.*, *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991) (MBTA did not prevent Forest Service from logging areas that were habitat for

23

migratory birds, and "habitat destruction, leading indirectly to bird deaths," is not a

"take" under MBTA, as it is under ESA).

Even if the APA might allow Plaintiffs past the courthouse door, their

MBTA claim still fails under the most recent court opinions, which do not require

federal defendants to issue or obtain an MBTA permit before authorizing decisions

and/or concurrences.  For example, in *Protect Our Communities*, the 9th Circuit

held that even if the plaintiff was correct that the project would inevitably result in

migratory bird fatalities, the "MBTA does not contemplate attenuated secondary

liability on agencies . . . that act in a purely regulatory capacity, and whose

regulatory acts do not directly or proximately cause the 'take' of migratory birds,

within the meaning of 16 U.S.C. § 703(a)."  *Protect Our Communities Found. v.

Jewell*, 825 F.3d 571, 585 (9th Cir. 2016).

*Protect Our Communities* involved BLM's authorization to construct and

operate a wind energy facility on public lands.  The court distinguished BLM's

authorization as a "purely regulatory action that does not constitute, or even

proximately cause, an unlawful 'take' under the MBTA[,]" from actions where the

*agency itself* is implicated in the killing of migratory birds without a permit.  *Id*. at

585-86 (explaining that "the BLM's decision to grant [third party]'s right-of-way

request was many steps removed in the causal chain from the potential commission

of an unlawful 'take' caused by wind-turbine collisions[,]" and noting that "as the

24

FWS has concluded, 'the agencies themselves are not subject to the prohibitions of the MBTA when acting in their regulatory capacities,' and thus are generally not required to seek a permit to cover the separate actions of 'third parties regulated by those agencies.'" (citation omitted)).  And similar, recent cases follow the same rationale. *See Protect Our Communities Found. v. Black*, No. 14-2261, 2016 WL 4096070, at \*5–10 (S.D. Cal. Mar. 29, 2016) ("[B]ased on the well-pleaded facts of Plaintiffs' Complaint, this case presents the following question: Whether, when an agency authorizes lawful conduct (such as constructing and operating a wind farm) by a third party, but that third party *may* later violate the law without necessarily breaching the terms of the agency's approval, the *agency* has acted 'without observance of procedure required by law' or 'not in accordance with law.' If the answer is yes, the agency has violated the APA. Based on the authority this Court has reviewed, however, the answer is no."); *Public Emps. for Envtl. Responsibility v. Beaudreu*, 25 F. Supp. 3d 67, 117 (D.D.C. 2014) ("[O]n its face, the Migratory Bird Treaty Act does not appear to extend to agency action that only potentially and indirectly could result in the taking of migratory birds. . . . Given the statutory and regulatory text, the Court finds that the [Bureau of Ocean Energy Management] did not violate the Migratory Bird Treaty Act by merely approving a project that, if ultimately constructed, might result in the taking of migratory

25

birds."). Accordingly, potential and indirect takes, in this context, fail as a matter of law.

**B.     There Is No Private Right of Action for IEN's Fourth Claim Involving the Bald and Golden Eagle Protection Act**

Plaintiff alleges broad violations of BGEPA to both bald and golden eagles. Complaint, ¶¶ 94-95. Like the MBTA, the language of BGEPA applies to persons, which are defined as "associations, partnerships, and corporations." 16 U.S.C. § 668c. No mention is made of the government, and there is no provision for a citizen suit. *See Protect Our Lakes v. U.S. Army Corps of Eng'rs*, No. 13-0402, 2015 WL 732655 (D. Me. Feb. 20, 2015); *Protect Our Eagles' Trees v. City of Lawrence*, 715 F. Supp. 996, 998 (D. Kan. 1989) ([T]here is no language in that Act purporting to create a private right of action . . . ."). As our analysis for the MBTA demonstrates, Plaintiffs, therefore, cannot pursue an individual claim based on an alleged "violation" of BGEPA by an agency when an agency's mere action is permitting lawful third party action.

## CONCLUSION

WHEREFORE, TransCanada moves and respectfully requests that this Court dismiss Plaintiffs' First Amended Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction, and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

26

Dated this 16th day of June, 2017.

CROWLEY FLECK PLLP


By   /s/ Jeffery J. Oven
      Jeffery J. Oven
      Mark L. Stermitz
      Jeffrey M. Roth
490 North 31st Street, Ste 500
P.O. Box 2529
Billings, MT 59103-2529

SIDLEY AUSTIN LLP


By   /s/  Peter R. Steenland, Jr.
      Peter R. Steenland, Jr.
      Lauren C. Freeman
1501 K Street, N.W.
Washington, D.C.  20005
*Counsel for TransCanada Keystone Pipeline, LP and TransCanada Corporation*

27

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2) of the United States Local Rules, I certify that this Brief contains 6,111 words, excluding caption and certificates of service and compliance, printed in at least 14 points and is double spaced, including for footnotes and indented quotations.

DATED this 16th day of June, 2017.

By:   /s/ Jeffery J. Oven

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the following counsel of record, by the means designated below, this 16th day of June, 2017:

1 - 6     CM/ECF
_____     Hand Delivered
_____     Mail
_____     Overnight Delivery Service
_____     Fax
_____     E-mail

1.    Clerk of U.S. District Court

2.    James A. Patten
      Patten, Peterman, Bekkedahl & Green, PLLC
      Suite 300, The Fratt Building
      2817 Second Avenue North
      Billings, MT 59101-2041
      *Attorney for Indigenous Environmental Network and North Coast Rivers Alliance*

3.    Stephan C. Volker
      Alexis E. Krieg
      Stephanie L. Clarke
      Daniel P. Garrett-Steinman
      James M.B. Volker
      Law Office of Stephan C. Volker
      950 Gilman Street, Suite 100
      Berkeley California 94710-1462
      *Attorney for Indigenous Environmental Network and North Coast Rivers Alliance*

4.    Luther L. Hajek
      U.S. DEPARTMENT OF JUSTICE - DENVER
      South Terrace, Suite 370
      999 18th Street
      Denver, CO 80202

*Attorneys for US Department of State, Thomas A. Shannon, Jr., US Fish & Wildlife Service, James W. Kurth, and Ryan Zinke*

5.     Bridget K. McNeil
       U.S. Department of Justice
       999 18th St.
       Suite 370
       Denver, CO 80202
       *Attorneys for US Department of State, Thomas A. Shannon, Jr., US Fish & Wildlife Service, James W. Kurth, and Ryan Zinke*

6.     Mark Steger Smith
       U.S. ATTORNEY'S OFFICE - BILLINGS
       2601 Second Avenue North
       Suite 3200
       Billings, MT 59101
       *Attorneys for US Department of State, Thomas A. Shannon, Jr., US Fish & Wildlife Service, James W. Kurth, and Ryan Zinke*

                         By     /s/ Jeffery J. Oven

30