JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
        PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

Attorneys for Plaintiffs
INDIGENOUS
ENVIRONMENTAL
NETWORK and NORTH
COAST RIVERS ALLIANCE

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
DANIEL P. GARRETT-STEINMAN (Pro
        hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:      svolker@volkerlaw.com
            akrieg@volkerlaw.com
            sclarke@volkerlaw.com
            dgarrett@volkerlaw.com
            jvolker@volkerlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, <br><br>             Plaintiffs, <br><br>     vs. <br><br> UNITED STATES DEPARTMENT OF STATE, et al., <br><br>             Federal Defendants, | Civ. No. 4:17-cv-00029-BMM <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE OF COURT TO FILE FIRST AMENDED COMPLAINT UNDER F.R. CIV. PRO. 15; EXHIBIT 1 ([PROPOSED] FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF)** <br><br> Hearing:  August 31, 2017 <br> Time:  1:30 p.m. <br><br> Judge:  Hon. Brian M. Morris |

and )
                                            )
TRANSCANADA KEYSTONE PIPELINE and          )
TRANSCANADA CORPORATION,                    )
                                            )
         Defendant-Intervenors.          )
_____ )

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

Notice is hereby given that on August 31, 2017 at 1:30 p.m., or as soon thereafter as this matter may be heard in the United States District Court for the District of Montana, Great Falls Division, located at the Missouri River Federal Courthouse, plaintiffs will move the Court for leave to file a First Amended Complaint.

This motion is based on the grounds that plaintiffs wish to amend their Complaint to add additional allegations showing plaintiffs' standing to sue; add a new claim for relief under the Endangered Species Act; clarify and expand other allegations showing plaintiffs' entitlement to relief; and withdraw two claims for relief. Pursuant to Local Rule 15.1, a copy of plaintiffs' [Proposed] First Amended Complaint for Declaratory and Injunctive Relief is attached as Exhibit 1 hereto.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and Declaration of Counsel, the pleadings and papers on file herein, and upon such other matters as may be presented to the Court at the time of the hearing.

In accordance with Local Rule 7.1(c)(1), the other parties have been

contacted and asked whether they oppose the motion. They have not yet responded.

Dated: July 14, 2017      Respectfully submitted,

                      PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC

                      s/ *James A. Patten*
                      JAMES A. PATTEN
                      LAW OFFICES OF STEPHAN C. VOLKER

                      s/ *Stephan C. Volker*
                      STEPHAN C. VOLKER (Pro Hac Vice pending)

                      Attorneys for Plaintiffs
                      INDIGENOUS ENVIRONMENTAL NETWORK
                      and NORTH COAST RIVERS ALLIANCE

# EXHIBIT 1

([Proposed] First Amended Complaint
for Declaratory and Injunctive Relief)

JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
    PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

Attorneys for Plaintiffs
INDIGENOUS
ENVIRONMENTAL
NETWORK and NORTH
COAST RIVERS ALLIANCE

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
DANIEL P. GARRETT-STEINMAN (Pro
    hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:      svolker@volkerlaw.com
            akrieg@volkerlaw.com
            sclarke@volkerlaw.com
            dgarrett@volkerlaw.com
            jvolker@volkerlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>    Federal Defendants, | Civ. No. 4:17-cv-00029-BMM<br><br>**[PROPOSED] FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Hearing:  August 31, 2017<br>Time:     1:30 p.m.<br><br>Judge:    Hon. Brian M. Morris |

- 1 -

and )
                                                    )

TRANSCANADA KEYSTONE PIPELINE and )
TRANSCANADA CORPORATION, )
                                                    )

             Defendant-Intervenors. )

_____ )

## INTRODUCTION

1.      On March 23, 2017, the U.S. Department of State ("State Department") rendered its decision to issue a Presidential Permit ("Permit") to TransCanada Keystone Pipeline, L.P., a limited Delaware partnership owned by affiliates of TransCanada Corporation of Canada, to construct, connect, operate, and maintain an 875-mile long pipeline and related facilities commonly known as the Keystone XL Pipeline (the "Project") to transport up to 830,000 barrels per day ("BPD") of crude oil from Alberta, Canada and the Bakken shale formation in Montana to existing pipeline facilities near Steele City, Nebraska.  From there, the oil would eventually be delivered to Cushing, Oklahoma and the Gulf Coast region.  The Project would pose grave risks to the environment, including the climate, water resources and wildlife, and to human health and safety.

2.      Plaintiffs Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA") (collectively, "plaintiffs") challenge the approval of the Project by defendants UNITED STATES DEPARTMENT OF STATE and Under Secretary of State THOMAS A. SHANNON, JR. (collectively, "State Department"), and Secretary of the Interior RYAN KEITH ZINKE, Acting Director of the United States Fish and Wildlife Service JAMES W. KURTH, and

the UNITED STATES FISH AND WILDLIFE SERVICE (collectively, "FWS")
for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C.
section 4321 *et seq*., the Endangered Species Act ("ESA"), 16 U.S.C. section 1531
*et seq*., the Administrative Procedure Act ("APA"), 5 U.S.C. section 701 *et seq*.,
and regulations promulgated thereunder.  The State Department's approval of the
Permit violates two principal environmental laws.

3.     First, the State Department's NEPA review of the Project was
inadequate.  The State Department's Final Supplemental Environmental Impact
Statement ("FSEIS") fails to (1) provide a detailed and independent Project
purpose and need, (2) analyze all reasonable alternatives to the Project, (3) study
the Project's transboundary effects, (4) disclose and fully analyze many of the
Project's adverse environmental impacts, (5) formulate adequate mitigation
measures, and (6) respond adequately to comments.  In addition, the FSEIS was
irredeemably tainted because it was prepared by Environmental Resources
Management ("ERM"), a company with a substantial conflict of interest.  The
State Department violated its own guidelines when it selected ERM, and this
selection was therefore arbitrary and capricious, in violation of the APA.

4.     Second, the State Department and FWS violated the Endangered
Species Act ("ESA"), 16 U.S.C. section 1531 *et seq*., because they failed to fully
analyze the Project's potential effects on threatened and endangered species, failed
to use the best scientific and commercial data available, and entirely failed to
consider the Project's effects on the endangered northern swift fox, contrary to 16

U.S.C. section 1536(a)(2). The FWS' violation of ESA is ripe for adjudication under the APA. The State Department's violation of ESA is now ripe for adjudication following plaintiffs' compliance with ESA's 60-day notice requirement. On May 2, 2017 plaintiffs served a 60-day notice of their intent to sue the State Department for this violation and therefore this First Amended Complaint alleges this violation.

5. Accordingly, plaintiffs seek orders from this Court: (1) granting preliminary injunctive relief restraining defendants from taking any action that would result in any change to the physical environment in connection with the Project pending a full hearing on the merits; (2) declaring that defendants violated NEPA; (3) declaring that defendants violated ESA; (4) declaring that defendants violated the APA; and (7) granting permanent injunctive relief overturning defendants' Project approvals pending defendants' compliance with NEPA, ESA and the APA.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action under 28 U.S.C. sections 1331 (federal question), 1337 (regulation of commerce), 1346 (U.S. as defendant), 1361 (mandamus against an officer of the U.S.), 2201 (declaratory judgment), and 2202 (injunctive relief); under the Administrative Procedure Act ("APA"), 5 U.S.C. sections 701-706 (review of final agency action); and under the ESA, 16 U.S.C. sections 1540(g)(1) (A) and (C) because (1) the action arises under the

APA, NEPA, and ESA; (2) the State Department and FWS are agencies of the U.S. government and the individual defendants are sued in their official capacities as officers of the U.S.; (3) the action seeks a declaratory judgment voiding the State Department's grant of the Permit; and (4) the action seeks further injunctive and mandamus relief until the State Department and FWS comply with applicable law.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(e)(1)(B) and Montana Local Civil Rules 1(c)(3) and 3.2(b)(1)(A) because the proposed pipeline would cross the international border in Phillips County. Since this border crossing triggers the Presidential permit requirement, "a substantial part of the events . . . giving rise to the claim occurred" in this judicial district.  28 U.S.C. § 1391(e)(1)(B); Mont. Civ.R. 3.2(b)(1)(A).

8.     There exists now between the parties hereto an actual, justiciable controversy in which plaintiffs are entitled to have a declaration of their rights, a declaration of the State Department's obligations, and further relief because of the facts and circumstances hereinafter set forth.

9.     This Complaint is timely filed within the applicable six-year statute of limitations set forth in 28 U.S.C. section 2401(a).

10.     Plaintiffs have standing to assert their claims and, to the extent required, have exhausted all applicable remedies.

## PARTIES

11.     Plaintiff Indigenous Environmental Network ("IEN") is incorporated

under the non-profit organizational name of Indigenous Educational Network of Turtle Island. Established in 1990, IEN a network of indigenous peoples from throughout North America including the states of Montana, South Dakota and Nebraska and the Province of Alberta through which the Project is proposed to be built, who are empowering their Indigenous Nations and communities toward ecologically sustainable livelihoods, long-denied environmental justice, and full restoration and protection of the Sacred Fire of their traditions. Its members include chiefs, leaders and members of Indigenous Nations and communities who inhabit the states and province through which the Project is proposed to be built and who would be directly and irreparably harmed by its many severe adverse environmental and cultural impacts. IEN has been involved in grassroots efforts throughout the United States and Canada to mobilize and educate the public regarding the harmful environmental and cultural impacts of the Project. IEN's members include individuals who have hiked, fished, hunted, observed and photographed wildlife and wild flowers, star-gazed, rode their horses, floated, swum, camped and worshipped the Creator on lands and waters within and adjacent to the proposed route of the Project and who intend to continue to do so in the future. Because IEN's members use and enjoy the land and water resources and wildlife within the Project area that the Project would harm, they would be directly and irreparably harmed by the construction and operation of the Project, and by the oil spills that would pollute the lands and waters that IEN's members use and enjoy.

12.     Plaintiff North Coast Rivers Alliance ("NCRA") is an unincorporated association of conservation leaders from the western and northern United States and Canada.  NCRA has participated in public education, advocacy before legislative and administrative tribunals, and litigation in state and federal court to enforce compliance by state and federal agencies with state and federal environmental laws.  NCRA's members include individuals who have camped, fished, observed and photographed wildlife and wild flowers, star-gazed, rode their horses, drove their wagon teams, floated, hiked and worshipped the Creator on lands and waters within and adjacent to the proposed route of the Project and who intend to continue to do so in the future.  Because NCRA's members use and enjoy the land and water resources and wildlife within the Project area that the Project would harm, they would be directly and irreparably harmed by the construction and operation of the Project, and by the oil spills that would pollute the lands and waters that NCRA's members use and enjoy.

