JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
    PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

Attorneys for Plaintiffs
INDIGENOUS
ENVIRONMENTAL
NETWORK and NORTH
COAST RIVERS ALLIANCE

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
DANIEL P. GARRETT-STEINMAN (Pro
    hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:    svolker@volkerlaw.com
    akrieg@volkerlaw.com
    sclarke@volkerlaw.com
    dgarrett@volkerlaw.com
    jvolker@volkerlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>           Plaintiffs,<br><br>  vs.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>           Federal Defendants, | Civ. No. 4:17-cv-00029-BMM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' AND TRANSCANADA'S SUPPLEMENTAL MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Hearing:  October 11, 2017<br>Time:     1:30 p.m.<br><br>Judge:    Hon. Brian M. Morris |

and                                             )
                                                )
                                                )
TRANSCANADA KEYSTONE PIPELINE                   )
and TRANSCANADA CORPORATION,                    )
                                                )
                                                )
          Defendant-Intervenors.                )
                                                )
_____

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**I.    THE ESA WAIVES THE FEDERAL GOVERNMENT'S SOVEREIGN IMMUNITY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**A.    STATE'S ACTIONS ARE "FEDERAL AGENCY" ACTIONS SUBJECT TO THE ENDANGERED SPECIES ACT AND ITS CITIZEN-SUIT PROVISION.**. . . . . . . . . . . . . 11

**B.    PRESIDENTIAL ACTIONS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**C.    THE PROJECT APPROVALS ARE NOT PRESIDENTIAL ACTIONS BECAUSE THE PRESIDENT EXPRESSLY "WAIVED" HIS AUTHORITY OVER THE FINAL PERMITTING DECISION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**D.    THE PROJECT APPROVALS ARE NOT PRESIDENTIAL ACTIONS BECAUSE CONGRESS REQUIRED THAT STATE COMPLY WITH THE ENDANGERED SPECIES ACT AND OTHER ENVIRONMENTAL PROTECTION STATUTES BEFORE TAKING ACTION**. . . . . . . . . . . . . . . . . 19

**II.   PLAINTIFFS HAVE STANDING TO BRING THEIR THIRD CLAIM**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**CERTIFICATE OF COMPLIANCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## CASES

*Anza v. Ideal Steel Supply Corp.*
547 U.S. 451 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Baker v. Carr*
369 U.S. 186 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21

*Bennett v. Spear*
520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Canyon County v. Syngenta Seeds, Inc.*
519 F.3d 969 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Center for Biological Diversity v. Hagel,*
80 F.Supp.3d 991 (N.D. Cal. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Center for Biological Diversity v. Mattis,*
2017 WL 3585638 (9th Cir. August 21, 2017).. . . . . . . . . . . . . . . . . . 27, 28

*Citizens for Better Forestry v. U.S. Department of Agriculture*
341 F.3d 961(9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Dalton v. Specter*
511 U.S. 462 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Defenders of Wildlife v. U.S. Environmental Protection Agency*
420 F.3d 946 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Detroit International Bridge Company v. Government of Canada*
189 F.Supp.3d 85 (D.D.C. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Earth Island Institute v. Christopher*
6 F.3d 648 (9th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Environmental Protection Information Center v.*
*Simpson Timber Co.*
255 F.3d 1073 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Franklin v. Massachusetts*
     505 U.S. 788 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Gilligan v. Jamco Development Corp.*
     108 F.3d 246 (9th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Japan Whaling Association v. American Cetacean Society*
     478 U.S. 221 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Knievel v. ESPN*
     393 F.3d 1068 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lucas v. South Carolina Coastal Council*
     505 U.S. 1003 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lujan v. Defenders of Wildlife*
     504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lujan v. National Wildlife Federation*
     497 U.S. 871 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Maya v. Centex Corp.*
     658 F.3d 1060 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mendoza v. Zirkle Fruit Co.*
     301 F.3d 1163 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*National Association of Home Builders v.*
*Defenders of Wildlife*
     551 U.S. 644 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Natural Resources Defense Council v. Jewell*
     749 F.3d 776 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Natural Resources Defense Council v. U.S. Department of State*
     658 F.Supp.2d 105 (D.D.C 2009). . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18

*Protect Our Communities Foundation v. Chu*
     2014 WL 1289444 (S.D.Cal. No. 3:12-cv-03062-L-JLB;
     March 27, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Salmon Spawning & Recovery Alliance v. Gutierrez*
     545 F.3d 1220 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Skaff v. Meridien North America Beverly Hills, LLC*
    506 F.3d 832 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*South Yuba River Citizens League v. National Marine Fisheries Service*
    629 F.Supp.2d 1123 (E.D.Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Thomas v. Mundell*
    572 F.3d 756 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Washington Toxics Coalition v. EPA*
    413 F.3d 1024 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**CONSTITUTION**

