**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

**FILED**

NOV 2 2 2017

Clerk, U.S  District Court
District Of Montana
Great Falls

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVER ALLIANCE,<br><br>       Plaintiffs,<br><br>   vs.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>        Defendants,<br><br>    and<br><br>TRANSCANDA CORPORATION, et al.,<br><br>       Intervenor-Defendants | **CV-17-29-GF-BMM**<br><br><br><br><br><br><br>**ORDER** |

Plaintiffs Indigenous Environmental Network ("IEN") and North Coast

River Alliance ("NCRA") (collectively "Plaintiffs") bring this action against the

United States Department of State and various other governmental agencies and

agents in their official capacities ("Federal Defendants"). Plaintiffs allege that the

State Department violated the Administrative Procedure Act ("APA"), National

Environmental Policy Act ("NEPA"), and Endangered Species Act ("ESA") when

it published its Record of Decision ("ROD") and National Interest Determination

("NID") and issued the accompanying Presidential Permit to allow defendant-

intervenor TransCanada Keystone Pipeline, LP ("TransCanada") to construct a cross-border oil pipeline. Federal Defendants and TransCanada move to dismiss this action for lack of jurisdiction.

## BACKGROUND

Under Secretary Thomas A. Shannon published a ROD/NID on March 23, 2017, to recommend that the State Department approve a Presidential Permit to TransCanada to construct, connect, operate, and maintain an 875-mile long pipeline. (Doc. 61 at 6.) Executive Order 13337 delegates to the State Department the President's authority to issue a permit for the construction of an oil pipeline across the border of the United States if it finds that issuance of the permit to the applicant "would serve the national interest." Issuance of Permits, Exec. Order No. 13337, 69 Fed. Reg. 25299 (2004). The State Department issued the accompanying Presidential Permit on April 4, 2017. Notice of Issuance of a Presidential Permit, 82 Fed. Reg. 16467-02 (Apr. 4, 2017).

TransCanada is a limited Delaware partnership owned by the affiliates of TransCanada Corporation of Canada. TransCanada proposed the Keystone XL Pipeline as an expansion to its existing Keystone Pipeline System in 2008. (Doc. 49 at 11.) The proposed Keystone XL Pipeline would transport up to 830,000 barrels per day of crude oil from Alberta, Canada and the Bakken shale formation in Montana to existing pipeline facilities near Steele City, Nebraska. *Id.* The

2

proposed Keystone XL Pipeline crossing of the United States-Canada border requires TransCanada to obtain a Presidential Permit as part of the overall construction and operation of the entire facility. *Id.* at 12.

TransCanada first applied for a Presidential Permit in September of 2008. *Id.* at 11. Congress mandates that all federal agencies prepare a detailed environmental analysis of all "major federal actions." 42 U.S.C. § 4332(2)(C). The environmental analysis constitutes an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1. The State Department recognized that the issuance of a Presidential Permit would constitute a "major Federal action" and retained the role as the lead agency. Notice of Intent to Prepare an EIS, 74 Fed. Reg. 5019-02 (Jan. 28, 2009). As a result, the State Department undertook the duty to provide an analysis of the Keystone XL Pipeline under NEPA. *Id.* The State Department issued a draft environmental impact statement ("EIS") in April 2010, supplemented the EIS in April 2011, and issued a final EIS in August 2011. (Doc. 49 at 13.)

Congress passed the Temporary Payroll Cut Continuation Act of 2011, which directed the State Department to render a final decision on TransCanada's application within sixty days. *Id.* The State Department denied TransCanada's application for a cross-border permit in early 2012. The State Department explained that the arbitrary sixty-day deadline failed to provide sufficient time to

3

complete its consideration of Keystone XL Pipeline's potential environmental impacts. *Id.*

TransCanada submitted a new application to the State Department for a Presidential Permit for the proposed pipeline on May 4, 2012. *Id.* at 14. The State Department again recognized its duty as lead agency and reviewed this new application for potential environmental effects. (Doc. 44-1 at 12). This review included input from the public and from federal, state, and tribal entities. *Id.* The State Department issued a final Biological Assessment ("BA") to the Fish, Wildlife and Service ("FWS") on December 21, 2012. FWS published its Biological Opinion ("BiOp") and concurrence statement regarding the proposed pipeline on May 15, 2013. (Doc. 61 at 13.) The State Department released its Final Supplemental Environmental Impact Statement ("FSEIS") in January 2014. (Doc. 44-1 at 12.)

Secretary of State John Kerry denied TransCanada's application on November 6, 2015. (Doc. 61 at 14.) Secretary Kerry determined that issuing a Presidential Permit for the pipeline would not serve the national interest as required by Executive Order 13337. *Id.* Secretary Kerry's denial did not end the matter.

President Trump issued a Presidential Memorandum Regarding Construction of the Keystone XL Pipeline ("Memorandum") on January 24, 2017.

