Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for Plaintiffs*
(additional counsel listed on signature pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVER ALLIANCE, <br><br> and <br><br> NORTHERN PLAINS RESOURCE COUNCIL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, et al., <br><br> Defendants, <br><br> TRANSCANADA KEYSTONE PIPELINE and TRANSCANADA CORPORATION, <br><br> Defendant-Intervenors. | CV 17-29-GF-BMM <br><br> CV 17-31-GF-BMM <br><br> **Northern Plains Plaintiffs' Memorandum in Support of Motion to Admit and to Supplement the Administrative Records** |

**INTRODUCTION**

Northern Plains Plaintiffs respectfully move the Court to admit their expert report into evidence. Plaintiffs also respectfully move the Court to supplement the administrative records with their expert report, the 2006 edition of the "Avian Power Line Interaction Committee's Suggested Practices for Avian Protection on Power Lines," the U.S. Geological Survey's 2012 Spring and Fall Updates on "Remote Tracking of Aransas-Wood Buffalo Whooping Cranes," and a 2015 USGS Report entitled "Whooping Crane Stopover Site Use Intensity Within the Great Plains."

As this Court previously held, Plaintiffs' fifth claim for relief—an Endangered Species Act (ESA) citizen suit claim against the State Department and Under Secretary Shannon (collectively, the Department)—is not limited to the administrative record. ECF No. 105 at 3. Accordingly, and pursuant to this Court's December 12, 2017 order, *id.*, Plaintiffs filed an expert report on December 29, 2017. ECF No. 110. The report displays whooping crane telemetry and sighting data that the Department ignored, and it provides the opinions of three whooping crane experts regarding the potential for the construction and operation of the Keystone XL pipeline to harm this iconic endangered species. This information is central to Plaintiffs' argument that the Department failed to use the best available science when considering the impacts of the project on listed species, as the ESA

requires, and erroneously concluded that Keystone XL is not likely to adversely affect whooping cranes. The expert report is relevant and is based on scientifically valid principles. The report should therefore be admitted to support Plaintiffs' ESA citizen suit claim.

Additionally, Plaintiffs respectfully move the Court to supplement the U.S. Fish and Wildlife Service's (Service's) administrative record with Plaintiffs' expert report so that it may be considered with regard to Plaintiffs' related ESA claim (Claim Six) against the Service and Secretary Zinke (collectively, the Service). Here, the test for supplementation is easily met because the report is necessary to (1) show that the Service did not consider all relevant factors under the ESA, and (2) display and explain the complex telemetry and sighting data. Because Plaintiffs' claim is based on the Service's failure to use the best available science, Plaintiffs must be able to show the data that the Service ignored and why they are important. Accordingly, the Court should supplement the Service's administrative record with the expert report.

Plaintiffs further move the Court to supplement the administrative record with the 2006 version of the Avian Power Line Interaction Committee's Suggested Practices for Avian Protection On Power Lines: The State of the Art in 2006 (APLIC 2006 Suggested Practices) (Exhibit 1). The Department erroneously relied on the outdated 1996 version of the APLIC Suggested Practices, and the Service

ignored this issue when considering the potential harm to endangered interior least terns and threatened piping plovers. The 2006 version was readily available when the Department and Service reviewed this project in 2012-2013, represents the best available science, and should be included in the Department and Service records.

Finally, Plaintiffs respectfully move for the Court to supplement the administrative record with the U.S. Geological Survey's (USGS) 2012 spring and fall updates on the Telemetry Project (Exhibits 2 and 3), as well as a 2015 USGS Report entitled "Whooping Crane Stopover Site Use Intensity Within the Great Plains" (Exhibit 4). These documents make clear that the telemetry data were available to identify whooping crane stopover locations along the central migratory corridor when the Department and Service reviewed the Project in 2012-2013, and that such data had been used to assess potential harm to whooping cranes from development projects prior to the Service's review and re-concurrence in 2017. These documents show that the Service failed to consider relevant factors, and therefore should be included in the Department and Service records.[1]

---

[1] Because the claim against the Department is not limited to the administrative record, the Court may properly consider Exhibits 1-4 (which are plainly relevant and reliable) for that claim regardless of whether it supplements the record. ECF No. 105 at 3. Nonetheless, these documents easily meet the test for supplementation, as explained below.

## STANDARD OF REVIEW

Scientific evidence may be admitted if it is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). Federal Rule of Evidence 702 permits a witness to give expert testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In *Daubert,* the Supreme Court made clear that admissibility depends on the trial court's determination that the testimony has a reliable foundation and is relevant to the issues at trial. "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597.