13.     Plaintiffs' injuries are fairly traceable to the State Department's and FWS' actions.  Construction and operation of the Project and connected actions will harm plaintiffs' use of the Project area for fishing, hunting, camping and other recreational, cultural and spiritual activities including nature study, wildlife and wildflower viewing, scenic enjoyment, photography, hiking, family outings, star gazing and meditation.  These injuries are actual, concrete, and imminent.  Plaintiffs have no plain, speedy, or adequate remedy at law.  Accordingly, plaintiffs seek injunctive, mandamus, and declaratory relief from this Court to set

aside the State Department's and FWS' unlawful acts and redress plaintiffs' injuries.

14.     Defendant UNITED STATES DEPARTMENT OF STATE ("State Department") is a federal executive agency headquartered in Washington, D.C. Under Executive Order 13337, the State Department is responsible for determining whether granting a Presidential permit for the Project would serve the national interest.

15.     Defendant THOMAS ALFRED SHANNON is the U.S. Under Secretary of State, and, in that capacity, is responsible for issuing Presidential permits for energy facilities that cross the United States-Canada border, including the Presidential Permit at issue here, where, as here, the Secretary of State has recused himself from the matter.

16.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("FWS") is an agency within the U.S. Department of the Interior.  Under ESA, FWS is charged with the preservation of endangered and threatened species and their habitat, including the species that will be harmed by the Project.

17.     Defendant JAMES W. KURTH is the Acting Director of FWS, and is therefore responsible for preserving endangered and threatened species and their habitat.

18.     Defendant RYAN KEITH ZINKE is the Secretary of the U.S. Department of the Interior, and, in that capacity, is the federal official charged

with responsibility for the proper management of FWS and is responsible for the actions of FWS challenged herein.

## BACKGROUND

19.     On May 4, 2012, the Department of State received an application from TransCanada Corporation, a Canadian public company organized under the laws of Canada, for a Presidential permit for a proposed pipeline that would run from the Canadian border to connect to a pipeline in Steele City, Nebraska.

20.     On March 1, 2013, the Department of State released a Draft Supplemental Environmental Impact Statement ("DSEIS") for the new Presidential Permit application for the proposed Keystone XL pipeline.

21.     On March 8, 2013, the U.S. Environmental Protection Agency (EPA) announced the availability of the Draft SEIS on its website, starting the 45-day public comment period.

22.     On April 18, 2013, the Department of State held a public meeting in Grand Island, Nebraska.

23.     On April 22, 2013, the comment period on the Draft Supplemental Environmental Impact Statement closed.

24.     On May 15, 2013, the FWS issued its Biological Opinion for the proposed Keystone XL pipeline to the Department of State.

25.     The State Department provided an additional 30-day opportunity for the public to comment during the National Interest Determination (NID) period

that began with the February 5, 2014 notice in the Federal Register announcing the release of the Final SEIS ("FSEIS").

26.     On November 6, 2015, Secretary of State John Kerry determined under Executive Order 13337 that issuing a Presidential permit for the proposed Keystone XL pipeline's border facilities would not serve the national interest, and denied the permit application.

27.     On January 24, 2017, President Donald Trump issued a Presidential Memorandum Regarding Construction of the Keystone XL Pipeline which, *inter alia*, invited the permit applicant "to resubmit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline."  On January 24, 2017, President Trump also issued an Executive Order on Expediting Environmental Reviews and Approvals for High Priority Infrastructure Projects in which he set forth the general policy of the Executive Branch "to streamline and expedite, in a manner consistent with law, environmental reviews and approvals for all infrastructure projects, especially projects that are a high priority for the Nation," and cited pipelines as an example of such high priority projects.

28.     On January 26, 2017, the State Department received a re-submitted application from TransCanada Keystone Pipeline, L.P. ("TransCanada"), a limited partnership organized under the laws of the state of Delaware and owned by affiliates of TransCanada Corporation, a Canadian public company, for the

proposed Project. The re-submitted application includes purportedly minor route alterations due to agreements with local property owners for specific right-of-ways and easement access, ostensibly within the areas previously included by the Department of State in its FSEIS.

29.     On March 23, 2017, the State Department granted a Presidential Permit to TransCanada, allowing its construction and operation of the Project.

## FIRST CLAIM FOR RELIEF

(Violation of the National Environmental Policy Act)

(Against All Defendants)

30.     The paragraphs set forth above are realleged and incorporated herein by reference.

31.     By granting the Presidential Permit to TransCanada based on an inadequate FSEIS, the State Department violated NEPA, 42 U.S.C. section 4321 *et seq.,* and its implementing regulations, 40 C.F.R. § 1500 *et seq*. By approving the Project without complying with NEPA, the State Department failed to proceed in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A) and (D).

## PROJECT PURPOSE AND NEED

32.     The FSEIS' purpose and need statement falls short of NEPA's requirements because the stated Project objectives are far too narrow. The FSEIS states that "the primary purpose of the proposed Project is to provide the infrastructure to transport [Western Canadian Sedimentary Basin ("WCSB")]

crude oil from the border with Canada to existing pipeline facilities" in Nebraska, for eventual delivery to refineries on the Gulf Coast.  FSEIS 1.3-1.

33.     By needlessly narrowing the Project's scope, the FSEIS unduly constrains the available options to those that are preemptively locked into fossil fuel dependence.  Therefore, the FSEIS only examines options that address moving oil from the WCSB and the Bakken shale formation to market, without discussing myriad other potential ways to meet global energy needs.  Its narrow purpose and need statement led the State Department to unreasonably restrict the range of alternatives considered, omitting feasible and much more environmentally beneficial renewable energy and energy efficiency alternatives. This violates NEPA.  *National Parks & Conservation Association v. Bureau of Land Management* ("*NPCA v. BLM*"), 606 F.3d 1058, 1070 (9th Cir. 2010).

## ALTERNATIVES

34.     NEPA requires that an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives" so that "reviewers may evaluate their comparative merits."  42 U.S.C. §4332(2)(C)(iii), (E); 40 C.F.R. § 1502.14. Furthermore, "[a]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality."  *NPCA v. BLM*, 606 F.3d at 1070 (internal quotations and citations omitted).  "The existence of a viable but

unexamined alternative renders an environmental impact statement inadequate."

*Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008).

35.     Here, the State Department *entirely* failed to consider the feasible and environmentally beneficial alternatives of adopting aggressive renewable energy and energy efficiency measures to obviate the claimed need for more crude oil. The EPA raised this objection in its comments on the Keystone XL DSEIS, and the FSEIS fails to remedy the DEIS', FEIS', and DSEIS' failure to analyze renewable energy and energy efficiency alternatives. Rather, after a cursory discussion, the FSEIS states that "use of alternative energy sources and energy conservation in meeting needs for transportation fuel have not been carried forward for further analysis as an alternative to the proposed Project." FSEIS 2.2-44. As EPA concluded in assigning the DSEIS a failing grade of "insufficient," this violates NEPA. 40 C.F.R. § 1502.14; *NPCA v. BLM*, 606 F.3d at 1070; *Friends of Yosemite Valley*, 520 F.3d at 1038.

## ENVIRONMENTAL IMPACTS

36.     An EIS must take a "hard look" at the environmental impacts of proposed major federal actions and provide a "full and fair discussion" of those impacts. 40 C.F.R. § 1502.1; *National Parks & Conservation Association v. Babbitt* ("*NPCA v. Babbitt*"), 241 F.3d 722, 733 (9th Cir. 2001). Here, however, the FSEIS' discussion of many environmental and cultural impacts is absent or inadequate, as explained below.

**A. Extraterritorial Impacts**

37.     Federal agencies must consider the international impacts of their proposed actions. *Backcountry Against Dumps v. Chu*, ___ F.Supp.3d ___, 2015 WL 12697959 *7 (S.D. Cal. 2015) ("under NEPA, agencies must analyze extraterritorial effects of actions before they can issue a permit"); *Backcountry Against Dumps v. United States Department of Energy*, Case No. 3:12-cv-03062-L-JLB (S.D. Cal. Jan. 30, 2017) ("Defendant had a duty to consider the environmental impacts upon Mexico stemming from all portions (the U.S. Line, the Mexico Line, and the ESJ Wind Farm) of the Project.  By not considering such impacts in the FEIS, Defendants violated NEPA."); *Government of the Province of Manitoba v. Salazar*, 691 F.Supp.2d 37, 51 (D.D.C. 2010) (federal agencies must consider the effects of their actions taken within the United States that are felt across sovereign borders, such as in Canada); *Border Power Plant Working Group v. Department of Energy*, 260 F.Supp.2d 997 (S.D. Cal. 2003) (same); *Hirt v. Richardson*, 127 F.Supp.2d 833, 844 (W.D. Mich. 1999) (holding that "the facts in this case warrant extraterritorial application of NEPA"); *National Organization for Reform of Marijuana Laws v. United States Department of State*, 452 F.Supp. 1226, 1232-33 (D.D.C. 1978) (court "assume[d] without deciding, that NEPA is fully applicable to the Mexican herbicide spraying program" in which the U.S. was participating, and required an analysis of the program's impacts in Mexico); *Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) ("[i]n view of the conclusions we reach in this case, we need only assume, without deciding, that

NEPA is fully applicable to construction in Panama"); *Wilderness Society v. Morton*, 463 1261 (D.C.Cir. 1972) (holding that Canadian citizens had standing to intervene in a NEPA-based suit on the basis of their claims that possible oil spills from the Trans-Alaskan oil pipeline might cause damage to Canada).

38. Here, the State Department claims that it is not legally required to "conduct an in depth assessment of the potential impacts of the Canadian portion of the proposed pipeline," but that, "as a matter of policy," the State Department included information regarding potential impacts in Canada." FSEIS 4.15-93. However, the State Department is wrong in its assertion that it need not analyze the Project's effects in Canada, and its proffered "information" falls far short of the "hard look" that NEPA requires. *Natural Resources Defense Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972).

39. Among the extraterritorial impacts that should have been – but were not – fully analyzed in the EIS are the impacts of an increase in bitumen tar sands mining in Canada that will result from the Project. The very premise of the FSEIS' limited discussion of the impacts of oil sands extraction – that the "Project would not contribute to cumulative impacts associated with bitumen extraction activities" – is fundamentally incorrect. FSEIS 4.15-104. It defies logic to claim, as does the FEIS, that because the pipeline (which will carry bitumen) is located slightly southeast of the point of extraction of the bitumen it will carry, the pipeline bears no relation to that extraction. FSEIS 4.15-104.