United States Constitution, Article 1
    § 8, cl. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**STATUTES**

United States Code, Title 5
    §§ 701-706 ("APA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States Code, Title 16
    §§ 1531 *et seq.* ("ESA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
    § 1536 ("Section 7"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
    § 1536(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
    § 1540(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12
    § 1540(g)(2)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States Code, Title 42
    §§ 4321 *et seq.* ("NEPA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**REGULATIONS**

Code of Federal Regulations, Title 22
    § 161.11(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Code of Federal Regulations, Title 50
    § 402.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**RULES**

Federal Rules of Civil Procedure
    Rule 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Rule 8(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20, 21
    Rule 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Rule 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

## OTHER AUTHORITIES

Executive Order 13337 of April 30, 2004
    69 Fed.Reg. 25299 (May 5, 2004). . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

Memorandum of January 24, 2017: Construction of the Keystone XL Pipeline
    82 Fed.Reg. 8663 (Jan. 30, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

Presidential Permit of March 23, 2017
    82 Fed.Reg. 16467 (Apr. 4, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

Denis Binder, *The Spending Clause As a Positive Source of*
    *Environmental Protection: A Primer*, 4 Chap.L.Rev. 147 (2001). . . . . . . . 17

Sara D. Van Loh, *The Latest and Greatest Commerce Clause*
    *Challenges to the Endangered Species Act: Rancho Viejo and*
    *GDF Realty*, 31 Ecology L.Q. 459 (2004). . . . . . . . . . . . . . . . . . . . . . 17

Merriam Webster, Online Dictionary (2017), "any"
    https://www.merriam-webster.com/dictionary/any. . . . . . . . . . . . . . . . . . 12

## INTRODUCTION

Plaintiffs Indigenous Environmental Network and North Coast Rivers Alliance (collectively, "plaintiffs") brought this action for declaratory and injunctive relief against defendants United States Department of State ("State"), Under Secretary of State Thomas A. Shannon, United States Fish and Wildlife Service ("FWS"), Acting Director of the United States Fish and Wildlife Service James Kurth, and Secretary of the Interior Ryan Zinke (collectively, "Federal Defendants") to set aside their erroneous approval of a Presidential Permit for the Keystone XL Pipeline ("Project").  On March 23, 2017, Federal Defendants issued a Record of Decision and National Interest Determination ("ROD/NID") approving the Presidential Permit for the Project.  ECF 44-6 (ROD/NID; Exhibit 4 to Federal Defendants' motion); ECF 44-8 (Presidential Permit; Exhibit 6 to Federal Defendants' motion).  TransCanada Corporation, *et al.* ("TransCanada;" collectively with Federal Defendants, "defendants"), successfully moved to intervene in this case on behalf of Federal Defendants.  ECF 37 at 2.

Defendants argue in their supplemental motions to dismiss plaintiffs' First Amended Complaint ("FAC," ECF 61, Exh. 1) that plaintiffs fail to state a claim under the citizen-suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. section 1540(g), because (1) State's issuance of the ROD/NID is a "presidential action, . . . outside the narrow waiver of sovereign immunity found in the ESA citizen-suit provision," and (2) plaintiffs lack standing to bring their ESA claim against State.  Federal Defendants' Memorandum of Points and Authorities in

Support of Supplemental Motion to Dismiss ("FDSMPA," ECF 71) 2-3 (quote), 4-10; TransCanada's Memorandum in Support of Motion to Dismiss First Amended Complaint ("TCSMPA," ECF 69) 3-12.  As explained more fully below, these arguments lack merit because the ROD/NID was approved by State, not the President, and plaintiffs have standing to raise their claims.

## STANDARD OF REVIEW

Defendants' supplemental motions to dismiss raise two primary arguments. Each argument is reviewed under the standard applicable to motions to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6).

First, defendants argue that plaintiffs' third claim for relief is not cognizable under the ESA citizen-suit provision because State's Project approval actions were supposedly "presidential" and not "agency" actions.  FDSMPA 2-3; TCSMPA 4-5, 7.  Because defendants question whether the ESA citizen-suit provision provides a cause of action here, defendants' argument is properly viewed as a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim, not a Fed.R.Civ.P. 12(b)(1) attack on subject-matter jurisdiction, as a District Court judge recently concluded under similar circumstances, albeit with respect to a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. sections 701-706, rather than the ESA citizen-suit provision.  *Protect Our Communities Foundation v. Chu*, 2014 WL 1289444, 2 ("*Chu*") (S.D.Cal. No. 3:12-cv-03062-L-JLB; March 27, 2014) ("The gravamen of Defendants' position is not that Plaintiffs do not present federal claims, but instead whether those claims are enforceable against the DOE

when it is acting on behalf of the President pursuant to [an] Executive Order").