4

Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8663, 8664 (Jan. 24,

2017). The Memorandum invited TransCanada to reapply. *Id.* The President

delegated to the State Department his authority to issue the Presidential Permit

within sixty days. *Id.* The Memorandum further stated that the State Department

should consider, to the maximum extent permitted by law, the FSEIS released in

January 2014 to satisfy all applicable NEPA requirements, and any other provision

of law that would require executive department consultation or review, including

the consultation or review required under ESA section 7(a). *Id.*

The State Department received a renewed application from TransCanada on

January 26, 2017. (Doc. 61 at 14.) Under Secretary Shannon relied on the 2014

FSEIS and FWS's 2013 BiOp in determining whether the issuance of the

Presidential Permit would serve the national interest. Under Secretary Shannon

published the ROD/NID on March 23, 2017. (Doc. 44-1 at 13.) The State

Department did not supplement or revise either the 2014 FSEIS or the 2013 BiOp

in any manner. The State Department issued the accompanying Presidential Permit

on April 4, 2017.

Plaintiffs challenge the State Department's publication of the ROD/NID and

its decision to issue the accompanying Presidential Permit. (Doc. 61 at 11.)

Plaintiffs first seek for Federal Defendants to withdraw their FSEIS and Keystone

XL Pipeline approvals, including the ROD/NID and Presidential Permit, until

5

Federal Defendants have complied with NEPA. Plaintiffs next seek for Federal

Defendants to withdraw their BA and BiOp until Federal Defendants have

complied with the ESA and APA. Plaintiffs further seek a declaration that Federal

Defendants violated the aforementioned acts and permanent injunctive relief that

would prevent Federal Defendants and TransCanada from initiating any activities

in furtherance of the Keystone XL Pipeline. (Doc. 61 at 51-52.)

## DISCUSSION

Federal Defendants and TransCanada move to dismiss Plaintiffs' Complaint

pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil

Procedure. A challenge to a court's jurisdiction to hear a claim may be brought

either as a facial attack on the sufficiency of the pleadings, or as a factual attack

that contests the complaint's allegations. *Leite v. Crane Co.*, 749 F.3d 1117, 1121

(9th Cir. 2014). Federal Defendants question whether Plaintiffs have presented a

cause of action. The Rule 12(b)(6) standard applies. *Leite*, 749 F.3d at 1121.

## I.     NEPA Claims Against the Federal Defendants

Federal Defendants and TransCanada argue that the following jurisdictional

defects require the Court to dismiss Plaintiff's alleged NEPA violations: (1) the

issuance of a Presidential Permit constitutes presidential action that a court may

not review under the APA; (2) even if the issuance of the Presidential Permit could

be deemed an agency action, it represents an action committed to agency discretion

6

by law thereby shielding it from judicial review under the APA; and (3) Plaintiffs lack the ability to redress their alleged injuries.

## A. Agency Action

NEPA provides no private right of action. *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n,* 457 F.3d 941, 950 (9th Cir. 2006). This Court possesses jurisdiction to review alleged NEPA violations under the provisions of the APA under 28 U.S.C. § 1331. The APA waives the government's sovereign immunity and provides a private cause of action. 5 U.S.C. §§ 701-706. The APA provides for judicial review where a party suffers a "legal wrong because of agency action" or is "adversely aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

### 1. Actions of the State Department

TransCanada first applied for a Presidential Permit in 2008. The State Department recognized that issuance of the Presidential Permit would "constitute a major Federal action that may have a significant impact upon the environment within the meaning of the NEPA." Notice of Intent to Prepare an EIS, 74 Fed. Reg. at 5019-02. The State Department concluded that an EIS was necessary to address reasonably foreseeable impacts from the proposed action and alternatives. *Id.*

TransCanada reapplied in 2012. The State Department again recognized the need to "evaluate the potential environmental impacts of the proposed project

7

consistent with NEPA and the State Department's regulations." Application for

Presidential Permit, 77 Fed. Reg. 27533-02 (May 10, 2012). The State Department

in February 2017 acknowledged that TransCanada had applied for the third time

for a Presidential Permit. Notice of Receipt of TransCanada's Re-Application, 82

Fed. Reg. 10429-01 (Feb. 10, 2017). The State Department announced that it

would conduct a review of TransCanada's third application in accordance with the

Presidential Memorandum and any other applicable requirements. *Id.* The State

Department further announced that it would seek no further public comment on the

national interest determination because it already had taken public comment in

February of 2014. *Id.*

The Federal Register notices indicate that the State Department originally

acknowledged that the issuance of the Presidential Permit would constitute a

"major Federal action." Notice of Intent to Prepare an EIS, 74 Fed. Reg. at 5019-

02. The State Department also originally acknowledged its duty to prepare an EIS

to address reasonably foreseeable impacts from the proposed action. *Id.* The logical

conclusion to be drawn is that the State Department intended for the publication of

the ROD/NID and the issuance of the accompanying Presidential Permit to be

reviewable as final agency action. Federal Defendants now attempt to recast the

State Department's original decision to comply with NEPA, as required for a major

Federal action, into a policy choice, or "act of grace," to avoid judicial review.