Regarding supplementation of an administrative record, the Ninth Circuit has held that, "[i]n limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.' These limited exceptions

operate to identify and plug holes in the administrative record." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004) (footnote omitted); *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (holding that a reviewing court may require supplementation of the administrative record if it is incomplete).

## ARGUMENT

### A.   Plaintiffs' expert report should be admitted to support Plaintiffs' ESA citizen suit claim against the Department

In its December 12, 2017 Order on the Federal Defendants' Motion to Limit Judicial Review of All Claims to the Administrative Record, the Court held that review of Plaintiffs' ESA citizen suit claim is not limited to the administrative record, ordered the Plaintiffs to file their expert reports on December 29, 2017, and stated that "[a]dmissibility of the expert statements will be determined after the Court has had the opportunity to review the statements." ECF No. 105. Plaintiffs submitted their expert report on December 29, 2017, ECF No. 110, and respectfully move for the report to be admitted to support Plaintiffs' ESA citizen suit claim against the Department.

Because review of Plaintiffs' ESA citizen suit claim is not limited to the administrative record, the Court need not supplement the record to consider the expert report for that claim, and the test for supplementation does not apply. Rather, the test for admissibility is whether the report is relevant and reliable. *See Daubert*, 509 U.S. at 589. Plaintiffs respectfully aver that (1) the expert report is

5

plainly relevant and would assist the Court in its consideration of this matter, and (2) the information it provides is reliable because it is based on scientifically valid principles. *See id*. at 589, 592-93; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497-98 (9th Cir. 2011) (allowing plaintiffs to provide several expert declarations attesting to the likelihood of impacts to endangered and threatened species from an agency action). The report should therefore be admitted.

The expert report is directly relevant to Plaintiffs' ESA citizen suit claim. This claim argues that the Department failed to use the best available science when considering the potential for harm to whooping cranes from construction and operation of Keystone XL, and that the agency's "not likely to adversely affect" determination was erroneous. The expert report provides the Court with the best available data—the telemetry and sighting data—that the Department ignored. ECF No. 110 (Crane Report) at 7-35. It further explains why that information is important and what it shows about the proximity of the project to whooping crane habitat. *Id.* It also provides the opinion of renowned experts, based on the best available science, that Keystone XL "presents a substantial risk of harm to Whooping Cranes." *Id.* at 7. The report is therefore directly relevant to Plaintiffs' claim that the Department did not fulfill its duties under the ESA to consider the best available science when analyzing the impacts of the project on the endangered whooping crane.

6

The report is also based on scientifically valid principles, and therefore meets the *Daubert* test for admissibility of scientific evidence. *Daubert*, 509 U.S. at 589, 592-93.[2] The authors of the report are renowned experts who have decades of experience studying this species. *See* Crane Report at 1-2, Appendix A. They have worked extensively with the Whooping Crane Trust, and Dr. Gil has acted as the Whooper Watch coordinator, while Dr. Chavez-Ramirez is a member of the U.S.-Canada Whooping Crane Recovery Team and a board member of the North American Crane Working Group, and has worked on the Whooping Crane Conservation Action Plan. *Id*. at 1-2. In fact, these experts helped develop the protocols for the Whooping Crane Tracking Partnership telemetry project, and Dr. Chavez-Ramirez physically bands the cranes. *Id.* Furthermore, they have provided support for their opinions with references to peer reviewed science. *See id.* at Appendix B.

The report provides maps showing the proximity of the project to habitat areas on which whooping cranes rely, as documented in the sighting and telemetry data maintained by the federal government. *Id*. at 17-30. These maps indicate that several of the proposed power lines overlap significantly with habitat historically used by migrating cranes, and the report explains how this poses a high risk of

---

[2] As a general rule, "[d]istrict courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence." *Millenkamp v. Davisco Foods Int'l, Inc*., 562 F.3d 971, 979 (9th Cir. 2009).

collisions. *Id.* at 31-32. Importantly, all three experts agree that this best available data indicates that Keystone XL poses a significant threat to the endangered whooping crane. *Id.* Clearly the product of "reliable principles and methods," the Plaintiffs' expert report meets the *Daubert* test and therefore should be admitted. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.

**B.     The Court should supplement the Service's administrative record to include Plaintiffs' expert report**

Plaintiffs' expert report should also be added to the Service's administrative record so that it may be considered in connection with Plaintiffs' ESA claim against that agency. The Court may supplement the administrative record if the extra-record evidence is necessary to, *inter alia*, determine "whether the agency has considered all relevant factors and has explained its decision," or "explain technical terms or complex subject matter." *Lands Council*, 395 F.3d at 1030 (citation omitted). Since both of these circumstances apply here, the Court should supplement the record with Plaintiffs' expert report.