40.     In addition, to the extent that the FSEIS does superficially analyze the impacts of oil sands extraction, it profoundly understates those impacts.  For example, the FEIS and DSEIS claim that 232 square miles "have been disturbed by oil sands mining activity," and the FSEIS slightly increases this number, admitting that 276 square miles "of land have been disturbed."[1]  FSEIS 4.15-107.  However, Google Earth imagery shows that the area of land disturbed by oil sands mining is already much larger – an impact that will grow far greater still if the Project is allowed to operate.

41.     The FSEIS also implies that tar sands mining sites can be and are being reclaimed.  To the contrary, in fact such sites cannot be reclaimed within a human lifetime, if ever.

42.     The FSEIS also fails to analyze the fact that tar sands mining releases massive amounts of sulfur dioxide and elemental sulfur into the surrounding environment, including both soil and water, harming birds and other wildlife.

43.     Finally, the FSEIS fails to adequately analyze the severe environmental hazards posed by tailings ponds, which contain a witches' brew of toxic tar sands and other contaminants, clay, sand, hydrocarbons, sulfur, and heavy

---

[1] According to the statistics provided in the DSEIS, the number of square miles (232) that had been disturbed by oil sands mining activity and the number of square miles that were in the process of reclamation (26) did not change between the time of the release of the original FEIS in August, 2011 and the release of the DSEIS *19 months later* in March, 2013.  DSEIS 4.15-113; FEIS 3.14-63. This is untrue, and is emblematic of the State Department's failure to provide accurate information regarding the Project's severe impacts in Canada and elsewhere.

metals and remain for decades after the oil extraction process. Such ponds pose massive risks to wildlife, especially birds that are attracted to and land on the ponds. For example, Syncrude Canada, the largest tar sands oil extraction company in Canada, runs one lake-sized reservoir that killed over 1,600 birds in 2008 alone.[2] FSEIS 4.15-113. In light of their significant risks, tailings ponds should be fully addressed in the FSEIS' analysis of environmental impacts, not simply mentioned as posing an unstudied "exposure risk" for birds, FSEIS 4.15-110, and discussed in three broad overview paragraphs – paragraphs that focus on efforts to mitigate risks of harm, rather than disclosing and analyzing the full extent of the harms themselves. FSEIS 4.15-113.

44.     By failing to analyze the Project's foreseeable and harmful extraterritorial impacts, the FSEIS violates NEPA.

**B.     Hydrologic Impacts**

45.     The new pipeline route purportedly skirts some of the ecologically sensitive Nebraska Sandhills. However, it still traverses northern Holt Country, which has permeable soil and a high water table – precisely the characteristics that made the Sandhills too risky an area to cross. Therefore, any spill or release of oil or other chemicals from the Project would still pose grave risks to groundwater. Indeed, the FSEIS admits that the Project will cross areas with sandy soils similar to those in the Sandhills, and that those soils "could be potential recharge areas for

---

[2] White, Patrick, October 26, 2010, "Toxic Syncrude tailings pond kills hundreds more ducks," *The Globe and Mail*.

underlying aquifers." FSEIS PC-71. The FSEIS dismisses this concern, claiming that preventive action and other laws would mitigate oil spill risks. *Id.* However, no known preventive measures could eliminate the profound risks posed to these vulnerable and critically needed aquifers, and no known mitigation measures can fully remediate and restore an aquifer contaminated by a crude oil spill.

46. The FSEIS also inadequately analyzes the risks posed by the mixture of tar sands and diluents used in the transport of tar sands bitumen commonly referred to as "dilbit." While the FSEIS includes some material describing how spilled dilbit would behave in an aquifer (*see, e.g.,* FSEIS 4.3-12), the discussion lacks the necessary detail, and admits risks that are simply too great to countenance. *See, e.g.,* FSEIS 4.13-84 ("The release of dilbit to a river or other aquatic environment introduces the potential for additional impacts and additional recovery challenges for responders of such an event to the environment.")

47. Furthermore, to date there has been *no* modeling of the effects of dilbit, and its movement within, the Northern High Plains Aquifer System. The FSEIS admits that "[n]o information regarding conditions related to large-scale petroleum releases was readily accessible for the alluvial aquifers or [Northern High Plains Aquifer] along the proposed pipeline area," and that the FSEIS therefore relies solely on information from a *non-dilbit* crude oil spill in Bemidji, Minnesota. FSEIS 4.3-15. This renders the FSEIS' groundwater impact analysis inadequate under NEPA.

48.     The fact that "[n]o information related to" large spills in the specific conditions of the Project area "was readily accessible" does not mean that the State Department was excused from addressing this issue.  Rather, when "there is incomplete or unavailable information" that is "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the [EIS]."  40 C.F.R. §1502.22; *Foundation for North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1179 (9th Cir. 1982) ("[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for . . . speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action"); *Oregon Natural Desert Association v. Singleton* ("*ONDA*"), 47 F.Supp.2d 1182, 1194 (D.Or. 1998) ("NEPA requires that the agency develop the data first, and then make a decision, not make a decision and then develop the data," internal quotations and citation omitted); *Oregon Environmental Council v. Kunzman*, 614 F.Supp. 657, 663 (D.Or. 1985).  Therefore, NEPA requires that the State Department conduct or fund a study that models dilbit's movement within the Northern High Plains Aquifer System.

49.     Finally, the FSEIS fails to give the public any assurances – let alone demonstrate with evidentiary support – that the many trade-secret chemicals that would be used as diluents in the dilbit would not behave unexpectedly and cause significant health and environmental problems if released into an aquifer or

surface waters.

50.     In addition to these informational deficiencies, the FSEIS also does not accurately identify or evaluate the potential impacts of oil spills or pipeline leaks on the surface and subsurface water resources of the Central Plains states of Montana, Wyoming, South Dakota, Nebraska, Kansas, Oklahoma, or Texas, and fails to disclose and discuss how extensively interconnected are the water resources put at risk by the Project.  The FSEIS also fails to account for and analyze the impacts of an oil spill to the thousands of unrecorded and unsealed wells in the rural areas through which the Project would pass.

## C.     Cultural Resource Impacts and Environmental Justice

51.     NEPA mandates that agencies analyze cultural resource impacts in environmental impact statements.  40 C.F.R. §§ 1502.16(f), 1508.8.  In addition, Executive Order 12898 (February 11, 1994) requires that federal agencies, including the State Department, "make achieving environmental justice part of [their] mission[s] by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations," including indigenous peoples.

52.     The Project would irreparably and disproportionately harm indigenous peoples and other under represented minority populations, while restricting its claimed economic benefits primarily to the corporate proponents of the Project and Canadian tar sands mining.  The Project's social, cultural, and

health impacts would extend from the tar sands mining areas in Canada, along the length of the Keystone XL Pipeline, and down into Texas where the tar sands dilbit would be processed and exported.  Yet in violation of both NEPA and Executive Order 12898, the State Department inadequately addressed these environmental justice and cultural resource impacts.

53.     The FSEIS claims that "mitigation measures" would limit the Project's cultural impacts, but those measures would be ineffectual.  *See, e.g.,* FSEIS 4.11-4 (suggesting that impacts to cultural resources could be mitigated by protecting "a similar resource nearby," "detailed documentation of the resource," or establishing "interpretive exhibits").

**D.     Climate Impacts**

54.     The FSEIS admits that the Project would emit .24 million metric tons of carbon dioxide equivalents ("$MMTCO_2e$") during construction, and an annual 148-170 $MMTCO_2e$ due to operation and production, refining, and combustion of oil sands crude oil transported through the Project.  FSEIS 4.14-4.  The FSEIS tries to downplay the Project's climate impacts by inexplicably claiming that approval of the Project is "unlikely to significantly impact the rate of extraction in the oil sands, or the continued demand for heavy crude oil at refineries in the U.S." FSEIS 1.4-10.  Both of these claims are without basis, and are therefore arbitrary and capricious.

55.     The FSEIS' premise that tar sands in Alberta will be fully exploited

regardless of whether the Project is approved improperly minimizes the climate change impacts of the Project by assuming that all climate change impacts of tar sands mining will take place whether or not the Project is approved and constructed. This premise is incorrect and is without logical or factual basis.

56. Despite the FSEIS' claims to the contrary, the Project will increase the rate of extraction in the oil sands. It is axiomatic that adding a major mode of transport – one that could carry 830,000 barrels of oil per day – would allow *more* oil to be brought from the tar sands to market, thereby increasing "the rate of extraction in the oil sands." FSEIS 1.4-10. Other potential modes of transport, including rail and tanker, are limited. *See*, *e.g.*, FSEIS 1.4-36 (noting that "transportation bottlenecks" are causing lower pricing). The Keystone XL pipeline would increase *overall* transport capacity from the tar sands, and therefore increase the *rate* of extraction.

57. Moreover, the State Department's conclusions were largely based upon its assumptions that rail transport capacity would increase sufficiently to transport as much oil as could be extracted from the tar sands. However, those predictions of rapid development of rail transport have not come to pass. In its March DSEIS, the State Department predicted that in 2013, rail shipments of Canadian tar sands crude to the U.S. Gulf Coast would reach at least 200,000 barrels per day. In fact, total Canadian crude rail shipments to *all* locations in 2013 totaled only 180,000 barrels per day, with less than 30,000 barrels per day going to the Gulf Coast – far less than the up to *830,000 barrels* of tar sands crude

that the Project would transport each day.

58.     The State Department's claims about the feasibility of shipping oil by rail were also inflated because they failed to incorporate higher costs associated with potential new regulations intended to address risks posed by the increasing practice of transporting oil by rail.  These regulations were recently recommended by the National Transportation Safety Board and the Canadian Transportation Safety Board.

59.     The FSEIS itself recognizes that at a certain price point, transporting oil by pipeline would still be profitable, while transporting it by rail would *not*. FSEIS 1.4-8.  According to the FSEIS, if the price dropped below $65 per barrel, oil sands extraction might not be economically viable no matter the transportation method, mooting the distinction between rail and pipeline transportation.  If oil prices – which currently fluctuate in the $50 range – return to levels above $65 per barrel, however, the Project would mean the difference between extracting, processing, and burning some of the most carbon-intensive – and thus climate change-inducing – fuel on the planet, and leaving it in the ground.