Second, Federal Defendants argue that plaintiffs lack standing to pursue their third cause of action alleging that State failed to comply with ESA section 7. To establish standing, the complaint need plead only "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed.R.Civ.P. 8(a).

Under Fed.R.Civ.P. 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006) ("we accept as true the factual allegations in the . . . complaint"). "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir.1997). Granting a motion to dismiss is only appropriate "'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1167 (9th Cir. 2002)).

## ARGUMENT

## I.   THE ESA WAIVES THE FEDERAL GOVERNMENT'S SOVEREIGN IMMUNITY

Defendants do not dispute that plaintiffs' third claim for relief is made pursuant to the ESA's citizen-suit provision (16 U.S.C. section 1540(g)(2)(a)). Nor do they dispute that the citizen-suit provision "itself is a waiver of sovereign

immunity." *South Yuba River Citizens League v. National Marine Fisheries Service*, 629 F.Supp.2d 1123, 1130 (E.D.Cal. 2009) (quote); FDSMPA 4 ("this provision is a waiver of sovereign immunity"); TCSMPA 5 ("If agency action were at issue here, the ESA citizen suit provision might supply the appropriate jurisdictional basis").  Instead, they argue this Court lacks jurisdiction over plaintiffs' ESA citizen-suit claim because the waiver of sovereign immunity in the citizen-suit provision is limited to suits challenging agency actions, while State's actions here are "presidential action."  FDSMPA 2-3 (quote); TCSMPA 3-8.

Defendants miss the mark.  It is irrelevant whether the ESA citizen-suit provision applies to *presidential* action because in this case, plaintiffs' claim challenges *agency* action.  As plaintiffs demonstrated in their opposition to defendants' original motions to dismiss, and expand on below, State's approval of the Presidential Permit through the ROD/NID is *agency* – not presidential – action.  Plaintiffs' Memorandum of Points and Authorities in Opposition to Federal Defendant's Motion to Dismiss and TransCanada's Motion to Dismiss ("PMPA," ECF 60) 18-29.

## A. STATE'S ACTIONS ARE "FEDERAL AGENCY" ACTIONS SUBJECT TO THE ENDANGERED SPECIES ACT AND ITS CITIZEN-SUIT PROVISION

The ESA mandates that "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). This consultation process generally involves preparation by the "federal agency" of a biological assessment, followed by preparation of a biological opinion and accompanying incidental take statement by the consulting agency (here, FWS). 16 U.S.C. § 1536; *Bennett v. Spear*, 520 U.S. 154, 157-158 (1997). And where, as here, an agency must consult under section 7 of the ESA prior to taking an action, it is subject to a "citizen suit" alleging that it failed to comply with section 7's requirements. 16 U.S.C. § 1540(g); *see, e.g., Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005); *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001).

State recognizes *in its own regulations* that it is a "federal agency" subject to the consultation requirement of section 1536(a)(2) for "*any Departmental action* that may have effects in the United States on listed species or their habitat." 22 C.F.R. §§ 161.11(a) (emphasis added). "Any" means "one or some indiscriminately *of whatever kind*." Merriam Webster, Online Dictionary (2017) (emphasis added). There are no listed exclusions for presidential permits, and State's regulations do not further narrow the definition of "any Departmental action."

Nor did State attempt to disclaim its statutory and regulatory consultation duties under the ESA prior to approving the Presidential Permit and issuing the ROD/NID. To the contrary, State *confirmed* its acceptance of its ESA duties by

preparing a biological assessment ("BA") for the Keystone XL Project (albeit an inadequate one).  State's ESA consultation with FWS culminated in the latter agency's preparation of a biological opinion ("BiOp") on which State relied in issuing its subsequent Presidential Permit and ROD/NID.  ECF 44-6.