8

Federal Defendants and TransCanada argue the State Department acted pursuant to the President's inherent authority under the Constitution and the law of the United States when it published the ROD/NID and when it issued the accompanying Presidential Permit. In particular, Federal Defendants contend that Under Secretary Shannon considered the Keystone application in conjunction with Executive Order 13337, and the Memorandum.

The Court considers the Under Secretary's publication of the ROD/NID "final" in the sense that it: 1) "mark[s] the consummation of the agency's decision-making process;" and 2) constitutes an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Under Secretary Shannon's publication of the ROD/NID consummated the State Department's review of the Presidential Permit Application. The Under Secretary's publication of the ROD/NID represents the type of action from which legal consequences will flow. *Id.* The publication of the ROD/NID prompted the issuance of the accompanying Presidential Permit that enabled TransCanada to begin construction of the pipeline.

## 2. Actions of the President

Federal Defendants and TransCanada argue that the Supreme Court has made it clear out of respect for the separation of powers, however, that a party cannot challenge a President's actions under the APA. *Franklin v. Massachusetts*,

9

505 U.S. 788, 800-01 (1992). The Court considers two factors in determining whether an action taken by an agency or official constitutes presidential action: 1) whether the President carries out the final action himself and the manner in which he does so; and 2) whether Congress has curtailed in any way the President's authority to direct the "agency" in making policy judgments. *Natural Res. Def. Council v. U.S. Dep't of State*, 658 F.Supp.2d 105, 111 (D.C. Cir. 2009).

The President waived any right in his Memorandum to review the State Department's decision under Executive Order 13337. The State Department's obligation to study the environmental impacts of its decision fundamentally does not stem from the foreign relations power. The State Department's own NEPA regulations recognize that the issuance of a Presidential Permit represents a "major Departmental action" subject to Congress's mandates in NEPA. 22 C.F.R. §§ 161.7, 161.7(c)(1). The State Department, on its own initiative, prepared a FSEIS and published a subsequent ROD/NID in this case.

Federal Defendants contend that the State Department's NEPA regulations require no NEPA analysis. They point out that the State Department's NEPA regulations predate Executive Order 13337. President George W. Bush issued Executive Order 133337 to expedite the processing of permits for cross-border pipelines. Nothing in Executive Order 13337 abrogates the State Department's NEPA regulations. Moreover, the President conceded in his Memorandum that the

10

State Department should consider the FSEIS as part of its obligation to satisfy all applicable requirements of NEPA. Construction of the Keystone XL Pipeline, 82 Fed. Reg. at 8663.

### 3. Case Analysis

Federal courts have divided on the question of whether Executive Order 13337 renders any decision on a cross-border project "Presidential action" that stands beyond judicial review. The Court analyzes these decisions at some length.

### a. President's Retention of Authority

Federal Defendants rely heavily on three district court decisions. These courts determined that the issuance of a Presidential Permit by a federal agency pursuant to an Executive Order constitutes Presidential action immune from judicial review under the APA. *Natural Res. Def. Council*, 658 F.Supp.2d 105; *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F.Supp.2d 1071 (D.S.D 2009); and *White Earth Nation v. Kerry*, 2015 WL 8483278 (D. Minn. 2015). Both *NRDC* and *Sisseton-Wahpeton* attribute significance to the language in Executive Order 13337 that provides for the President to make the "final decision." *White Earth Nation* relied, in turn, on the "overwhelming authority" found in *NRDC* and *Sisseston-Wahpeton* to support its conclusion that the State Department's actions qualify as Presidential in nature. *White Earth Nation*, 2015 WL 8483278 at *7.

11

*NRDC* noted that the President's decision to retain ultimate authority to settle any interagency dispute "signals the President's belief" that the issuance of presidential permits ultimately constitutes a presidential action. *Natural Res. Def. Council*, 658 F.Supp.2d at 111. *Sisseton-Wahpeton* likewise determined that Executive Order 13337 explicitly states that the President retains the authority to issue a final decision on whether to issue the Presidential Permit. *Sisseton-Wahpeton*, 659 F.Supp.2d at 1081. The President remains the final actor in determining the issuance of the Presidential Permit. *Id.* President Trump specifically waived, in his Memorandum, any authority that he retained to make the final decision regarding the issuance of the Presidential Permit. This distinction proves persuasive.