It is axiomatic that Plaintiffs' claim against the Service requires the Court to consider evidence outside the administrative record. Plaintiffs' claim is, in part, that the Service failed to use the best available science to ascertain the risk of harm to whooping cranes from the Keystone XL project—particularly, the potential for increased collisions with associated power lines. This is especially important given

8

that the Service has acknowledged that power lines pose the greatest threat of mortality for migrating whooping cranes. FWS000000002134.

Under the ESA, the Service must use the best available science when it makes its determinations. 16 U.S.C. § 1536(a)(2). The Service failed to do so here, and therefore did not consider all relevant factors. Extra-record evidence is therefore warranted to show that the Service's determination regarding Keystone XL's effects on whooping cranes was not based on the best available science. Plaintiffs need to provide the Court with the information the Service failed to analyze, explain why it constitutes the best available science, and show how the information should have been used to assess the project's risk of harm to the cranes. Plaintiffs' expert report contains all this information, and is thus essential for the Court to determine whether the agency has used the best available science and therefore "considered all relevant factors." *Lands Council*, 395 F.3d at 1030; *In re Delta Smelt Consolidated Cases*, No. 1:09-cv-1053 OWW DLB, 2010 WL 2520946, at *18-19 (E.D. Cal. June 21, 2010) (stating that expert testimony is required to demonstrate that a certain document is the best available science that was ignored or given insufficient weight).

Furthermore, the report should be admitted into the record because it "is necessary to explain technical terms or complex subject matter." *Lands Council*, 395 F.3d at 1030. Here, the relevant data that constitute the best available science

9

are GPS telemetry and historical crane sighting data. Although telemetry data have been included in the Service's record (at the Court's request), those data are contained in databases (Excel spreadsheets) and carry little meaning in their raw form. The proximity of crane habitat to the Keystone XL project becomes clear only once the data are mapped by a professional. Plaintiffs therefore seek to supplement the record with their expert report, which contains these maps. The report also explains specifically how, given the data shown on the maps, the project may adversely affect the endangered whooping crane. In short, the expert report provides this Court with an essential breakdown of complex information (i.e., maps of the data and an interpretation of what they mean) to assess whether the Service complied with its obligations under the ESA.

Plaintiffs' expert report shows that the Service failed to consider all relevant factors and explains complex and relevant subject matter, and therefore meets the test for supplementing the administrative record.

## C.    The Court should supplement the administrative records to include the 2006 APLIC Suggested Practices

As described in Part B, *supra*, a court may supplement the administrative record when necessary to determine "whether the agency has considered all relevant factors and has explained its decision." *Lands Council*, 395 F.3d at 1030. Here, the Department and Service failed to consider the best available science— and therefore failed to "consider[] all relevant factors"—when they evaluated

10

Keystone XL's potential to increase predation of listed bird species. Record supplementation is therefore warranted.

The Department admitted in its Biological Assessment that power lines increase the potential for predation of protected bird species by increasing the opportunity for raptor (i.e., hawk) perching. FWS000000000718. The Department nonetheless determined that endangered interior least terns and threatened piping plovers would not be adversely affected by Keystone XL because power providers would install pole-top raptor guards (called "perch discouragers") to limit raptor perching. This determination relied on the 1996 Avian Power Line Interaction Committee's Suggested Practices for Avian Protection on Power Lines. FWS000000000654. The Service concurred in the Department's determination, without discussing increased predation of terns and plovers. FWS000000002044, FWS000000002058, FWS000000002064, FWS000000002065.

However, the 1996 edition of the APLIC Suggested Practices that the Department relied on was supplanted in 2006, well before Defendants undertook their review of the Keystone XL pipeline. As set forth in Plaintiffs' Motion for Summary Judgment, Defendants' reliance on an outdated version of the APLIC Suggested Practices violates the ESA's best available science mandate. In fact, the 2006 Suggested Practices specifically states that using perch discouragers to

11

prevent raptors from preying on sensitive species "is not recommended." Ex. 1,

APLIC 2006 at 17 (Figure 2.5).

Supplementation of the record is therefore warranted, since the 2006

version of the APLIC Suggested Practices—the best available science that the

Department and Service ignored—shows that that Department and Service failed

to "consider[] all relevant factors" when analyzing the increased predation of listed

species associated with Keystone XL. *See Lands Council*, 395 F.3d at 1030.