60.     The FSEIS seems to conclude that it is unlikely that oil prices will fall to between $65 and $75 per barrel, see FSEIS 1.4-105, but there is no basis for this conclusion.  First, the FSEIS itself notes that oil prices are volatile, difficult to predict, and driven by a variety of factors. FSEIS 1.4-8.  Second, of course, *in fact* the price of oil *has* fallen below $75 per barrel and is currently fluctuating in the

range of $50 per barrel. Without the Project, falling prices are even more likely. *See*, *e.g.*, FSEIS 1.4-36 (noting that "transportation bottlenecks" are causing lower pricing). Therefore, the FSEIS' conclusion that transporting oil by rail will remain profitable is unfounded.

61. The FSEIS also ignores other factors pushing the Project's total contribution to greenhouse gas levels upward. For example, extracting the heavy oil from the tar sands is energy intensive. Additional carbon emissions result from the energy, usually natural gas, used to extract the oil, increasing the carbon footprint of the whole process by 23% to 41%. Due to the amount of energy needed to extract the oil, oil sands development also drives up demand for natural gas, displacing its use in electrical generation and making it more likely that coal will be burned for such purposes. Therefore, considering advancing extraction technologies and energy usage, the total carbon production for the oil sands transported by the Project could be more than 230 gigatonnes. This carbon production should be, but is not, taken into account in the FSEIS as a climate impact and as a foreseeable and related cumulative impact.

62. The FSEIS also fails to support its assertion that approval of the Project would not affect "the continued demand for heavy crude oil at refineries in the U.S." FSEIS 1.4-10. The Project may not affect the overall global demand for energy. However, because the Project would allow more oil to be transported more cheaply (*see*, *e.g.*, FSEIS 1.4-10 ("other modes of transportation, such as rail . . . would probably (but not certainly) be more expensive")), it would

disincentivize investment in and use of alternative energy sources, including various forms of renewable energy. Therefore, it would cause demand for oil to remain higher than it would if alternative energy sources were more available and affordable.

## INADEQUATE MITIGATION MEASURES

63.     NEPA requires that an EIS include a "detailed discussion of possible mitigation measures." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); 40 C.F.R. §1502.14(f). "[O]mit[ting] a reasonably thorough discussion of mitigation measures . . . would undermine the action-forcing goals of [NEPA]." *City of Carmel-By-The-Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1154 (9th Cir. 1997). The FSEIS fails to adequately mitigate the Project's substantial risks.

64.     For example, the FSEIS acknowledges that the risk of releases, spills, or leaks poses dangers to the environment, but it fails to consider multiple available and feasible mitigation measures, including, for example, the sensors used by the Longhorn pipeline in Texas, and more frequent foot and aerial inspections. *See*, *e.g.*, FSEIS 4.13-4.

65.     The FSEIS also implies that the impacts to birds from the Alberta tar sands tailings ponds are sufficiently mitigated because "[t]ailings settling ponds are designed and located after environmental review and bird deterrents are used to prevent birds from landing on tailings ponds." FSEIS 4.15-108. But the facts

show otherwise. For example, over 1600 ducks died in a single tailings pond in 2008 despite highly vaunted "bird deterrents" that proved to be completely ineffectual. The FSEIS' conclusory one-sentence description of measures to reduce these well documented and continuing impacts lacks "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 353; *South Fork Band Council v. U.S. Department of Transportation*, 588 F.3d 718, 727 (9th Cir. 2009).

## INADEQUATE RESPONSE TO COMMENTS

66. NEPA requires that agencies solicit the public's comments on draft environmental impact statements and respond to those comments. 40 C.F.R. §§ 1502.9(b), 1503.1(a)(4), 1503.4(a) (agency "shall assess and consider comments both individually and collectively, and shall respond, . . . stating its response in the final statement"). If the agency decides that a comment "do[es] not warrant further agency response," the agency must provide an explanation for this decision. 40 C.F.R. § 1503.4(a)(5). *See also, e.g.*, *California v. Block*, 690 F.2d 753, 773-774 (9th Cir. 1982); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1183 (9th Cir. 2011) (EIS must "address[] substance of public comments").

67. The State Department failed to adequately respond to the public's comments on the DSEIS. First, the FSEIS repeatedly offered completely irrelevant answers to plaintiffs' comments. *See*, *e.g.*, FSEIS PC-1436, PC-53 through PC-54 (responding to plaintiffs' comment that the purpose and need

statement was impermissibly narrow with a paragraph that does not address the narrowness of the purpose and need statement at all), FSEIS PC-1433 through PC-1434, PC-162, PC-168 (failing to respond to plaintiffs' comments regarding the discrepancy between the claimed and actual footprint of oil sands development, sulfur dioxide, and the infeasibility of reclaiming mining sites), FSEIS PC-1433, PC-163 (referring plaintiffs to a response that is completely irrelevant to their comments regarding inadequate mitigation measures).

68.     Second, the FSEIS responded to numerous comments with the acronym "ACK," rather than responding substantively – or at least referring those commentors to the "Theme Codes" for responses. *See*, *e.g.*, FSEIS PC-818, PC-819, PC-821, PC-822, PC-823. The acronym "ACK" is not defined. *See* FSEIS PC-iii (list of acronyms). These comments raised significant issues, including the effects of facilitating tar sands mining (FSEIS PC-818, PC-819), the Project's indirect effects on the boreal forest and the migratory songbirds that it supports (FSEIS PC-819), the questionable safety of waste disposal procedures (FSEIS PC-821), and the risks of water pollution and oil spills (FSEIS PC-822). Responding to such comments with only an undefined acronym and no substantive discussion violates NEPA.

## THE ENVIRONMENTAL REVIEW PROCESS WAS IRREDEEMABLY TAINTED BY AN ILLEGAL CONFLICT OF INTEREST

69.     Federal law prescribes specific procedures to ensure that contractors preparing EISs are free of any conflicts of interest that may taint the review. 40

C.F.R. section 1506.5(c) provides that the contractor "shall execute a disclosure statement . . . specifying that they have no financial or other interest in the outcome of the project." *See also* Kate M. Manuel, "Responsibility Determinations Under the Federal Acquisition Regulation: Legal Standards and Procedures," Congressional Research Service, January 4, 2013 (describing "unavoidable and unmitigated organizational conflicts of interest" as an issue that would preclude the government from contracting with a given company).

70.    The State Department selected Environmental Resources Management ("ERM") to prepare the SEISs for the Project.  This selection process was rife with problems.  ERM misled the State Department regarding its potential conflicts of interest and its extensive ties to the oil and gas industry.  In addition, ERM failed to disclose that it was working on another TransCanada project during the period covered by the conflict of interest disclosure statement, and that it had relationships with a number of companies that stand to benefit from approval of the Project.  The State Department ignored both its own Interim Guidance procedures and the Office of the Inspector General's ("OIG's") recommendations, failed to conduct any independent inquiry into ERM's potential conflicts of interest, and selected ERM based on TransCanada's recommendation.

71.    The State Department required ERM to fill out a questionnaire aimed at ensuring that the company did not have any conflicts of interest.  ERM intentionally misled the State Department by changing the multiple-choice questions provided on the form.  One question asked:

Within the past three years, have you (or your organization) had a direct or indirect relationship (financial, organizational, contractual or otherwise) with any business entity that could be affected in any way by the proposed work?

The questions requested answers of "no" or "yes," and requested more information if the answer was yes. But ERM *altered* the question by unilaterally changing the "no" option and substituting "ERM has no existing contract or working relationship with TransCanada," thus significantly narrowing the scope of information that it would have to disclose.

72.     ERM's alteration of the questionnaire was improper for several reasons. First, while the State Department's question clearly asked about relationships that existed at any time during the past three years, ERM's response was limited to *existing* relationships. Second, while the State Department's question inquired broadly into any "direct or indirect" relationships, ERM's answer was confined to "contract" or "working relationship." By refusing to answer the actual question that the State Department asked, ERM failed to disclose (until it submitted an addendum in August, 2012), that an ERM affiliate, OASIS Environmental, Inc., worked for URS on TransCanada's Alaska Pipeline Project from 2010 through 2012. ERM also later disclosed that its affiliate ERM-West had also worked on the Alaska Pipeline Project in 2010 and 2011.

73.     Third, the State Department inquired broadly into the relationships of the person filling out the questionnaire, as well as that person's "organization." ERM confined the scope of its answer only to ERM, conveniently omitting the

fact that multiple ERM staff members have connections to TransCanada and other oil and pipeline companies. For example, ERM's Steven Koster played a prominent role in obtaining permits for an expansion of the Wolverine Pipeline System and conducting environmental review and permitting of the Mariner West Pipeline. ERM's Mark Jennings was a consultant to ExxonMobil on the Alaska Pipeline Project.

74. Finally, the State Department's question asked about ERM's relationships with "any business entity that could be affected in any way by the proposed work," but ERM limited its answer to relationships with TransCanada itself. ERM failed to disclose that it has a number of clients in the oil and gas industry, including Shell, Syncrude Canada, Saudi Aramco, and Total. Chevron is another ERM client, and owns oil sands projects in Canada and refineries in the U.S. that process oil from the tar sands. Another ERM client is Plains All American Pipeline, an oil and gas transportation firm that operates a storage facility in Cushing, Oklahoma, which could be directly connected to the Keystone XL Pipeline. ERM failed to disclose these relationships, despite the fact that those companies are clearly "business entit[ies] that could be affected . . . by the proposed work."

75. The State Department's questionnaire also asked whether ERM was an "energy concern," defined as including any person "significantly engaged in the business of conducting research" on "developing, extracting, producing, refining, [or] transporting by pipeline" minerals for energy. ERM inexplicably answered

"no" to this question. However, ERM's own website proclaims that "[t]he oil and gas sector remains at the core of our business," accounting for 34 percent of ERM's sales in 2013. In addition, ERM is a member of at least five oil industry trade associations, including the American Petroleum Institute ("API"), which is self-described as a group "open to corporations involved in the oil and natural gas industry or an allied industry," with a goal of "influenc[ing] public policy in support of a strong, viable U.S. oil and natural gas industry." API spent between 16 and 22 million dollars on its lobbying efforts in favor of Keystone XL. ERM did not explain how it could be a member of multiple oil industry trade associations, but not be an "energy concern" as defined by the State Department's questionnaire.

76.     The State Department ignored OIG's recommendation that the State Department minimize TransCanada's role in selecting a contractor to prepare the SEIS. TransCanada prepared the Request for Proposals seeking third party contractors that the State Department released, and provided the State Department with a list of potential contractors, including ERM.