And, of course, both State and the President acknowledged that the BA was prepared and the Presidential Permit was issued *pursuant to the ESA's requirements*.  82 Fed. Reg. 16467 (April 4, 2017; Presidential Permit, confirming it was issued after "having considered the environmental effects of the proposed action consistent with . . . Section 7 of the Endangered Species Act of 1973"); ECF 44-6 (ROD/NID, stating that "[c]onsistent with Section 7 of the ESA, the Department [of State] consulted with the FWS and submitted a Biological Assessment on the proposed Project"); 82 Fed. Reg. 8663 (January 24, 2017 Presidential Memorandum, stating: "To the maximum extent permitted by law, the [FSEIS] issued by the Department of State in January 2014 regarding the Keystone XL Pipeline . . . and the environmental analysis, consultation, and review described in that document . . . shall be considered by the Secretary of State to satisfy . . . any . . . provision of law that requires executive department consultation or review (including the consultation or review *required under section 7(a) of the Endangered Species Act of 1973*" (emphasis added)).

Yet now, faced with a legal challenge to State's compliance with the ESA, defendants wholly ignore State's and the President's prior confirmations that State's Project approval actions were taken pursuant (and thus subject) to the

ESA's consultation requirements – and thus subject to lawsuits challenging State's compliance with those requirements under the ESA citizen-suit provision.  Instead, relying on inapposite case law interpreting "agency action" under the *APA*, defendants contend this Court is powerless to decide whether State complied with the ESA's mandates.  Defendants argue that State's "Departmental action[s]" were not actually "agency action" for purposes of the ESA, but rather "presidential action."  FDSMPA 2-3 (quote); TCSMPA 4-5.

Wrong.  As plaintiffs demonstrated in their opposition to defendants' first motions to dismiss, and as summarized again below, even applying the APA's definition of "agency action" and the case law interpreting it, State took *agency* action subject to judicial review under the ESA's citizen-suit provision.  PMPA 18-29.

## B.   PRESIDENTIAL ACTIONS

Defendants contend that State's Project approval actions constitute *presidential* – not *agency* – actions under the APA.  TCSMPA 5.  They then assume that the same APA standards apply to the ESA citizen-suit provision, and argue that State's "presidential action[s]" are "outside the narrow waiver of sovereign immunity found in the ESA citizen-suit provision."  FDSMPA 2-3.  But even if defendants were right that the same APA standards regarding presidential actions apply to the ESA citizen-suit provision, State's approvals would still constitute *agency*, not *presidential*, action.

Whether an action taken by the President, or a delegee agency or official,

- 14 -

constitutes a "presidential action" unreviewable under the APA boils down to how much discretionary authority the President possesses to take or direct the action. In determining whether an action taken by an agency or official constitutes "presidential action," the courts consider two factors: (1) "[w]hether the President carries out the final action himself and the manner in which he does so," and (2) "whether 'the President's authority to direct the [agency] in making policy judgments' is curtailed in any way," for example by Congress. *Natural Resources Defense Council v. U.S. Department of State* ("*NRDC v. State*"), 658 F.Supp.2d 105, 111 (D.D.C 2009) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992)).

Where the President himself takes the "final act," that indicates that "his duties are not merely ceremonial or ministerial," and thus the approval is generally "presidential action" unreviewable under the APA. *Franklin*, 505 U.S. at 800 (quotes); *Dalton v. Specter*, 511 U.S. 462, 469-470 (1994). That is not the case here, as discussed in the next section; the President *relinquished* his authority to take the "final act" on the Project in his Memorandum dated January 24, 2017.

Where an agency, or official besides the President, takes the "final act," the action may still be "presidential" for purposes of the APA only if (1) the authority and restrictions to act are conferred on the agency primarily under the President's own authority ("discretionary authority vested in the President by law," either the Constitution or statute), rather than by Congress, and (2) "'the President's authority to direct the [agency] in making policy judgments' is [not] curtailed in

- 15 -

any way." *NRDC v. State*, 658 F.Supp.2d at 111.

For example, in *Detroit International Bridge Company v. Government of Canada* ("*DIBC*"), the court held that State's approval of a bridge between Canada and the U.S., under delegation from the President, was unreviewable presidential action because it satisfied both criteria. 189 F.Supp.3d 85, 96-105 (D.D.C. 2016). First, the "President's authority over the construction of international bridges" was "'at its maximum, for it includes all that he possesses in his own right'" under the Constitution (foreign affairs), plus a statutory delegation to the President pursuant to Congress' own constitutional powers in the field (foreign and domestic commerce). *Id.* at 98. And second, the President "chose to retain ultimate authority" over bridge approval where "any interagency dispute" arose, which "signal[ed] his belief that the issuance of presidential permits is ultimately a presidential action." *Id.* at 103 (internal quotations and citation omitted). Here, unlike in *DIBC*, Congress has not statutorily delegated its powers to the President, and as discussed more fully below, the President has retained no ultimate approval authority.