### b. Agency Action on Application

The district court in *Sierra Club v. Clinton*, 689 F.Supp.2d 1147 (D. Minn. 2010), declined to follow *NRDC* and *Sisseton-Wahpeton*. *Sierra Club* disagreed with the reasoning of *NRDC* and *Sisseton-Wahpeton* "insofar as they hold that any action taken by the State Department pursuant to an executive order" escapes judicial review. *Sierra Club*, 689 F.Supp.2d at 1157 n. 3. The court expressed particular skepticism at the notion of shielding from judicial review under the APA "the preparation of an EIS for a major federal action." *Id.*

12

The plaintiffs in *Sierra Club* alleged that federal defendants violated NEPA and the APA by issuing a Presidential Permit to build and operate an oil pipeline from Alberta, Canada to Superior, Wisconsin. *Id.* at 1151. The State Department determined that issuing the pipeline permit would constitute a "major federal action" under NEPA. *Id.* at 1157. The State Department considered itself the lead agency on the project and exercised its discretion to prepare and issue the FEIS under NEPA. *Id.* Deputy Secretary of State James Steinberg published the State Department's ROD and issued the Presidential Permit. *Id.* at 1152. Federal defendants argued that the State Department's "presidential actions" insulated the decision from judicial review. *Id.* at 1155.

The mere fact that the pipeline crossed the international border did not insulate the State Department's analysis of the environmental impacts of the pipeline project from judicial review under the APA. *Id.* at 1157. The State Department recognized that the pipeline constituted a "major federal action" and acted accordingly in issuing the FEIS. *Id.* The pipeline's crossing of the international border failed to convert the State Department's actions into presidential action. *Id.*

*Protect Our Communities Found. v. Chu*, 2014 WL 1289444 at *6 (S.D. Cal. 2014), agreed with the reasoning in *Sierra Club*. The federal defendants in *Chu* sought to dismiss a complaint arising from the issuance of a presidential permit for

13

a cross-border electric transmission line. *Id.* at 2. The Department of Energy ("DOE") prepared an EIS after having received the application. *Id.* The federal defendants argued that the DOE had acted pursuant to Presidential authority in issuing the permit. The DOE suggested that an executive order constituted an express delegation of executive authority that insulated DOE's acts from judicial review. *Id.* at 5.

The court rejected the idea that an agency could shield itself from judicial review under the APA for any action "by arguing that it was 'Presidential,' no matter how far removed from the decision the President actually was." *Id.* at 6. Congress designed NEPA to "promote environmentally sensitive decision-making without proscribing substantive standards." *Id.* at 5. No agency possesses discretion whether to comply with procedural requirements such as NEPA. The relevant information provided by a NEPA analysis needs to be available to the public and the people who play a role in the decision-making process. This process includes the President. *Id.* The DOE based the issuance of its Presidential Permit on its own EIS. The court possessed authority to review this agency action to ensure compliance with NEPA. *Id.*

The reasoning of *Sierra Club* and *Chu* applies here. The State Department took final agency action when it published the ROD/NID for the Keystone XL Pipeline and issued the accompanying Presidential Permit. The Ninth Circuit has

14

determined that "once an EIS's analysis has been solidified in a ROD, the agency

has taken final agency action, reviewable under [APA section] 706(2)(A)." *Or.

*Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118-19 (9th Cir.

2010); *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1088 (9th Cir. 2003). The

publication of the ROD/NID led to the State Department's issuance of the

accompanying Presidential Permit.

### B. Agency Discretion by Law

A strong presumption exists that Congress intends judicial review of

administrative action. *ASSE Int'l v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015).

Two narrow exceptions apply: (1) when Congress expressly bars review by statute,

or (2) where an agency action is "committed to agency discretion by law." *Id.*

Federal Defendants and TransCanada argue that the second exception applies as

they contend that Congress committed the State Department's decision to issue the

Presidential Permit "to agency discretion by law."

### 1. NEPA Provides Standard

Congress commits agency action to agency discretion in those rare instances

where Congress draws statutes in such broad terms that no law exists to apply in a

given case. 5 U.S.C. § 701(a)(2). Congress's decision to draft a statute in such

broad terms leaves the court "with no meaningful standard against which to judge

the agency's exercise of discretion." *Id.* Courts must consider "the language of the

statute" and whether judicial review would endanger "the general purposes of the statute." *Cnty. Of Esmeralda v. Dep't of Energy*, 925 F.2d 1216, 1218 (9th Cir. 1991).

Congress has provided a meaningful standard in the form of NEPA against which to judge the State Department's conduct. Congress enacted NEPA to "protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011). NEPA, as enacted by Congress, its regulations, and any judicial opinions that address similar NEPA claims, have developed these standards more fully. 42 U.S.C.A. § 4332(2)(C); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

The Ninth Circuit has made clear that the State Department cannot avoid judicial review simply by invoking its consideration of "foreign policy" or "security" factors. *Kerry*, 803 F.3d at 1069. The State Department in *Kerry* sought to avoid judicial review of its own regulations in the State Department's administration of a visa exchange program. *Id.* The Ninth Circuit concluded that it could consider the State Department's compliance without infringing on the State Department's prerogative to create the program, or related national-security

16

concerns. *Id.* The Ninth Circuit emphasized that a weak connection to foreign policy fails to commit an agency action to the agency's discretion. *Id.*

### 2. Foreign Policy Implications

Federal Defendants maintain that *No Oilport! v. Carter*, 520 F. Supp. 344 (W.D. Wash. 1981), and *Jensen v. Nat'l Marine Fisheries Service*, 512 F.2d 1189, 1191 (9th Cir. 1975), illustrate the lack of any meaningful standard for this Court to apply. A closer look at these decisions explains the courts' reluctance to review the President's actions. Plaintiffs' claims do not raise similar concerns.