**D.     The Court should supplement the administrative records to include the 2012 Telemetry Project updates, and the 2015 USGS whooping crane report.**

In its testimony submitted January 26, 2017, the Service's whooping crane

declarant averred that the data from the Whooping Crane Tracking Partnership

Telemetry Project were not available when the Service concurred with the

Department's "not likely to adversely affect" determination for this project in

2013. ECF No. 128, Ex. 4 at 8. However, the USGS published several updates on

the Telemetry Project, including a "2011 Winter Season and 2012 Spring

Migration Update" and a "2012 Breeding Season and Fall Migration Update"

(Exhibits 2 and 3). These documents, published by the USGS Northern Prairie

Wildlife Research Center prior to the Service's issuance of its 2013 Biological

Opinion and Concurrence for this project, show that at the time of the Service's

review, the telemetry data were undoubtedly available to determine whooping

12

crane stopover locations. In fact, these publicly available documents note that as of 2012 the Telemetry Project had identified over 260 stopover locations using the telemetry data, and the documents provide maps showing these stopover locations within the migratory corridor.[3]

As described in Part B, *supra*, a court may supplement the administrative record when necessary to determine "whether the agency has considered all relevant factors and has explained its decision." *Lands Council*, 395 F.3d at 1030. The USGS Telemetry Project updates provide direct evidence that the telemetry data was readily available when the Service reviewed the project, and therefore confirm that the Service failed to consider the best available science on whooping cranes when it disregarded this information. Supplementation is therefore warranted, since these documents show that the Service did not consider relevant factors when analyzing the potential for harm to the species. *Id.*

The Court should also supplement the record with the 2015 USGS report, "Whooping Crane Stopover Site Use Intensity Within the Great Plains" (the USGS 2015 Crane Report) (Exhibit 4). This report, authored by USGS and Service personnel, shows that the Service was well aware when it re-evaluated the project

---

[3] The Tracking Partnership updates further note that the Service is an "equal partner" in the Whooping Crane Tracking Partnership, confirming that the Service had access to these data.

in 2017 that the telemetry data could be used to determine whooping crane

stopover locations in order to prevent harm from collisions.

When TransCanada re-applied for a cross-border permit for Keystone XL in

2017, the Department reinitiated ESA consultation. FWS000000002737. As part of

that reinitiation, the Department and the Service re-evaluated the species that had

previously been determined not to be adversely affected by the project, including

the whooping crane. FWS000000002738-39. The Service claims that it reviewed

the available new information on previously considered species, and concluded

that no new analysis was necessary, thereby re-concurring in the Department's

"not likely to adversely affect" determination for these species.

FWS000000002749.

The Service, however, clearly disregarded available new information

regarding the telemetry data. The USGS 2015 Crane Report, which was readily

available when consultation was reinitiated in 2017, shows that in 2015 the USGS

and the Service were using the telemetry data specifically to identify whooping

crane stopover locations. Moreover, the purpose of the report was to show how the

telemetry data could be used to site projects, such as wind energy development,

that may harm whooping cranes. *See* USGS 2015 Crane Report at 1. The report

states that the telemetry data were being used by the Service as a "tool to identify

landscapes that may be of greater conservation significance to migrating whooping

14

cranes" as part of the Service's evaluation of the Great Plains Wind Energy Habitat Conservation Plan. *Id.*

This report therefore confirms that the telemetry data was readily available when the Service re-concurred on the project in 2017, and in fact had been used in 2015 to undertake an analysis almost identical to what should have been done for Keystone XL through formal consultation. The USGS 2015 Crane Report therefore shows that the Service failed to consider relevant factors when it reconsidered the project in 2017, and supplementation of the record is warranted. *Lands Council*, 395 F.3d at 1030.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) admit Plaintiffs' expert report; (2) supplement the Service's administrative record with that report; (3) supplement the Department's and Service's records with the 2006 APLIC Suggested Practices; and (4) supplement the Department's and Service's records with the 2012 USGS Telemetry Project updates and USGS 2015 Crane Report.

/ / /

/ / /

/ / /

/ / /

Dated:      February 9, 2018      /s/ Doug Hayes
Doug Hayes (*pro hac vice*)
/s/ Eric Huber
Eric Huber (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
eric.huber@sierraclub.org
*Attorneys for Sierra Club and Northern*
*Plains Resource Council*

/s/ Jaclyn Prange
Jaclyn Prange (*pro hac vice*)
/s/ Cecilia Segal
Cecilia Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100
jprange@nrdc.org
csegal@nrdc.org
*Attorneys for Bold Alliance and Natural*
*Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
/s/ Amy R. Atwood
Amy R. Atwood (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(971) 717-6401
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org
*Attorneys for Center for Biological Diversity*
*and Friends of the Earth*

16

/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## WORD COUNT CERTIFICATION

I certify that the foregoing brief contains 3,370 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement.

<u>/s/ Jaclyn H. Prange</u>

18

## CERTIFICATE OF SERVICE

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.


/s/ Jaclyn H. Prange