77.     Under its own rules, as well as according to the OIG, the State Department is required to independently review and evaluate the statements that contractors make in their conflict-of-interest disclosures. Interim Guidance for the Use of Third-Party Contractors in Preparation of Environmental Documents by the Department of State (noting that 40 C.F.R. § 1506.5(c) requires that the agency "'independently evaluate' the disclosure statement specifying that the contractor

has no financial or other interest in the outcome of the project"). The State Department failed to follow up on a number of red flags raised by ERM's responses.

78. For example, the State Department should have inquired as to why ERM substantially narrowed the scope of the State Department's question regarding ERM's potential conflicts of financial interest, as described above. In addition, the State Department seems to have done no investigation into ERM. If it had, it would have discovered that ERM is a member of API and other oil industry trade associations, and that it has clients that stand to benefit from the Project. At the very least, ERM's membership in an organization whose purpose is to promote the interests of the oil and gas industry should have prompted the State Department to investigate whether this membership made ERM an "energy concern," and to analyze whether ERM could objectively evaluate the Project's impacts.

79. Not only did the State Department fail to independently investigate ERM's potential conflicts of interest, as required – it also *actively concealed* such potential conflicts from the public. When the State Department posted ERM's conflict of interest disclosures on its website, it redacted the biographical information about ERM's employees – information that revealed their relationships with TransCanada and their work on other pipeline projects.

80. The State Department should not have relied on the FSEIS prepared

by ERM.  ERM misled the State Department in its conflict of interest disclosures, and the State Department violated its own rules by failing to independently verify ERM's statements and ensure that ERM was capable of an objective review of the Project.  This was arbitrary and capricious and an abuse of discretion, and therefore violated the APA.  The FSEIS and Project approval must be set aside.

## SECOND CLAIM FOR RELIEF

(Violation of the Endangered Species Act and the Administrative Procedure Act)

(Against FWS)

81.     Plaintiffs incorporate by reference all preceding paragraphs.

82.     The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of any endangered or threatened species.  16 U.S.C. § 1536(a)(2).  First, agencies authorizing activities such as the Project must consult with and prepare a biological assessment ("BA") for FWS.  16 U.S.C. § 1536(a).  This BA is used by FWS to prepare a biological opinion ("BiOp") assessing the project's impacts on endangered and threatened species.  16 U.S.C. § 1536(c); 50 C.F.R. § 402.12.  If the BA is deficient, FWS has a duty to identify the deficiencies in order that FWS can perform a thorough consultation and prepare an adequate BiOp.  *Id.*; 50 C.F.R. § 402.14.

83.     Here, the State Department's BA was deficient and FWS failed to identify the deficiencies in the BA.  FWS' BiOp on the Project failed to fully

assess the Project's risks to endangered and threatened species. The agencies ignored impacts to species in Canada, understated the Project's risks to endangered and threatened species, presumed the efficacy of unproven mitigation measures, inappropriately deferred analysis of connected actions such as power lines, and completely failed to analyze risks to the endangered northern swift fox. FWS also failed to develop and use the "best scientific and commercial data available" to assess the Project's adverse impacts on endangered species. These omissions violate FWS' duties under ESA, and are enforceable under the APA.

84. Plaintiffs' ESA claims against FWS under the APA do not require a 60-day notice because they are not brought under ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A)-(C). FWS' review of the Project and issuance of the BiOp in violation of ESA is arbitrary, capricious, an abuse of discretion and contrary to law in violation of APA, 5 U.S.C. §§ 701-706, and is subject to judicial review thereunder.

## THIRD CLAIM FOR RELIEF

(Violation of the Endangered Species Act and the Administrative Procedure Act)

(Against All Defendants)

85. Plaintiffs incorporate by reference all preceding paragraphs.

86. On or before May 2, 2017, plaintiffs served their 60-day notice of intent to sue the State Department and FWS under the citizen-suit notice provision of ESA, 16 U.S.C. § 1540(g)(2)(A), for their violations of ESA as alleged in this

Claim for Relief.  A true copy of the 60-day notice (but without its exhibits) is attached as Exhibit 1 hereto, and incorporated herein by this reference.

87.     In the United States, the Keystone pipeline would cross more than 1,000 water bodies and the vast Ogallala Aquifer in South Dakota and Nebraska. In Canada, it would cross hundreds more water bodies.  Steel pipelines such as the Project are inherently prone to corrosion and leakage.  For example, TransCanada's first Keystone pipeline spilled 14 times in the United States in its first year of operation alone.  Oil derived from tar sands, known as dilbit, is exceedingly difficult to clean up because it is so dense it sinks in water and attaches to the beds and banks of water bodies.  Several years after the Enbridge pipeline spilled over one million gallons of tar sands oil into the Kalamazoo River in 2010, nearly 40 miles was still contaminated with oil despite the expenditure of nearly one billion dollars on cleanup.

88.     The Project would pass through threatened and endangered species' occupied and identified recovery habitat, exposing them to risks such as contact with toxic spills or tailings ponds, injury or displacement by construction and maintenance equipment vehicles and workers, collisions with power lines and other infrastructure, excessive noise and night-time lighting, surface- and ground-water contamination, habitat destruction and fragmentation, predation by introduced and invasive species, poaching by Project personnel and visitors, and other harms.  The imperiled species affected include the endangered black-footed ferret, northern swift fox, whooping crane, interior least tern, pallid sturgeon, and

American burying beetle, and the threatened piping plover, northern long-eared bat and western prairie fringed orchid, among others.  Plaintiffs highly value all of these species, have sought to study and observe them in the wild, and will continue to do so in the future, and would be directly harmed if the Project hastens their demise by degrading or destroying their habitat, displacing them from their habitat, or by killing or injuring them directly or indirectly.

89.    Any action "authorize[d], fund[ed], or carr[ied] out" by a federal agency which may affect listed species or their critical habitat is subject to inter-agency consultation under section 7 of the ESA.  "A federal agency must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat, and any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement."  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (internal quotes omitted).

90.    The consultation process under section 7 of the ESA requires the State Department as the "action agency" to consult with the Secretary of Interior to ensure that the State Department's actions are "not likely to jeopardize the continued existence of any endangered species . . . ."  16 U.S.C. §1536(a)(2).  In order to fulfill this statutory mandate, the State Department and FWS must use the "best scientific and commercial data available."  *Id.*

91.    The consultation process often begins with informal consultation, an

"optional process that includes all discussions, correspondence, etc., between the Service and the Federal [action] agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). If, during informal consultation, both the action agency *and* the agency representing the Department of Interior – in this case FWS – determine that "the action is not likely to adversely affect listed species," then the consultation process is terminated. *Id.* This termination requires written concurrence on the part of FWS. *Id.*

92. In the event that the agencies determine that the actions may adversely affect listed species, they must initiate formal consultation. 50 C.F.R. § 402.14. Formal consultation requires a detailed inquiry into the scope and extent of adverse effects upon endangered species which may result from the proposed action. *Id.* The formal consultation process must result in a biological opinion reaching one of two conclusions: that the project will, or will not, jeopardize listed species. 50 C.F.R. § 402.14(e).

93. If the project will jeopardize the continued existence of a listed species, taking that species creates civil and criminal liability under section 9 of the ESA. If, however, the biological opinion concludes that the project will not jeopardize the continued existence of the species, but will cause the "incidental take" of members of the listed species, FWS will provide an incidental take statement authorizing a certain number or extent of takings allowed, and specifying "reasonable and prudent measures" required to minimize the impact.

50 C.F.R. § 402.14(i).

94.     In both the State Department's 2012 Biological Assessment ("BA")
and FWS' 2013 Biological Opinion ("BiOp") for the Project, the State Department
and FWS failed to properly consider the potential impacts of pipeline spills,
tailings ponds, injury or displacement by the Project's long-term operation and
growth-induction, collisions with power lines and other infrastructure, excessive
noise and night-time lighting, surface- and ground-water contamination, habitat
destruction and fragmentation, predation by introduced and invasive species,
poaching by Project personnel and visitors, and other harms to listed species.  In
addition, the agencies improperly relied upon conservation measures that are
speculative, ineffective or unenforceable under the ESA in concluding that the
Project would not adversely affect endangered species.  *See Center for Biological
Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101, 1109-1110 (9th
Cir. 2012) (concluding that it was improper for the biological opinion to rely upon
a Conservation Action Plan that was "unenforceable under the procedures
established by the ESA").

95.     Furthermore, the BA and BiOp focus on construction stage impacts
and ignore the Project's operational impacts including pipeline rupture and oil
spills.  For example, the BiOp suggests that construction should be halted if
species such as the piping plover, interior least tern, and whooping crane are
observed during monitoring surveys.  *See, e.g.,* BiOp 24, 26, 29.  But the BiOp
only discusses crude oil spills in relation to the American burying beetle.  BiOp

65.  And that discussion declines to detail the impacts of a spill beyond a brief mention of soil compaction and soil disturbance.  *Id.*  Instead, the BiOp determines that oil spills are not covered by any take permit, and that the EPA will consult with FWS about species impacts *once a spill takes place*.  But it is too late to prevent harm *after* the damage has occurred.

96.  The endangered whooping crane is one of the rarest birds in North America, and the transmission lines for the Project threaten the species' survival and recovery.  Both the BA and FSEIS admit that transmission lines will pose a collision hazard to birds, including whooping cranes.  *See*, *e.g.*, FSEIS 4.6-1, 4.6-3, 4.6-18 through 4.6-20; BA 3.0-20 (acknowledging that "[p]ower lines associated with the proposed Project are collision hazards to migrant whooping cranes").  However, the agencies then claim that they have no duty to analyze the hazards associated with power lines, and instead rely upon future analysis and consultation to claim that these impacts will be mitigated to a level that is not likely to adversely affect the species.  BA 3.0-2; BiOp 10.  This deferral of analysis is impermissible.

97.  Mitigating risks to the whooping crane with bird flight diverters ("BFDs") on power lines is also insufficient.  It is not clear that BFDs are effective, and neither the State Department nor FWS made any attempts to understand whether and how whooping cranes would respond to BFDs.  Thus, the agencies failed to meet the ESA's section 7 requirements.

98.     The Project's route through Nebraska coincides with the migration corridor used by 90 percent of whooping cranes, where they stop to rest and feed on the Niobrara, Platte, and North and Middle Loup rivers.  Yet the BiOp fails to appropriately account for the potentially lethal risk that a pipeline leak or spill would pose to whooping cranes at these locations.