By contrast, where the President's – or agency delegee's – decisionmaking authority is constrained by Congress, the agency's action is likely an "agency action" *reviewable* under the APA, especially where the President also relinquishes his "ultimate authority" over the agency decision at issue. As relevant here, the ESA – like NEPA – is a prime example of how Congress constrains agency decisions in the realm of foreign and domestic commerce, even

where the President also possesses some inherent authority over the actions pursuant to his constitutional powers over foreign affairs.  Denis Binder, *The Spending Clause As a Positive Source of Environmental Protection: A Primer*, 4 Chap.L.Rev. 147, 147-148 (2001); Sara D. Van Loh, *The Latest and Greatest Commerce Clause Challenges to the Endangered Species Act: Rancho Viejo and GDF Realty*, 31 Ecology L.Q. 459, 469 (2004); *Chu*, 2014 WL 1289444, 5 ("it is clear that this Court has been tasked to review agency actions such as the issuance of a Presidential permit by an agency, based on its own EIS that was created to comply with NEPA").

Here, State's Project approval and issuance of the Presidential Permit and ROD/NID are final agency actions reviewable under the APA – and, under defendants' analytical extension, the ESA citizen-suit provision – because (1) the President relinquished his "ultimate authority" over the Project approval, and (2) Congress, through the ESA and other environmental statutes, curtailed State's discretionary power to approve the Project.

## C.   THE PROJECT APPROVALS ARE NOT PRESIDENTIAL ACTIONS BECAUSE THE PRESIDENT EXPRESSLY "WAIVED" HIS AUTHORITY OVER THE FINAL PERMITTING DECISION

While Executive Order 13337 gives the President authority to render a final decision on presidential permits under some circumstances, the President himself relinquished that authority with respect to the Keystone XL Pipeline Project through his Memorandum dated January 24, 2017.

- 17 -

Executive Order 13337 gives nearly plenary authority to State to decide whether or not to issue a presidential permit "for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels to or from a foreign country." 69 Fed. Reg. 25299. However, it requires State to consult with various entities and individuals prior to issuing – or denying – a presidential permit, and allows them to object to State's proposed decision. 69 Fed. Reg. 25300 (section 1(i)). And if the dispute cannot be resolved, section 1(i) of EO 13337 requires that State "refer the application . . . to the President for consideration and a final decision." *Id.* The "President [thus] chose to retain ultimate authority to settle any interagency dispute" as a referee under section 1(i) of EO 13337, which "signal[ed] his belief that the issuance of presidential permits is ultimately a presidential action." *NRDC v. State*, 658 F.Supp.2d at 111.

But here, the President did not elect to retain that ultimate authority. Instead, the President *expressly relinquished* his referral and decisionmaking authority over the Project through his January 24, 2017 Memorandum on the "Construction of the Keystone XL Pipeline." In that memorandum, the President directed that the "agency notification and fifteen-day delay requirements of sections 1(g), 1(h) and 1(i) of Executive Order 13337 are *hereby waived*," thus extinguishing his only avenue to review State's permitting decision and the "presidential" nature of the permit State ultimately issued. 82 Fed. Reg. 8663

- 18 -

(emphasis added).  This *express waiver* completely disposes of defendants' argument.

 **D. THE PROJECT APPROVALS ARE NOT PRESIDENTIAL ACTIONS BECAUSE CONGRESS REQUIRED THAT STATE COMPLY WITH THE ENDANGERED SPECIES ACT AND OTHER ENVIRONMENTAL PROTECTION STATUTES BEFORE TAKING ACTION**

 "[I]t is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'"  *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 229-30 (1986) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1969)).  Yet defendants once again make that fatal error here.  They claim that "the State Department acted" solely "pursuant to delegated authority from the President under Executive Order 13337."  TCSMPA 5.  Not so.

 Rather than occupied solely by the President, the field of cross-border facilities is a "zone of twilight in which he and Congress . . . have concurrent authority."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636 (1952).  While the President has constitutional authority over foreign affairs, Congress has constitutional authority over both foreign and domestic commerce.  U.S. Const. art. I, § 8, cl. 3 (Congress has authority to "regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes").  And Congress has not shied away from exercising that power to condition "Federal agency" actions, including the permitting of cross-border pipelines, on compliance with the ESA.  16 U.S.C. § 1536(a)(2).  Nor is the ESA the only Congressional regulation with which the State Department must comply before issuing permits

like the Presidential Permit here.  Congress further restricted agency discretion

through NEPA, 42 U.S.C. section 4321 *et seq.*, and other environmental protection

laws.  Indeed, as discussed, both State and the President acknowledged that the

agency was subject to those Congressional requirements.