Congress enacted the Public Utility Regulatory Policies Act ("PURPA") to "expedite action on federal permits required for the construction of a west-to-east crude oil transportation system." *No Oilport!*, 520 F. Supp. at 344. To achieve this goal, Congress mandated expedited judicial review, established a sixty-day statute of limitations, and prohibited the issuance of preliminary injunctive relief. *Id.* citing 43 U.S.C. § 2011(b) and (c). The pipeline at issue would run from the North Slope of Alaska to Minnesota.

PURPA directed that certain agency heads, including the Secretary of Interior, were to make recommendations to the President and establish an expedited schedule for review of applications of parties who sought to obtain the benefit of PURPA. *Id.* The President selected the west-to-east pipeline route based on his determination that the prevailing project proposal would be "in the national

17

interest." *No Oilport!* 520 F.Supp. at 350. The court deemed the President's national interest determination to fall "beyond the competency of the judiciary to review." *Id.* citing *Chicago & Southern Airlines v. Waterman Steamship Corp.*, 333 U.S. 103 (1948) (reasoning that Presidential approval of the decision of the Civil Aeronautics Board ("CAB") regarding certificate for overseas air transportation constituted political decisions beyond the competency of the courts to adjudicate); *Braniff Airways, Inc. v. C.A.B.*, 581 F.2d 846 (D.C. Cir. 1978) (determining that federal court lacked authority to review decision of the CAB awarding an airline authority to operate between Chicago, Illinois and Montreal, Canada).

Tellingly, the court cited to decisions of the Supreme Court in *Chicago & Southern Airlines*, 333 U.S. at 104, and the D.C. Circuit in *Braniff Airways*, 581 F.2d at 848, in which the President selected among competing airlines the preferred provider of particular international routes. The CAB selected airlines to service particular routes under the highly regulated system in place at that time. *Id.* The President had to approve the CAB's choice in each case due to the overseas nature of the routes to be serviced. *Id.* The President's need to consider particular foreign policy factors left these decisions beyond the competency of the courts to review. *Id.* at 852.

The court in *No Oilport!* evaluated whether the Secretary of Interior and the President adequately had complied with the procedural requirements of PURPA. *No Oilport!*, 520 F.Supp. at 352. It deemed only the President's decision regarding the choice of the route to be "unreviewable." *Id.* The court showed no hesitation in evaluating the compliance of the Secretary of the Interior and the President with the procedural requirements of NEPA. In fact, the court examined in detail the four volume EIS and whether it satisfied the various scoping, notice, and review requirements, as well as alternatives. *Id.* at 352-59.

Plaintiffs here challenge, in large part, Federal Defendants' compliance with the procedural requirements of NEPA. Unlike PURPA, Congress has passed no law to expedite review of proposed pipelines like the Keystone XL Pipeline. 43 U.S.C. § 2011(b)-(c). Congress has not established a truncated statute of limitations or prohibited a court from granting preliminary injunctive relief. *Id.* And Congress has not delegated to the President the decision as to the route of any pipeline. *Id.* Congress has enacted NEPA to ensure a full analysis of potential environmental impacts of pipeline projects such as the Keystone XL Pipeline. The State Department's own regulations require compliance with NEPA for projects of this type. 22 C.F.R. §§ 161.3, 161.5.

Plaintiffs in *Jensen* challenged under the APA the legality of a specific halibut fishing regulation adopted by the International Pacific Halibut Commission

("Commission"). *Jensen*, 512 F.2d at 1190. A 1953 Treaty between the United States and Canada to preserve the halibut fish population of the Northern Pacific Ocean and Bering Sea created the Commission. *Jensen*, 512 F.2d at 1190. The Senate ratified the Treaty on July 27, 1953. Preservation of Halibut Fishery of Northern Pacific Ocean and Bering Sea, Mar. 2, 1953, 5 U.S.T. 5.

The Treaty granted the Commission the authority to enact fishing regulations with the approval of the President and the Governor General of Canada. *Jensen*, 512 F.2d at 1196. The President expressly delegated to the State Department his authority under the Treaty to approve halibut fishing regulations proposed by the Commission. The nature of the regulation arising from an international Treaty with Canada implicated the field of foreign affairs committed to presidential discretion by law. *Id.* at 1190.