99.     The whooping crane is also listed as endangered in Canada, and its survival there is threatened by tar sands development.  Tar sands mining results in the creation of tailings ponds containing a toxic stew of clay, sand, hydrocarbons, sulfur, and heavy metals that remains for decades and possibly centuries after the oil extraction process.  Syncrude Canada, the largest tar sands oil extraction company in Canada, runs one lake-sized tailing reservoir that killed over 1,600 birds in 2008 alone.  FSEIS 4.15-113.  These tailings ponds pose a significant risk to many species of birds, including the whooping crane.  The State Department refused to consider impacts to whooping cranes in Canada, insisting that it has no duty to do so.  However, 50 C.F.R. § 402.02 requires that agencies consider both direct and indirect impacts to species in "all areas to be affected" by the Project, "and not merely [in] the immediate area involved in the action."  Therefore, the agencies' refusal to consider the effects of the Project on whooping cranes in Canada violates the ESA.

100.   The pallid sturgeon has been listed as endangered since 1990, and the Keystone XL pipeline would cross through its habitat in the Missouri and Yellowstone rivers, and upstream of its habitat in the Missouri and lower Platte

rivers.  A spill in either area would do tragic and irreparable harm to the pallid

sturgeon.  The BA recognizes that a spill exposing the pallid sturgeon to crude oil

"could result in adverse toxicological effects" to the fish, but dismisses this risk

with the assertion that such effects are "unlikely due to the low probability of a

spill."  BA 3.0-30.  The agencies further claim that the Project is not likely to

adversely affect the pallid sturgeon because "if a significant spill event were to

occur, federal and state laws would require cleanup."  BA 3.0-30; BiOp 9.

However, according to the State Department's own analysis, the pipeline will spill

an average of 1.9 times annually, for a total of 34,000 gallons of oil each year.  *See*

FSEIS Appendix K, Tables 6-9.  Tar sands oil is thicker, more viscous and

therefore more difficult to clean up than conventional crude oil.  Simply hoping

that a spill will not occur in or near pallid sturgeon habitat – and assuming that it

will be rapidly and completely cleaned up if it does – is not the comprehensive,

objective and searching analysis that the ESA requires.

    101.   The black-footed ferret, once considered extinct, is still extremely

rare.  It has been protected as an endangered species for the last fifty years.  32

Fed.Reg. 4001 (3-11-1967).  Black-footed ferrets depend upon prairie dogs as

their main food source, and upon prairie dog burrows for their only source of

shelter.  BA 3.0-2.  While the proposed Project does not cross through any known

black-footed ferret habitats, it will cross through eight prairie dog towns,

endangering important habitat that ferrets could use as their population recovers.

BA 3.0-3.  The loss of these prairie dog towns will further limit the ability of the

black-footed ferret to recover, and both the BA and the BiOp must consider this impact.

102.   The Project will cut through endangered interior least tern habitat in Montana, South Dakota, and Nebraska, including important breeding areas along the Yellowstone, Cheyenne, Platte, Loup, and Niobrara rivers.  BA 3.0-5 through 3.0-6.  This will expose the rare least tern to the risk of oil spills, construction noise and activity, habitat loss, and power line collisions.  BA 3.0-8 through 3.0-11.  As with its analysis of the whooping crane above, the State Department declined to fully analyze the impacts of power lines because power providers have committed to consult with federal agencies when they build power lines in the future.  BA 3.0-10.  But by then the Project would be built and it will be too late to redesign it.  Deferring analysis of this significant risk is unacceptable under the ESA.

103.   The Project will cut through habitat of the threatened piping plover in Nebraska and Montana, skirting nesting areas near the Platte, Loup, and Niobrara rivers and the Fort Peck Reservoir.  BA 3.0-66.  Not only will power lines pose a collision risk, but their towers would create perches for raptors, increasing predation of the piping plover.  BA 3.0-67 through 3.0-68.  Again, the State Department impermissibly deferred analysis of these critical risks until after Project approval, in violation of the ESA.  BA 3.0-68.

104.   The rufus red knot is a migratory bird species.  In its listing decision,

FWS stated that "in years when conditions favor it, a large proportion of midcontinental migrants may use Northern Plains stopovers in spring. In addition, birds using the Northern Plains as a spring stopover stayed an average of 16.2 days (Newstead et al. 2013, Table 3); this was not a short stop but actually similar to the stopover duration in Delaware Bay." 79 Fed.Reg. 73706, 73716 (12-11-2014). The rufus red knot has been observed stopping over in Montana and South Dakota, and may possibly stop over in Nebraska. *Id.* The FSEIS and BA do not address the rufus red knot at all. While the State Department's 2017 Record of Decision states that it consulted with FWS on the impacts to this species, the bare conclusion that the Project will not harm these species does not address the conflicts between the rufus red knot's migration patterns and the potential harms cause by project construction and operation. None of the Project's mitigation measures contemplate protections for the rufus red knot during construction or operation, and no survey protocols were included in the BiOp or FSEIS. The agencies failed to use and present the best scientific and commercial data available to protect the rufus red knot.

105.  After the BA and BiOp were prepared, FWS listed the northern long-eared bat as a threatened species, due to human disturbance, habitat destruction and fragmentation, and fungal disease. FSEIS 4.8-7 through 4.8-8. The State Department's analysis of potential threats to this species is entirely inadequate. The State Department acknowledges that the northern long-eared bat "occur[s] within the proposed Project area," FSEIS 4.8-5, and that the bat "may be impacted

by proposed Project construction or operations." FSEIS 4.8-8. However, the State Department failed to determine what those impacts would be, precluding consideration of any measures to mitigate or avoid them. FSEIS 4.8-4 (Table 4.8-1 admits that no conservation measures were developed for the northern long-eared bat). In addition, the State Department failed to conduct surveys to determine whether there are roosts in the Project area. In fact, after *admitting* that the Project could have impacts on the northern long-eared bat, the State Department backtracked and abdicated its duty to determine impacts and protect wildlife, stating simply that it would "coordinate with [FWS] on whether the proposed Project could have impacts on the species." FSEIS 4.8-8. While the 2017 ROD indicates that FWS concurred that the Project "may affect, but is not likely to adversely affect" the northern long-eared bat, this concurrence is meaningless if based upon the inadequate information included in the FSEIS.

106.   The threatened western fringed prairie orchid is present in the Project area in Nebraska, and may be present in South Dakota, though uncertainty remains due to insufficient surveying. BA 3.0-70. Clearing for construction would disturb existing fringed orchids, and "introduce or expand invasive species" that would compete with the orchid, hastening its decline and impeding its recovery. BA 3.0-72; BiOp 31.

107.   The BiOp claims that conservation measures would prevent the Project from adversely affecting this species, but the conservation measures are completely unenforceable, rely on TransCanada's employees avoiding the plant,

and fail to contemplate the fact that the plant may be difficult to detect at certain points in its growth cycle. BiOp 10. The effectiveness of these measures is therefore far from certain. The conservation measures also completely fail to address the risk posed by invasive species, and the fact that the orchid's pollination requires the hawk moth, which could be harmed by herbicides used to maintain the pipeline's right of way.

108. The BiOp claims that conservation measures would prevent the Project from adversely affecting this species, but the conservation measures are completely unenforceable, rely on TransCanada's employees avoiding the plant, and fail to contemplate the fact that the plant may be difficult to detect at certain points in its growth cycle. BiOp 10. The effectiveness of these measures is therefore far from certain. The conservation measures also completely fail to address the risk posed by invasive species, and the fact that the orchid's pollination requires the hawk moth, which could be harmed by herbicides used to maintain the pipeline's right of way.

109. Both agencies failed to perform *any* ESA analysis of the Project's potential effects on the northern swift fox *(vulpes velox hebes)*, even though it is a federally listed endangered species in Canada, was previously listed in Montana and South Dakota, and may again be listed in those states due to its depressed population and loss of habitat. 50 C.F.R. § 17.11(h). It is simply not mentioned in either the BA or the BiOp. The Project will cut through many areas where the swift fox is managing to reestablish populations, and additional suitable habitat

areas in Montana and South Dakota.  The State Department admitted that the Project would affect northern swift foxes in the United States because it could crush dens along with the kits and adults within.  FSEIS 4.8-36.  In addition, the Project will also harm habitat by disturbing it with noise and dust.  FSEIS 4.8-36. While the State Department claims that the impacted foxes in Montana and South Dakota will return to the Project area once construction is completed, and that the loss of animals killed when the Project caused their dens to collapse will have "no significant population effects," this statement *entirely* lacks factual support or explanation.  FSEIS 4.8-36.

110.   FWS and the State Department entirely failed to consider that the Project will also have impacts on the northern swift fox in the Canadian portion of the pipeline, and that the species will be subject to the additional risks posed by tar sands mining in Alberta.  Yet the ESA requires that agencies consider both direct and indirect impacts of their actions, including impacts outside "the immediate area involved in the action."  50 C.F.R. § 402.02.  The agencies' failure to consider the Project's impacts on the northern swift fox violates the ESA.  Turning a blind eye to the plight of a species simply because some of its members happen to inhabit one side of a political border – in this case, the Canadian side of its border with the United States – defies common sense and violates the language and intent of the ESA.

111.   As alleged above, the State Department and FWS failed to adequately assess the risks that the Project poses to threatened and endangered species as

required by the ESA.  Despite plaintiffs' delivery on or before May 2, 2017 of their 60-day notice alerting defendants to their ESA errors and omissions, defendants have failed to take corrective action to remedy those ESA violations. Accordingly, plaintiffs bring this Claim for Relief at this time.