Furthermore, State's reviews under ESA and NEPA were inextricably

intertwined with its decisionmaking process leading up to and including its

ultimate action in issuing the Presidential Permit for the Project.  As the permit

itself recites, State only issued the permit after "having considered the

environmental effects of the proposed action consistent with [NEPA], Section 7 of

the Endangered Species Act of 1973 . . ., and other statutes relating to

environmental concerns," as well as "the National Historic Preservation Act of

1966."  82 Fed. Reg. 16467.

Because Congress so substantially "curtail[ed]" the President's and State's

discretionary authority over permitting the Keystone XL Pipeline Project, State's

Project approvals – including the Presidential Permit, ROD/NID and FSEIS – are

*agency* actions subject to review by this Court under the ESA citizen-suit

provision, not unreviewable presidential actions.  *Franklin*, 505 U.S. at 799.

## II.    PLAINTIFFS HAVE STANDING TO BRING THEIR THIRD CLAIM

Defendants argue that plaintiffs' third claim "should be dismissed for lack

of standing."  FDSMPA 7 (quote); TCSMPA 8.  Their argument is mistaken.

Plaintiffs' allegations are more than adequate under Fed.R.Civ.P. 8(a).  "At the

pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice," because the Court presumes "'that general allegations embrace those specific facts that are necessary to support the claim'" when deciding a motion to dismiss.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (*quoting Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).[1]  The complaint need plead only "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp.*, 550 U.S. at 570; *see also* Fed.R.Civ.P. 8(a).  Thus this Court "must accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009).  Under this framework, defendants' attack on plaintiffs' standing fails on all three prongs:  plaintiffs' FAC establishes (1) injury in fact, (2) a plausible causal connection between defendants' conduct and plaintiffs' injury, and (3) redressability, as discussed below.

First, plaintiffs' allegations are sufficient to establish injury in fact.  *See Skaff v. Meridien North America Beverly Hills, LLC*, 506 F.3d 832, 838-841, 840 n.7 (9th Cir. 2007) ("succinct" allegation that plaintiff suffered injury was sufficient to provide notice to the defendants of plaintiff's standing and show injury in fact under Rule 8).  The FAC alleges that IEN's members "inhabit the states and province through which the Project is proposed to be built and who

---

[1]  *See also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 n.3 (1992) (had the challenge in *Lujan v. Defenders of Wildlife* "to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful").

would be directly and irreparably harmed" by its impacts, and that "NCRA's members use and enjoy the land and water resources and wildlife within the Project area that the Project would harm."  FAC ¶¶ 11, 12.  It states that plaintiffs' members have performed many activities – wildlife observation and photography among them – "on lands and waters within and adjacent to the proposed route of the Project and . . . intend to continue to do so in the future." FAC ¶¶ 11, 12.

Further, the FAC alleges that plaintiffs "highly value" and "have sought to study and observe" the ESA-protected species whose habitat the Project threatens, including the "endangered black-footed ferret, northern swift fox, whooping crane, interior least tern, pallid sturgeon, and American burying beetle, and the threatened piping plover, northern long-eared bat and western prairie fringed orchid, among others."  FAC ¶ 88.  Plaintiffs "have sought to study and observe them in the wild, and will continue to do so in the future."  *Id.*

The FAC also alleges that plaintiffs "would be directly harmed if the Project hastens [the species'] demise by degrading or destroying their habitat, displacing them from their habitat, or by killing or injuring them directly or indirectly."  *Id.* Plaintiffs state that these harms flow from "construction and operation of the Project, and by the oil spills that would pollute the lands that [plaintiffs'] members use and enjoy."  FAC ¶¶ 11,12, 13.  Plaintiffs allege that the "pipeline will spill an average of 1.9 times annually, for a total of 34,000 gallons of oil each year."  FAC ¶ 100.

TransCanada's claim that plaintiffs "fail to establish that any of their members possess an interest in the species at issue" ignores these allegations. TCSMPA 8.  For the same reason, Federal Defendants' claim that the FAC fails to allege a concrete and particularized interest fails.  FDSMPA 7.

Second, plaintiffs' allegations are sufficient to show a plausible causal connection between defendants' conduct and plaintiffs' injury.  "To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a line of causation between defendants' action and [plaintiffs'] alleged harm that is more than attenuated."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (internal quotations and footnote omitted).  Plaintiffs did so here.  While TransCanada claims that the FAC fails to identify conduct in violation of the ESA and "lacks the particularity and detail about the potential source of injury that would adversely affect these species," this misstates the facts.  TCSMPA 9-10. Plaintiffs' allegations establish an affirmative duty for the agencies to consult, and detail the manner in which the defendants failed to perform their consultation duties under the ESA, including specific deficiencies in the BA, BiOp, and consultation process.  *See* FAC ¶¶ 94-111.