The regulation at issue prohibited fisherman from keeping halibut that they caught incidentally in their nets to other fish that the fishermen intended to catch. *Id.* The Commission's scientific staff had recommended that the fishermen be permitted to keep a certain percentage of halibut taken. The Commission disagreed with the scientific staff and enacted the regulation that allowed the fisherman to keep no halibut. *Id.*

The Secretary of State's adoption of the Commission's fishing regulations qualified as actions of the President. *Id.* at 1191. The law commits presidential

action in the field of foreign affairs to presidential discretion. *Id. Jensen* expressly

assumed that the action of the Secretary of State in adopting the regulation

qualified as presidential in nature. More specifically, the court reasoned that the

APA placed the decision whether to adopt the regulation beyond judicial review as

agency action "committed to agency discretion by law." *Id.* citing 5 U.S.C. § 701.

*Chu* specifically distinguished *Jensen* based on the fact that the Treaty

created the Commission and delegated to the Commission the authority to enact

fishing regulations subject to the approval of the President and the Governor

General of Canada. *Chu*, 2014 WL 1289444 at 8. *Jensen* did not analyze the Ninth

Circuit's explicit requirements for exemption from judicial review. *See ASSE Int'l

v. Kerry*, 803 F.3d at 1068. Plaintiffs do not challenge the Secretary of State's

approval of a regulation enacted by an international Commission. Plaintiffs seek,

by contrast, to enforce the State Department's compliance with its own regulations.

*Jensen* and its reasoning provide limited guidance in determining whether to

commit the State Department's decision to publish the ROD/NID and issue the

accompanying Presidential Permit to agency discretion by law.

### 3. State Department's Regulations Require NEPA Review

Section § 701(a)(2) of the APA prohibits judicial review of an administrative

agency's decision if Congress enacted the statute in question in a way that the

court would have no meaningful standard against which to judge the agency's

21

exercise of discretion. 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 822 (1985). No statute prohibits review here. The APA embodies the basic presumption of judicial review to "a person suffering legal wrong because of agency action." 5 U.S.C. § 702. In the absence of a statute, the Court deems it appropriate to look to the State Department's own regulations to determine whether judicial review would endanger the general purposes of the regulations.

The State Department's regulations require a NEPA review for actions of this type. 22 C.F.R. §§ 161.3, 161.5. NEPA serves to require proper environmental considerations before the government takes action. *Id.* The State Department acknowledged the need for NEPA review throughout TransCanada's previous applications. Federal Defendants and TransCanada have failed at this stage to meet their burden to demonstrate that Congress has committed to agency discretion by law the State Department's decision to publish the ROD/NID and issue the accompanying Presidential Permit. *See Kerry*, 803 F.3d at 1068-69.

## C. Redressability of Injuries

Federal Defendants next argue that an order by this Court to enjoin the Presidential Permit unconstitutionally would infringe on the President's authority. Plaintiffs must demonstrate that their alleged injury likely would be redressed by a favorable decision. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A

22

relaxed redressability standard applies as Plaintiffs have alleged procedural injuries under NEPA. *Sierra Club*, 689 F.Supp.2d. at 1150.

Plaintiffs allege procedural injuries under NEPA similar to those alleged in *Sierra Club. Id.* at 1151. The Ninth Circuit has determined that a remedy "procedural in nature" would redress a procedural NEPA injury. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005). Plaintiffs' alleged procedural injuries could be redressed through the procedural remedy of adequate environmental review under NEPA. *Id.*

## II. ESA and APA Claim Against FWS

Federal Defendants argue that the Court should dismiss for lack of standing the alleged ESA and APA violations committed by FWS in preparing the BiOp. TransCanada asserts that Plaintiffs' second claim for relief should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).

### A. Standing

Federal Defendants argue that Plaintiffs lack standing because their Complaint contains only vague allegations regarding adverse environmental and cultural impacts, as well as land and water resources being affected by the Keystone XL Pipeline. Federal Defendants also argue that Plaintiffs' failure to allege an interest in any ESA-listed species defeats causation or redressability. Federal Defendants contend that this failure prevents Plaintiffs from identifying a

23

causal link between the BiOp's alleged infirmities and any injury to Plaintiffs'
members.

Plaintiffs must demonstrate an injury-in-fact that is fairly traceable to the
challenged action and that is likely to be redressesed by a favorable court decision
in order to establish standing. *Summers*, 555 U.S. at 493. To show injury-in-fact, a
plaintiff must show "an invasion of a legally protected interest" that is both
"concrete and particularized." *Lujan v. Defs of Wildlife*, 504 U.S. 555, 560 (1992).
The relevant showing "is not injury to the environment, but injury to the plaintiff."
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181
(2000).