## PRAYER FOR RELIEF

1.      WHEREFORE, plaintiffs respectfully request that the Court:

2.      Adjudge and declare that the defendants acted in an arbitrary and capricious manner by certifying the Project's FSEIS and approving the Project because the FSEIS is legally inadequate under the National Environmental Policy Act ("NEPA"), 42 U.S.C. section 4321 *et seq.*, and approval of the Project violates NEPA and the Administrative Procedure Act, 5 U.S.C. section 701 *et seq.*;

3.      Order defendants to withdraw their FSEIS and Project approvals including the Presidential Permit until such time as the defendants have complied with the requirements of NEPA and their implementing regulations;

4.      Adjudge and declare that the defendants' BA and BiOp for the Project violated the Endangered Species Act and the Administrative Procedure Act, 5 U.S.C. section 701 *et seq.*, and order the State Department to withdraw its BA and the FWS to withdraw its BiOp for the Project until such time as these defendants have complied with the requirements of the Endangered Species Act and its implementing regulations and the Administrative Procedure Act;

5.      Preliminarily and permanently enjoin all defendants including TransCanada from initiating any activities in furtherance of the Project that could

result in any change or alteration of the physical environment unless and until defendants comply with the requirements of the APA, NEPA, ESA and their implementing regulations;

6.      Award plaintiffs their reasonable attorneys' fees and costs and expenses incurred in connection with the litigation of this action;

7.      Grant plaintiffs such additional relief as the Court may deem just and proper.


Dated: July 14, 2017          PATTEN, PETERMAN, BEKKEDAHL &
                              GREEN, PLLC

                              s/ *James A. Patten*
                                  JAMES A. PATTEN


Dated: July 14, 2017          LAW OFFICES OF STEPHAN C. VOLKER

                              s/ *Stephan C. Volker*
                              STEPHAN C. VOLKER (Pro Hac Vice)

                              Attorneys for Plaintiffs
                              INDIGENOUS ENVIRONMENTAL NETWORK
                              and NORTH COAST RIVERS ALLIANCE

# EXHIBIT 1

(Plaintiffs' 60-Day Notice)

Stephan C. Volker
Alexis E. Krieg
Stephanie L. Clarke
Daniel P. Garrett-Steinman
Jamey M.B. Volker (Of Counsel)

Law Offices of
# Stephan C. Volker
950 Gilman Street, Suite 100
Berkeley, California 94710
Tel: (510) 496-0600 ❖ Fax: (510) 559-9654
svolker@volkerlaw.com

10.505.01

April 4, 2017

***VIA CERTIFIED MAIL AND FACSIMILE***

Ryan Keith Zinke, Secretary
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240
Fax: (202) 219-2100

Rex Tillerson, Secretary
United States Department of State
2201 C Street, NW
Washington, DC 20520
Fax: (202) 647-4780

James W. Kurth, Acting Director
United States Fish & Wildlife Service
1849 C Street, NW, Room 3331
Washington, DC 20240-0001
Fax: (202) 208-6817

Thomas Shannon, Under Secretary
United States Department of State
2201 C Street, NW, Room 7250
Washington, DC 20520
Fax: (202) 647-4780

Re:  **Sixty-Day Notice of Intent to Sue for Violations of Section 7 of the Endangered Species Act**

Dear Secretary Zinke, Acting Director Kurth, Secretary Tillerson, and Under Secretary Shannon:

We write on behalf of the Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA") to notify you that the U.S. Department of State ("State Department") and the U.S. Fish and Wildlife Service ("FWS") are in violation of section 7 of the Endangered Species Act (the "ESA"), 16 U.S.C. section 1536, and its implementing regulations promulgated at 50 C.F.R. part 402. As discussed below, the State Department approved a permit for the Keystone XL Pipeline Project ("Project") that will affect endangered and threatened species without adequately consulting with the FWS and without preparing an adequate biological assessment. FWS likewise failed to conduct a lawful consultation under section 7 because it prepared a biological opinion that fails to adequately assess the risks of the Project to endangered and threatened species. Therefore, the State Department and FWS failed to fulfill their obligations under the ESA. This letter is provided pursuant to the sixty-day notice requirement of the citizen suit provision of the ESA, 16 U.S.C. section 1540(g).

## I.   BACKGROUND

On March 24, 2017, the State Department announced Under Secretary Thomas A. Shannon's March 23, 2017, decision to issue a Presidential Permit ("Permit") to TransCanada to construct, operate, and maintain the approximately 1204-mile long Keystone XL Pipeline and related Project facilities, including approximately 875 miles of pipeline in Montana, South Dakota and Nebraska, to transport up to 830,000 barrels per day ("BPD") of crude oil from Hardisty, Alberta, Canada and the Bakken shale formation in Montana to existing pipeline facilities near Steele City, Nebraska. From there, the oil would eventually be delivered to Cushing, Oklahoma and the Gulf Coast region.

In the United States, the pipeline would cross more than 1,000 water bodies and the vast Ogallala Aquifer in South Dakota and Nebraska, and hundreds more water bodies in Canada. Steel pipelines such as the Project are inherently prone to corrosion and leakage. For example, TransCanada's first Keystone pipeline spilled 14 times in the United States in its first year of operation alone.[1] Oil derived from tar sands, known as dilbit, is exceedingly difficult to clean up because it is so dense it sinks in water and attaches to the beds and banks of water bodies.[2] Several years after the Enbridge pipeline spilled over one million gallons of tar sands oil into the Kalamazoo River in 2010, nearly 40 miles was still contaminated with oil despite the expenditure of nearly one billion dollars on cleanup.[3]

The Project would pass through threatened and endangered species' occupied and identified recovery habitat, exposing them to risks such as contact with toxic spills or tailings ponds, injury or displacement by construction and maintenance equipment vehicles and workers, collisions with power lines and other infrastructure, excessive noise and night-time lighting, surface- and ground-water contamination, habitat destruction and fragmentation, predation by introduced and invasive species, poaching by Project personnel and visitors, and other harms. The species affected include the endangered black-footed ferret, northern swift fox, whooping crane, interior least tern, pallid sturgeon, and American burying beetle, and the threatened piping plover, northern long-eared bat and western prairie fringed orchid, among others.

---

[1] Final Environmental Impact Statement for the Proposed Keystone XL Pipeline (August 26, 2011), ES-8.

[2] Song, Lisa. "Dilbit Sinks in Enbridge Oil Spill, but Floats in its Lab Study." InsideClimate News. March 14, 2013. Web. Http://insideclimatenews.org/news/20130314/tar-sands-dilbit-sinks-enbridge-oil-spill-floats-its-lab-study. (Attached here as Exhibit 1.)

[3] FWS, "Enbridge Must Restore Environment Injured by 2010 Kalamazoo River Oil Spill – Settlement for natural resources requires comprehensive restoration project to address resource losses and resource damages" (June 8, 2015), https://www.fws.gov/midwest/news/785.html. (Attached here as Exhibit 2.)

## II.    VIOLATIONS OF THE ESA

### A.    Applicability of the ESA

Any action "authorize[d], fund[ed], or carr[ied] out" by a federal agency which may affect listed species or their critical habitat is subject to inter-agency consultation under section 7 of the ESA. "A federal agency must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat, and any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (internal quotes omitted).

The consultation process under section 7 of the ESA requires the State Department as the "action agency" to consult with the Secretary of Interior to ensure that the State Department's actions are "not likely to jeopardize the continued existence of any endangered species . . . ." 16 U.S.C. §1536(a)(2). In order to fulfill this statutory mandate, the State Department and FWS must use the "best scientific and commercial data available." *Id.*

The consultation process often begins with informal consultation, an "optional process that includes all discussions, correspondence, etc., between the Service and the Federal [action] agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). If, during informal consultation, both the action agency *and* the agency representing the Department of Interior – in this case FWS – determine that "the action is not likely to adversely affect listed species," then the consultation process is terminated. *Id.* This termination requires written concurrence on the part of FWS. *Id.*

In the event that the agencies determine that the actions may adversely affect listed species, they must initiate formal consultation. 50 C.F.R. § 402.14. Formal consultation requires a detailed inquiry into the scope and extent of adverse effects upon endangered species which may result from the proposed action. *Id.* The formal consultation process must result in a biological opinion reaching one of two conclusions: that the project will, or will not, jeopardize listed species. 50 C.F.R. § 402.14(e).

If the project will jeopardize the continued existence of a listed species, taking that species creates civil and criminal liability under section 9 of the ESA. If, however, the biological opinion concludes that the project will not jeopardize the continued existence of the species, but will cause the "incidental take" of members of the listed species, FWS will provide an incidental take statement authorizing a certain number or extent of takings allowed, and specifying "reasonable and prudent measures" required to minimize the impact. 50 C.F.R. § 402.14(i).

### B. The State Department and FWS Failed to Fully Consider the Impacts of the Pipeline on Threatened and Endangered Species

In both the State Department's 2012 Biological Assessment ("BA") and FWS' 2013 Biological Opinion ("BiOp") for the Project, the State Department and FWS failed to properly consider the potential impacts of pipeline spills, tailings ponds, injury or displacement by the Project's long-term operation and growth-induction, collisions with power lines and other infrastructure, excessive noise and night-time lighting, surface- and ground-water contamination, habitat destruction and fragmentation, predation by introduced and invasive species, poaching by Project personnel and visitors, and other harms to listed species. In addition, the agencies improperly relied upon conservation measures that are speculative, ineffective or unenforceable under the ESA in concluding that the Project would not adversely affect endangered species. *See Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101, 1109-1110 (9th Cir. 2012) (concluding that it was improper for the biological opinion to rely upon a Conservation Action Plan that was "unenforceable under the procedures established by the ESA").

Furthermore, the BA and BiOp focus on construction stage impacts and ignore the Project's operational impacts including pipeline rupture and oil spills. For example, the BiOp suggests that construction should be halted if species such as the piping plover, interior least tern, and whooping crane are observed during monitoring surveys. *See, e.g.,* BiOp 24, 26, 29. But the BiOp only discusses crude oil spills in relation to the American burying beetle. BiOp 65. And that discussion declines to detail the impacts of a spill beyond a brief mention of soil compaction and soil disturbance. *Id.* Instead, the BiOp determines that oil spills are not covered by any take permit, and that the EPA will consult with FWS about species impacts *once a spill takes place*. But it is too late to prevent harm *after* the damage has occurred.

#### *Whooping Crane*

The endangered whooping crane is one of the rarest birds in North America, and the transmission lines for the Project threaten the species' survival and recovery. Both the BA and FSEIS admit that transmission lines will pose a collision hazard to birds, including whooping cranes. See, e.g., FSEIS 4.6-1, 4.6-3, 4.6-18 through 4.6-20; BA 3.0-20 (acknowledging that "[p]ower lines associated with the proposed Project are collision hazards to migrant whooping cranes"). However, the agencies then claim that they have no duty to analyze the hazards associated with power lines, and instead rely upon future analysis and consultation to claim that these impacts will be mitigated to a level that is not likely to adversely affect the species. BA 3.0-2; BiOp 10. This deferral of analysis is impermissible.

Mitigating risks to the whooping crane with bird flight diverters ("BFDs") on power lines is also insufficient. It is not clear that BFDs are effective, and neither the State Department nor FWS made any attempts to understand whether and how whooping cranes would respond to BFDs. Thus, the agencies failed to meet the ESA's section 7 requirements.

The Project's route through Nebraska coincides with the migration corridor used by 90 percent of whooping cranes, where they stop to rest and feed on the Niobrara, Platte, and North and Middle Loup rivers. Yet the BiOp fails to appropriately account for the potentially lethal risk that a pipeline leak or spill would pose to whooping cranes at these locations.