Contrary to defendants' contention, the FAC specifically details how defendants violated the ESA.  *E.g.* FAC ¶¶ 94 (deficiencies in documents), 95 (existing consultation process ignored oil spill impacts for most species), 96 (BA and BiOp impermissibly defer mitigation for power line impacts on whooping crane to future date), 97 (reliance upon bird flight diverters to mitigate risks when

effectiveness for whooping crane is unknown violates ESA), 98 (BiOp fails to address whooping crane risks from pipeline leaks), 99 (Project impacts to whooping crane in Canada improperly ignored under 50 C.F.R. § 402.02), 100 (reliance upon future consultation to address oil spill harms to pallid sturgeon violates ESA), 101 (BiOp and BA fail to address how Project's prairie dog town impacts impair black-footed ferret recovery), 102 (deferring to future power line consultation insufficient to protect interior least tern), 103 (deferring analysis of power line construction on piping plover improper), 104 (agencies failed to use and present best scientific and commercial data available to protect rufus red knot), 105 (State's analysis of northern long-eared bat "entirely inadequate" because it contains no surveys or data; FWS's concurrence inadequate if based on FEIS), 106-108 (Project will impede recovery of western fringed prairie orchid, yet BiOp relies upon uncertain and ineffective mitigations), 109 (claim that Project's destruction of northern swift fox dens in the United States will have "no significant population effects" lacks support),110 (defendants failed to perform ESA analysis for northern swift fox in Canada), 111 (defendants "failed to adequately assess the [Project's] risks" to threatened and endangered species as the ESA requires).

Further, plaintiffs' allegations specifically address how these violations harm each species, both through Project construction and its operation. *Id.* For example, plaintiffs allege the harms to the whooping crane, pallid sturgeon, and interior least tern (FAC ¶ 88, 94-95, 98-99, 100, 102) posed by oil spills – which

are inevitable and not simply a speculative concern.  FAC ¶¶ 87 (Project's pipelines are "inherently prone to corrosion and leakage" and "TransCanada's first Keystone pipeline spilled 14 times in the United States in its first year of operation"), 100 (State predicted average spills of 34,000 gallons of oil each year). These allegations are sufficient to show causation.

Third, plaintiffs' claims are redressable.  As they did with their NEPA arguments, defendants again try to repurpose their incorrect assertion that the Project is not an agency action into an argument that plaintiffs' third claim for relief is not redressable.  FDSMPA 8-10; TCSMPA 9; PMPA 33-35.  Federal Defendants assert that plaintiffs "cannot obtain redress of their alleged concrete interests because the Court cannot enjoin the Presidential Permit or direct the President to further consider impacts to listed species without infringing on his constitutional authority over foreign affairs and national security."  FDSMPA 9. TransCanada similarly claims "that the President retains ultimate discretion over the issuance of the permit, thereby rendering Plaintiffs' alleged injury unredressable."  TCSMPA 9.

This argument fails.  The Ninth Circuit has repeatedly held that injuries under the ESA are redressable where a ruling would ensure that "protections accorded by the [ESA] would then come back into operation."  *Defenders of Wildlife v. U.S. Environmental Protection Agency*, 420 F.3d 946, 957 (9th Cir. 2005), *reversed in part on other grounds by National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).  A ruling requiring

compliance with the ESA's section 7 consultation requirement would do just that, contrary to defendants' contentions.  TCSMPA 9; FDSMPA 10.  Setting aside the BA and the BiOp to require a more thorough analysis of the Project's impacts on protected species and protected habitat *would* ensure compliance with the ESA and effectuation of the protections it affords.

Furthermore, section 7(a)(2) of the ESA "contains both substantive and procedural requirements, and plaintiffs have alleged violations of both requirements.  They have alleged, in addition to substantive noncompliance, 'procedural' harms . . . here, lack of adequate consultation between [State] and the FWS, including reliance on a legally improper Biological Opinion."  *Defenders of Wildlife*, 420 F.3d at 957.  "[T]o establish standing, a litigant who asserts a procedural violation under ESA Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests."  *Natural Resources Defense Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (emphasis added), *citing Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961, 971 (9th Cir. 2003) *and Defenders of Wildlife*, 420 F.3d at 957.

Plaintiffs have met this burden.  They have shown that the Project will threaten their interests because "the use of improper section 7 consultation by reason of an inadequate biological opinion lessens the likelihood that the impact of the proposed action on listed species and their habitats will be recognized and accounted for in making the [Project] decision."  *Defenders of Wildlife*, 420 F.3d at 958.  Therefore plaintiffs' injuries are redressable.