Plaintiffs' First Amended Complaint describes their interests in the wildlife
and wildlife habitat. (Doc 61.) As noted by the Supreme Court in *Lujan*, the "desire
to use or observe an animal species, even for purely esthetic purposes, is
undeniably a cognizable interest for the purpose of standing." *Lujan*, 504 U.S. at
562-63. Plaintiffs allege that the Keystone XL Pipeline would affect a host of
species, including the endangered black-footed ferret, northern swift fox,
whooping crane, interior least tern, pallid sturgeon, American burying beetle,
threatened piping plover, northern long-eared bat and western prairie fringed
orchid, among other. Plaintiffs allege that its members highly value all of these

24

species, have studied and observed them in the wild, and will continue to do so in the future. These alleged harms constitute injuries-in-fact. *Id.*

Plaintiffs have met the redressability requirement for the ESA and APA claims. A plaintiff asserting a procedural violation under Section 7 of the ESA needs to show only that the relief requested could protect the plaintiff's concrete interest in the species. *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008). Plaintiffs' request that FWS engage in a formal consultation that includes a complete and non-arbitrary analysis of the Keystone XL Pipeline's alleged threat to the potentially affected species. This formal consultation could protect the Plaintiffs' concrete interests and thereby redress Plaintiffs' claim. *Id.*

### B. Failure to State a Claim

TransCanada contends that the imprecise and generalized nature of Plaintiffs' allegations supports denial of Plaintiffs' second claim for relief. Fed. Rule of Civ. Pro. 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 41, 47 (1957). The complaint needs to plead only "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. TransCanada

further contends that Plaintiffs have failed to identify the actual conduct alleged to violate the ESA with sufficient specificity to meet the Rule 12(b)(6) standard.

Plaintiffs' First Amended Complaint describes their interest in the affected wildlife and their habitat. Plaintiffs allege that the State Department's BA for FWS contained deficiencies and that FWS failed to identify these deficiencies. For example, Plaintiffs contend that the BA failed to analyze adequately the potential effects of the Keystone XL Pipeline on protected species. Plaintiffs further allege that the BA did not provide adequate mitigation methods of the Keystone XL Pipeline's threats to these species. FWS used the BA to prepare the BiOp. Plaintiffs assert that based on the BA's alleged deficiencies, FWS's BiOp also failed to analyze Keystone Pipeline XL's risks to endangered and threatened species. Plaintiffs further argue that the BiOp's reliance on the flawed BA caused FWS to presume the efficacy of unproven mitigation measures, inappropriately to defer analysis of connected actions such as power lines, and completely fail to analyze risks to the endangered northern swift fox. These alleged violations by FWS may be enforced under the APA. 5 U.S.C. §§ 701-706. Plaintiffs have alleged sufficient facts to state a claim for relief under Rule 12(b)(6).

## III.   ESA and APA Claim Against Federal Defendants

Federal Defendants and TransCanada argue that Plaintiffs' alleged violations of the ESA and APA in their third claim for relief should be dismissed. Federal

26

Defendants cite two deficiencies: (1) no waiver of sovereign immunity for the ESA citizen-suit claim; and (2) Plaintiffs lack of standing to bring the ESA citizen suit-claim.

## A. Waiver of Sovereign Immunity

The ESA mandates that each federal agency shall insure, in consultation with and with the assistance of the Secretary, that any action authorized, funded, or carried out by such agency will not "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The consultation process generally involves preparation by the federal agency of a BA, followed by a preparation of a BiOp, and accompanying incidental take statement by the consulting agency. 16 U.S.C. § 1536; *Bennett*, 520 U.S. at 157-58. Plaintiffs ground this claim under the ESA citizen-suit provision.

The ESA citizen-suit provision offers the only jurisdictional basis for Plaintiffs' third claim for relief. The citizen-suit provision represents "a waiver of sovereign immunity." *South Yuba River Citizens League v. Nat'l Marine Fisheries Service*, 629 F.Supp.2d 1123, 1130 (E.D. Cal. 2009). The ESA's waiver of sovereign immunity permits a citizen to bring suit to enjoin "any person including the United States and any other governmental instrumentality or agency" alleged to be violating the ESA. 16 U.S.C. § 1540(g)(1)(A). The citizen-suit provision

27

provides private parties with a vehicle to "enforce the substantive provisions of the ESA against" government agencies. *Bennett*, 520 U.S. at 173.

Federal Defendants and TransCanada argue that this waiver of sovereign immunity excludes the President. Federal Defendants again argue that the State Department's publication of the ROD/NID and its issuance of the accompanying Presidential Permit qualify as presidential action. They do not. They represent agency actions by the State Department. The State Department recognizes in its own regulations that it sits as a federal agency subject to the consultation requirements of Section 7 of the ESA for "any Departmental action that may have effects in the United States on listed species or their habitat." 22 C.F.R. § 161.11(a). These regulations provide no exclusion for Presidential Permits.

Federal Defendants contrast the citizen-suit provision's specification of parties subject to suit to the APA's definition of "agency" addressed by the Supreme Court in *Franklin*. *Franklin*, 505 U.S. at 800-01. *Franklin* acknowledged that the APA's definition of agency did not explicitly include or exclude the President. *Id.* This textual silence shielded the President from the provisions of the APA. *Id.*

Federal Defendants misplace reliance on *Franklin* and its definition of agency under the APA. The Ninth Circuit distinguished the ESA citizen-suit provision from the APA in *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472,

28

495-97 (9th Cir. 2011). The ESA does not look to the APA to define who remains subject to suit. *Id.* The ESA turns, by default, to the APA solely for its standard of review due to the lack of an internal standard in the ESA. *Id.*

The State Department forthrightly accepted its ESA duties when it issued a BA of the Keystone XL Pipeline in December 2012. The State Department also consulted with FWS in order for FWS to prepare its BiOp. FWS prepared and issued the BiOp in May 2013. TransCanada at the oral argument dismissed these activities as "acts of grace." The Court disagrees. The State Department, or any other federal agency, rarely undertakes voluntarily needless activities as acts of grace to our citizens.

The State Department coupled its review obligations under the ESA with its decision to issue the Presidential Permit. Under Secretary Shannon stated in issuing the accompanying Presidential Permit that he "considered the environmental effects of the proposed action consistent with . . . Section 7 of the Endangered Species Act of 1973." Notice of Issuance of a Presidential Permit, 82 Fed. Reg. at 16467-02. The State Department's publication of the ROD/NID and its issuance of the accompanying Presidential Permit qualify as agency actions subject to review by this Court under the ESA citizen-suit provision. 16 U.S.C.A. § 1540(g)(1)(A).

29

TransCanada further argues that Congress specifically refers to the President in some ESA citizen-suit provisions, including the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). The Court's application of the canon of statutory interpretation, TransCanada suggests, should lead to a determination that Congress's lack of reference to the President in the ESA citizen-suit provision indicates an intentional omission. TransCanada ignores the reason for the specific mention of the President in the CERCLA citizen-suit provision. The President administers the CERCLA statute and warrants specific mention. *See* 42 U.S.C. § 9659(a)(2). The President plays no similar administrative role under the ESA. *See* 16 U.S.C. § 1540(g)(1)(A).

## B. Standing

Federal Defendants and TransCanada argue that Plaintiffs lack standing to bring the ESA citizen-suit claim because Plaintiffs fail to allege a sufficient concrete interest in listed species that will be harmed. To have standing, Plaintiffs must establish (1) injury-in-fact; (2) plausible connection between defendants' conduct and plaintiffs' injury; and (3) redressability. Injuries may be redressed under the ESA where a ruling would ensure that "protections accorded by the ESA would then come back into operation." *Defs of Wildlife v. U.S. Envt'l Prot. Agency*, 420 F.3d 946, 957 (9th Cir. 2005).

30

### 1. Injury-In-Fact

Plaintiffs' allegations establish injury-in-fact under Rule 8. The First Amended Complaint alleges that Plaintiffs' members inhabit the states through which TransCanada proposes to build the Keystone XL Pipeline. (Doc. 61 at 10.) Plaintiffs allege that its members highly value and have studied the ESA-protected species whose habitat the Keystone XL Pipeline threatens. *Id.* These ESA protected species include the "endangered black-footed ferret, northern swift fox, whooping crane, interior least tern, pallid sturgeon, and American burying beetle, and the threatened piping plover, northern long-eared bat and western prairie fringed orchid, among others." *Id.* at 39-40. Plaintiffs allege that the pipeline will spill an average of 1.9 times annually, for a total of 34,000 gallons of oil each year, to the detriment of these ESA-protected species. *Id.* at 45.

### 2. Causal Connection

Plaintiffs' allegations likewise show a plausible causal connection between Federal Defendants' conduct and Plaintiffs' injury. To survive a motion to dismiss for lack of constitutional standing, Plaintiffs must establish a "more than attenuated" line of causation between Federal Defendants' action and the alleged harm. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). Plaintiffs' allegations establish an affirmative duty for the federal agencies to consult and detail the manner in which Federal Defendants have failed to perform their

consultation duties under the ESA. Plaintiffs' allegations further catalogue how Federal Defendants have violated the ESA and how each violation harms each specific species.

### 3. Redressability

Finally, Plaintiffs present redressable claims. A ruling that would ensure "protections accorded by the ESA would then come back into operation" would redress injuries under the ESA. *Defs of Wildlife*, 420 F.3d at 957. As determined above, the State Department's publication of the ROD/NID and its issuance of the accompanying Presidential Permit constitute agency action. Plaintiffs' injuries would be redressed if the State Department were to set aside the Presidential Permit and engage in a more thorough analysis of the Keystone XL Pipeline's impacts on the protected species and the protected habitat to ensure compliance with the ESA. 50 C.F.R. § 402.14(a)-(b).

### CONCLUSION

Accordingly, it is **HEREBY ORDERED** that Federal Defendants' Motion to Dismiss (Doc. 44) and Supplemental Motion to Dismiss (Doc. 70) are **DENIED**.

It is **FURTHER ORDERED** that TransCanada's Motion to Dismiss (Doc. 48) and Supplemental Motion to Dismiss (Doc. 68) are **DENIED**.

DATED this 22nd day of November, 2017.

Brian Morris
United States District Court Judge