The whooping crane is also listed as endangered in Canada, and its survival there is threatened by tar sands development. Tar sands mining results in the creation of tailings ponds containing a toxic stew of clay, sand, hydrocarbons, sulfur, and heavy metals that remains for decades and possibly centuries after the oil extraction process. Syncrude Canada, the largest tar sands oil extraction company in Canada, runs one lake-sized tailing reservoir that killed over 1,600 birds in 2008 alone.[4] FSEIS 4.15-113. These tailings ponds pose a significant risk to many species of birds, including the whooping crane. The State Department refused to consider impacts to whooping cranes in Canada, insisting that it has no duty to do so. However, 50 C.F.R. § 402.02 requires that agencies consider both direct and indirect impacts to species in "all areas to be affected" by the Project, "and not merely [in] the immediate area involved in the action." Therefore, the agencies' refusal to consider the effects of the Project on whooping cranes in Canada violates the ESA.

*Pallid Sturgeon*

The pallid sturgeon has been listed as endangered since 1990, and the Keystone XL pipeline would cross through its habitat in the Missouri and Yellowstone rivers, and upstream of its habitat in the Missouri and lower Platte rivers. A spill in either area would do tragic and irreparable harm to the pallid sturgeon. The BA recognizes that a spill exposing the pallid sturgeon to crude oil "could result in adverse toxicological effects" to the fish, but dismisses this risk with the assertion that such effects are "unlikely due to the low probability of a spill." BA 3.0-30. The agencies further claim that the Project is not likely to adversely affect the pallid sturgeon because "if a significant spill event were to occur, federal and state laws would require cleanup." BA 3.0-30; BiOp 9. However, according to the State Department's own analysis, the pipeline will spill an average of 1.9 times annually, for a total of 34,000 gallons of oil each year. See FSEIS Appendix K, Tables 6-9. Tar sands oil is thicker, more viscous and therefore more difficult to clean up than conventional crude oil. Simply hoping that a spill will not occur in or near pallid sturgeon habitat – and assuming that it will be rapidly and completely cleaned up if it does – is not the comprehensive, objective and searching analysis that the ESA requires.

*Black-Footed Ferret*

The black-footed ferret, once considered extinct, is still extremely rare. It has been protected as an endangered species for the last fifty years. 32 Fed.Reg. 4001 (3-11-1967).

---

[4] White, Patrick, October 26, 2010 (as updated August 23, 2012), "Toxic Syncrude tailings pond kills hundreds more ducks," *The Globe and Mail* (attached hereto as Exhibit 1).

Black-footed ferrets depend upon prairie dogs as their main food source, and upon prairie dog burrows for their only source of shelter. BA 3.0-2. While the proposed Project does not cross through any known black-footed ferret habitats, it will cross through eight prairie dog towns, endangering important habitat that ferrets could use as their population recovers. BA 3.0-3. The loss of these prairie dog towns will further limit the ability of the black-footed ferret to recover, and both the BA and the BiOp must consider this impact.

### *Interior Least Tern*

The Project will cut through endangered interior least tern habitat in Montana, South Dakota, and Nebraska, including important breeding areas along the Yellowstone, Cheyenne, Platte, Loup, and Niobrara rivers. BA 3.0-5 through 3.0-6. This will expose the rare least tern to the risk of oil spills, construction noise and activity, habitat loss, and power line collisions. BA 3.0-8 through 3.0-11. As with its analysis of the whooping crane above, the State Department declined to fully analyze the impacts of power lines because power providers have committed to consult with federal agencies when they build power lines in the future. BA 3.0-10. But by then the Project would be built and it will be too late to redesign it. Deferring analysis of this significant risk is unacceptable under the ESA.

### *Piping Plover*

The Project will cut through habitat of the threatened piping plover in Nebraska and Montana, skirting nesting areas near the Platte, Loup, and Niobrara rivers and the Fort Peck Reservoir. BA 3.0-66. Not only will power lines pose a collision risk, but their towers would create perches for raptors, increasing predation of the piping plover. BA 3.0-67 through 3.0-68. Again, the State Department impermissibly deferred analysis of these critical risks until after Project approval, in violation of the ESA. BA 3.0-68.

### *Rufus Red Knot*

The rufus red knot is a migratory bird species. In its listing decision, FWS stated that "in years when conditions favor it, a large proportion of midcontinental migrants may use Northern Plains stopovers in spring. In addition, birds using the Northern Plains as a spring stopover stayed an average of 16.2 days (Newstead et al. 2013, Table 3); this was not a short stop but actually similar to the stopover duration in Delaware Bay." 79 Fed.Reg. 73706, 73716 (12-11-2014). The rufus red knot has been observed stopping over in Montana and South Dakota, and may possibly stop over in Nebraska. *Id.* The FSEIS and BA do not address the rufus red knot at all. While the State Department's 2017 Record of Decision states that it consulted with FWS on the impacts to this species, the bare conclusion that the Project will not harm these species does not address the conflicts between the rufus red knot's migration patterns and the potential harms cause by project construction and operation. None of the Project's mitigation measures contemplate protections for the rufus red knot during construction or operation, and no survey protocols were included in the BiOp or FSEIS. The agencies failed to use and present the best scientific and commercial data available to protect the rufus red knot.

### Northern Long-Eared Bat

After the BA and BiOp were prepared, FWS listed the northern long-eared bat as a threatened species, due to human disturbance, habitat destruction and fragmentation, and fungal disease. FSEIS 4.8-7 through 4.8-8. The State Department's analysis of potential threats to this species is entirely inadequate. The State Department acknowledges that the northern long-eared bat "occur[s] within the proposed Project area," FSEIS 4.8-5, and that the bat "may be impacted by proposed Project construction of operations." FSEIS 4.8-8. However, the State Department failed to determine what those impacts would be, precluding consideration of any measures to mitigate or avoid them. FSEIS 4.8-4 (Table 4.8-1 admits that no conservation measures were developed for the northern long-eared bat). In addition, the State Department failed to conduct surveys to determine whether there are roosts in the Project area. In fact, after *admitting* that the Project could have impacts on the northern long-eared bat, the State Department backtracked and abdicated its duty to determine impacts and protect wildlife, stating simply that it would "coordinate with [FWS] on whether the proposed Project could have impacts on the species." FSEIS 4.8-8. While the 2017 ROD indicates that FWS concurred that the Project "may affect, but is not likely to adversely affect" the northern long-eared bat, this concurrence is meaningless if based upon the inadequate information included in the FSEIS.

### Western Fringed Prairie Orchid

The threatened western fringed prairie orchid is present in the Project area in Nebraska, and may be present in South Dakota, though uncertainty remains due to insufficient surveying. BA 3.0-70. Clearing for construction would disturb existing fringed orchids, and "introduce or expand invasive species" that would compete with the orchid, hastening its decline and impeding its recovery. BA 3.0-72; BiOp 31.

The BiOp claims that conservation measures would prevent the Project from adversely affecting this species, but the conservation measures are completely unenforceable, rely on TransCanada's employees avoiding the plant, and fail to contemplate the fact that the plant may be difficult to detect at certain points in its growth cycle. BiOp 10. The effectiveness of these measures is therefore far from certain. The conservation measures also completely fail to address the risk posed by invasive species, and the fact that the orchid's pollination requires the hawk moth, which could be harmed by herbicides used to maintain the pipeline's right of way.

### American Burying Beetle

The endangered American burying beetle is the only species that the agencies admitted was likely to be adversely affected by the Project, due to habitat loss, soil compaction, increased predation, exposure to spills, and being crushed by traffic or exposed during excavation. FSEIS ES-23; BA 3.0-56. This species plays an important role in its ecosystem, recycling nutrients and limiting the fly population. Yet FWS issued an incidental take statement, allowing the Project to harm or kill approximately 352 American burying beetles. BiOp 74. Despite the critical role played by the American burying beetle and the likelihood of a spill, as described above,

defendants claim that the improbability of a spill excuses them from considering the impacts that such a foreseeable incident – indeed, one *predicted* by the FSEIS – would have on this endangered species. BiOp 65. This is impermissible.

### Northern Swift Fox

Both agencies failed to do *any* ESA analysis of the Project's potential effects on the northern swift fox *(vulpes velox hebes)*, even though it is a federally listed endangered species in Canada. 50 C.F.R. § 17.11(h). It is simply not mentioned in either the BA or the BiOp. The Project will cut through many areas where the swift fox is managing to establish populations, and additional suitable habitat areas in Montana and South Dakota. The State Department admitted that the Project would affect northern swift foxes in the United States because it could crush dens along with the kits and adults within. FSEIS 4.8-36. In addition, the Project will also harm habitat by disturbing it with noise and dust. FSEIS 4.8-36.[5]

FWS and the State Department entirely failed to consider that the Project will also have impacts on the northern swift fox in the Canadian portion of the pipeline, and that the species will be subject to the additional risks posed by tar sands mining in Alberta. Yet the ESA requires that agencies consider both direct and indirect impacts of their actions, including impacts outside "the immediate area involved in the action." 50 C.F.R. § 402.02. The agencies' failure to consider the Project's impacts on the northern swift fox violates the ESA. Turning a blind eye to the plight of a species simply because some of its members happen to inhabit one side of a political border – in this case, the Canadian side of its border with the United States – defies common sense and violates the language and intent of the ESA.

---

[5] While the State Department claims that the impacted foxes in Montana and South Dakota will return to the Project area once construction was completed, and that the loss of animals killed when the Project caused their dens to collapse will have "no significant population effects," this statement *entirely* lacks factual support or explanation. FSEIS 4.8-36.

### III.    **CONCLUSION**

The State Department and FWS failed to adequately consider the risks that the Project poses to threatened and endangered species as required by the ESA. If the State Department does not act within sixty days to correct its violation of the ESA, IEN and NCRA will commence litigation in federal court against the agencies and officials named in this letter. We will seek injunctive and declaratory relief, as well as legal fees and costs incurred in the litigation, to remedy these violations.

Respectfully submitted,

Stephan C. Volker
Attorney for Indigenous Environmental Network and North
Coast Rivers Alliance


cc:    Clients

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2017, a copy of the foregoing

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE OF COURT

TO FILE FIRST AMENDED COMPLAINT UNDER F.R. CIV. PRO. 15 was

electronically served on all counsel of record via the Court's CM/ECF system.

<div style="margin-left:2em">

s/ *Stephan C. Volker*_____
Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE

</div>