- 26 -

Finally, defendants' authorities are all inapposite.  Defendants rely on *Center for Biological Diversity v. Hagel*, 80 F.Supp.3d 991 (N.D.Cal. 2015), but that case has been overturned on this exact point on appeal, further cementing the error of defendants' argument.  *Center for Biological Diversity v. Mattis* ("*Mattis*"), 2017 WL 3585638, 10-11 (9th Cir. August 21, 2017); FDSMPA 8; TCSMPA 9.  In *Mattis* the Ninth Circuit held that the government's failure to comply with procedural statutory requirements was redressable because an "adequate process will benefit" plaintiffs, even where a project is currently ongoing.  2017 WL 3585638, 11.  So too here, plaintiffs' injuries are redressable by requiring State and FWS to undertake an adequate ESA consultation process.

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008) is also distinguishable on the grounds that the Ninth Circuit articulated in *Mattis*, 2017 WL 3585638.  FDSMPA 8-9; TCSMPA 9.  Like the *Mattis* case, here plaintiffs have standing because the claims presented are "forward-looking" and ask "that the Government discharge a statutory procedural requirement.  If the Government has failed to do so, then the court can remedy the defect by ordering the Government to comply with its statutory obligations."  2017 WL 3585638, 10.  Indeed, plaintiffs' prayer for relief requests that the Court "declare that the defendants' BA and BiOp for the Project violated the [ESA] and the [APA] . . . and order the State Department to withdraw its BA and the FWS to withdraw its BiOp for the Project until such time as these defendants have complied with the requirements of the [ESA]," unlike the *Salmon Spawning* case which sought to

overturn a treaty entered into nine years prior.  FAC 47 (Prayer ¶ 4); *Salmon Spawning*, 545 F.3d at 1227.  As noted in *Mattis*, even the *Salmon Spawning* case found that the plaintiffs satisfied the redressability requirement as to the agency's obligation to reinitiate ESA consultation because "a court order requiring the agencies to reinitiate consultation would remedy the harm asserted" in that "forward-looking allegation."  *Salmon Spawning*, 545 F.3d at 1229; *see also Mattis*, 2017 WL 3585638, 10.

TransCanada's reliance on *Earth Island Institute v. Christopher*, 6 F.3d 648, 652-653 (9th Cir. 1993) is likewise misplaced.  TCSMPA 9.  That case does not address redressability of a plaintiff's injuries, nor decide a plaintiff's standing.  Instead, *Earth Island* ruled that "the authority to negotiate treaties with foreign countries" lies with the Executive Branch.  6 F.3d at 652.  But no treaty is at issue here.  Rather, as discussed above, the issue before this Court is whether government agencies – State and FWS – complied with their duties to consult under the ESA – a question that plaintiffs have standing to raise here.

Plaintiffs' injuries can be remedied by ensuring that State and FWS comply with the procedural requirements of the ESA, thereby affording the sensitive species and habitat that exist along the Project route the protections provided by the ESA.  Therefore, plaintiffs' third claim for relief is redressable and plaintiffs have standing to bring this claim.

///

///

**CONCLUSION**

Plaintiffs properly seek review of final agency action, and have standing to do so.  Accordingly, their challenge to State's and FWS' compliance with the ESA cannot be dismissed, and defendants' motions must be denied.


Dated:  September 8, 2017          PATTEN, PETERMAN, BEKKEDAHL &
                                   GREEN, PLLC
                                   s/ *James A. Patten*
                                   JAMES A. PATTEN


Dated:   September 8, 2017         LAW OFFICES OF STEPHAN C. VOLKER
                                   s/ *Stephan C. Volker*
                                   STEPHAN C. VOLKER (Pro Hac Vice)

                                   Attorneys for Plaintiffs
                                   INDIGENOUS ENVIRONMENTAL NETWORK
                                   and NORTH COAST RIVERS ALLIANCE

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2) of the District of Montana Local Rules, I certify that this Brief contains 5219 words, excluding caption, certificates of service and compliance, table of contents and authorities, and exhibit index, as counted by WordPerfect X7, the word processing software used to prepare this brief.

Dated:  September 8, 2017        s/ *Stephan C. Volker*
                                                    STEPHAN C. VOLKER (Pro Hac Vice)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2017, a copy of the foregoing

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO

FEDERAL DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS AND

TRANSCANADA'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

was electronically served on all counsel of record via the Court's CM/ECF system.

<u>s/ *Stephan C. Volker*_____</u>
Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE