MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667
FAX: (406) 657-6058
mark.smith3@usdoj.gov

JEFFREY H. WOOD, Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
SETH M. BARSKY, Section Chief
BRIDGET KENNEDY McNEIL (CO Bar 34299)
Wildlife and Marine Resources Section
LUTHER L. HAJEK (CO Bar 44303)
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, Colorado 80202
Ph: 303-844-1484; 303-844-1376
bridget.mcneil@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK, *et al.*,<br><br>and<br><br>NORTHERN PLAINS RESOURCE COUNCIL, *et al.*,<br><br>    Plaintiffs,<br>v. | CV 17-29-GF-BMM<br>CV 17-31-GF-BMM<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

| UNITED STATES DEPARTMENT OF STATE, *et al.,* | |
| :--- | :--- |
| Federal Defendants,<br>and | |
| TRANSCANADA CORPORATION, *et al.,* | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 1

I.    The State Department Satisfied NEPA ...................................................... 1

    A.    The SEIS Contains a Valid Purpose and Need Statement and Analyzes a Reasonable Range of Alternatives ........................................... 1

    B.    The SEIS Appropriately Analyzes the Planned Route through Nebraska, and No Additional Analysis Is Necessary to Support the Under Secretary's Determination ..................................................... 3

    C.    The SEIS Contains an Appropriate Analysis of the Oil Markets and the No Action Alternative ........................................................... 5

        1.    The State Department's Findings Regarding the Oil Market Are Based on Analysis of Data, Not Assumptions ......................... 6

        2.    The SEIS Appropriately Analyzed a Status Quo Baseline Alternative and Three Other No Action Alternatives to Account for the Predictable Actions of Third Parties .................. 10

    D.    The SEIS Adequately Analyzes Cumulative Greenhouse Gas Emissions and Climate Change Impacts .................................................... 12

        1.    The Analysis of Climate Change Impacts Satisfied NEPA .......... 12

        2.    An Analysis of the Social Cost of Carbon Was Not Required ..... 14

        3.    A Specific Analysis of the Greenhouse Gas Emissions Associated with the Alberta Clipper Pipeline Expansion Was Not Required ......................................................................... 15

    E.    The State Department's Analysis of Environmental Impacts in Canada Was Sufficient to Satisfy NEPA .................................................... 17

        1.    NEPA Has No Extraterritorial Application ................................. 18

        2.    The Analysis in the SEIS Satisfies the Standards in Executive Order 12,114, the State Department's Regulations, and CEQ's Guidance .................................................................. 20

3.     The Keystone XL Pipeline Is Not a Proximate Cause of the Impacts of Oil Sands Production in Canada ................................ 21

F.     The SEIS Adequately Analyzes Potential Impacts to Water Resources, Impacts to Water Cultural Resources, and Mitigation ........... 22

1.     Water Resources ........................................................ 22

2.     Cultural Resources .................................................... 25

3.     Mitigation .................................................................. 26

G.     The State Department Is Not Required to Prepare a Supplemental NEPA Analysis ................................................................. 26

1.     Change in Oil Prices .................................................. 27

2.     Transportation of Crude Oil by Rail .............................. 27

3.     Oil Spills .................................................................. 28

4.     Greenhouse Gas Emissions ......................................... 29

II.     The Claim that the State Department Did Not Give a Reasoned Explanation for Its Policy Change Is Not Legally Cognizable and Lacks Merit ..................... 30

A.     The Under Secretary's National Interest Determination Was Committed to Agency Discretion by Law ................................ 30

B.     The Ninth Circuit Does not Recognize a Stand-Alone APA Claim ........ 32

C.     The Under Secretary Provided a Reasoned Explanation for His Decision ................................................................. 34

III.     The Agencies' Analyses Satisfy the ESA ......................................... 36

A.     The Agencies Reasonably Assessed Impacts to Whooping Cranes ......... 36

1.     The "Not Likely to Adversely Affect" Conclusion is Reasonable and Formal Consultation Was Not Required ............. 36

2.     The Expert Report Does Not Undercut the Agencies' Analysis ................................................................. 40

3.     Reinitiation of Consultation Moots the Whooping Crane Claims ................................................................. 43

B.     The Agencies Reasonably Assessed Impacts to Terns and Plovers ......... 45

C.      The Agencies Reasonably Assessed Potential Oil Spill Impacts.............. 48

D.      The Network's Extra-Territorial Impacts Argument Fails ...................... 49

E.      The Agencies Properly Analyzed the Remaining Species....................... 50

        1.      Black-Footed Ferret ....................................................... 50

        2.      Rufa Red Knot and Northern Long-Eared Bat ............................ 51

        3.      Western Prairie Fringed Orchid...................................... 52

IV.     The Court Should Not Vacate the Presidential Permit ......................... 52

CONCLUSION.................................................................................... 53

# TABLE OF AUTHORITIES

## Cases

*Alaska Envtl. Ctr. v. Kempthorne*,
 457 F.3d 969 (9th Cir. 2006) ...................................................... 2, 16, 17

*Alliance for the Wild Rockies v. U.S. Dept. of Agriculture*,
 772 F.3d 592 (9th Cir. 2014) ...................................................... 43, 44

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
 501 U.S. 104 (1991)............................................................................ 18

*Backcountry Against Dumps v. Chu*,
 215 F. Supp. 3d 966 (S.D. Cal. 2015)................................................ 20

*Backcountry Against Dumps v. Perry*,
 No. 3:12-cv-3062-L-JLB, 2017 WL 3712487 (S.D. Cal. Aug. 29, 2017)................. 20

*Backcountry Against Dumps v. U.S. Dep't of Energy*,
 No. 3:12-cv-3062-L-JLB, 2017 WL 2988273 (S.D. Cal. Jan. 30, 2017) ................. 20

*Barnes v. U.S. Dep't of Transp.*,
 655 F.3d 1124 (9th Cir. 2011) ............................................................ 16

*Basel Action Network v. Maritime Admin.*,
 370 F. Supp. 2d 57 (D.D.C. 2005)................................................ 19, 37, 50

*Bear Lake Watch v. FERC*,
 324 F.3d 1071 (9th Cir. 2003) ............................................................ 39

*Bering Strait Citizens for Responsible Res. Devel. v. U.S. Army Corps of Eng'rs*,
 524 F.3d 938 (9th Cir. 2008) .............................................................. 26

*Bundorf v. Jewell*,
 142 F. Supp. 3d 1138 (D. Nev. 2015)..................................................... 5

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
 688 F.3d 989 (9th Cir. 2012) .............................................................. 53

*California v. Bureau of Land Management*,
 286 F. Supp. 3d 1054 (N.D. Cal. 2018)................................................. 34

*Center for Biological Diversity v. National Highway Traffic Safety Administration*,
 538 F.3d 1172 (9th Cir. 2008) ............................................................ 15

*Center for Biological Diversity v. U.S. Department of the Interior*,
 623 F.3d 633 (9th Cir. 2010) ............................................................... 9

*Cold Mountain v. Garber*,
 375 F.3d 884 (9th Cir. 2004) ............................................................... 5

*Conservation Cong. v. U.S. Forest Serv.*,
 720 F.3d 1048 (9th Cir. 2013) ............................................................ 36

*Conservation Northwest v. Rey,*
  674 F. Supp. 2d 1232 (W.D. Wash. 2009) ........................................... 11

*Ctr. for Biological Diversity v. Lohn,*
  511 F.3d 960 (9th Cir. 2007) .............................................................. 44

*Ctr. for Biological Diversity v. Salazar,*
  706 F.3d 1085 (9th Cir. 2013) .............................................................. 5

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
  698 F.3d 1101 (9th Cir. 2012) ............................................................ 37

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation,*
  655 F.3d 1000 (9th Cir. 2011) ...................................................... 16, 17

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
  883 F.3d 895 (D.C. Cir. 2018) ............................................................ 32

*Earth Island Inst. v. Carlton,*
  626 F.3d 462 (9th Cir. 2010) .............................................................. 36

*Environmental Defense Fund v. Massey,*
  986 F.2d 528 (D.C. Cir. 1993) ...................................................... 18, 19

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) ...................................................................... 34, 36

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
  423 U.S. 326 (1976) ........................................................ 45, 46, 47, 48

*Forest Guardians v. Johanns,*
  450 F.3d 455 (9th Cir. 2006) ........................................................ 44, 51

*Government of Manitoba v. Salazar,*
  691 F. Supp. 2d 37 (D.D.C. 2010) ................................................ 19, 27

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
  860 F.3d 1244 (9th Cir. 2017) ............................................................ 17

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy,*
  383 F.3d 1082 (9th Cir. 2004) ............................................................ 25

*High Country Conservation Advocates v. U.S. Forest Service,*
  52 F. Supp. 3d 1174 (D. Colo. 2014) ............................................... 8, 15

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.,*
  545 F.3d 1147 (9th Cir. 2008) ............................................................ 28

*Immigration and Naturalization Servs v. Elias-Zacarias,*
  502 U.S. 478 (1992) ...................................................................... 39, 40

*In re Am. Rivers & Idaho Rivers United,*
  372 F.3d 413 (D.C. Cir. 2004) ............................................................ 52

*Kilroy v. Ruckelshaus,*
  738 F.2d 1448 (9th Cir. 1984) .................................................................. 11

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) .................................................................... 39

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989).................................................................................. 39

*Montana Environmental Information Center v. U.S. Office of Surface Mining,*
  274 F. Supp. 3d 1074 (D. Mont. 2017) ...................................................... 8

*Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).................................................................................... 33

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior,*
  835 F.3d 1377 (11th Cir. 2016) ................................................................ 52

*NEPA Coal. of Japan v. Aspin,*
  837 F. Supp. 466 (D.D.C. 1993) ............................................................... 19

*Natural Res. Def. Council v. Nuclear Regulatory Comm'n,*
  647 F.2d 1345 (D.C. Cir. 1981) ................................................................ 18

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
  No. 04–3096–PA, 2007 WL 1072112 (D. Or. Apr. 3, 2007) .................... 44

*Or. Natural Res. Council v. Thomas,*
  92 F.3d 792 (9th Cir. 1996) ................................................................ 32, 33

*Organized Village of Kake v. U.S. Department of Agriculture,*
  795 F.3d 956 (9th Cir. 2015) .................................................................... 33

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989).................................................................................. 26

*Rock Creek All. v. FWS,*
  663 F.3d 439 (9th Cir. 2011) .................................................................... 38

*Sale v. Haitian Ctrs. Council,*
  509 U.S. 155 (1993).................................................................................. 19

*Sierra Club v. Bosworth,*
  465 F. Supp. 2d 931 (N.D. Cal. 2006) ........................................................ 5

*Sierra Club v. Clinton,*
  746 F. Supp. 2d 1025 (D. Minn. 2010)...................................................... 21

*Sierra Club v. U.S. Department of Energy,*
  867 F.3d 189 (D.C. Cir. 2017)..................................................................... 9

*Sierra Forest Legacy v. Sherman,*
  646 F.3d 1161 (9th Cir. 2011) .................................................................. 23

*Smith v. United States*,
  507 U.S. 197 (1993) ................................................................................. 19

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) .................................................................... 38

*Te-Moak Tribe of W. Shoshone. v. U.S. Dep't of the Interior*,
  608 F.3d 592 (9th Cir. 2010) .................................................................... 25

*the Wild Rockies v. U.S. Army Corps of Eng'rs*,
  237 F. Supp. 3d 1079 (D. Or. 2017) ......................................................... 43

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) .................................................................. 23

*Western Organization of Resource Councils v. U.S. Bureau of Land Management*,
  CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26, 2018) ................... 2, 14, 15, 53

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ........................................................... 13, 16

*Wildearth Guardians v. Jewell*,
  No. 1:16-cv-605-RJ, 2017 WL 3442922 (D.N.M. Feb. 16, 2017) ................. 15

*WildEarth Guardians v. U.S. Bureau of Land Management*,
  870 F.3d 1222 (10th Cir. 2017) ............................................................. 7, 8

*Wilderness Ass'n v. McAllister*,
  460 Fed. Appx. 667 (2011) ...................................................................... 11

*Wilderness Ass'n v. McAllister*,
  658 F. Supp. 2d 1249 (D. Mont. 2009) .................................................... 11

**Statutes**

 *Administrative Procedure Act,*
  5 U.S.C. § 701(a)(2) ................................................................................ 31

*Natural Environmental Policy Act,*
  42 U.S.C. § 4332(2)(C) ............................................................................ 18

*Natural Environmental Policy Act,*
  42 U.S.C. § 4332(2)(F) ............................................................................ 18

**Regulations**

U.S. Department of State, Regulations for Implementation of the National Environmental Policy Act,
  22 C.F.R. pt. 161.12 ................................................................................ 21

**Federal Register**

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,
  46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) ......................................... 12

Executive Order No. 13,337 § 1(g)-(h) of April 30, 2004, Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States,
    69 Fed. Reg. 25,299 (Apr. 30, 2004) ....................................................................................... 30

Executive Order 12,114 of January 4, 1979, Environmental Effects Abroad of Major Federal Actions,
    44 Fed. Reg. 1,957 (Jan. 4, 1979) .................................................................................. 20 ,21

**Other Authorities**

Council on Environmental Quality, "Guidance on NEPA Analyses for Transboundary Impacts" (July 1, 1997) (available at:
https://ceq.doe.gov/guidance/guidance.html)..............................................................................20

**TABLE OF ACRONYMS**

APA……..………………………………...………………Administrative Procedure Act

ANILCA……………………………………..Alaska National Interest Lands Conservation Act

APLIC 2012...……………..…………………...Avian Power Line Interaction Committee 2012

BLM...…..…………………………………….…...……....U.S. Bureau of Land Management

Bpd...……………………………………………….……………... ..Barrels per day

CEQ……………….……………..…………..…….Council on Environmental Quality

DEQ…..………………………………………….....Department of Environmental Quality

DOE…………………………………………………………..…….Department of Energy

DOS……………………………………………………………..…….Department of State

EIS……………………………………………………Environmental Impact Statement

ESA...…………………………………………………….……..………Endangered Species Act

GREET………………………….....Greenhse. Gases, Reg. Emiss., Energy Use in Transportation

IEN…………………………………………………...……Indigenous Environmental Network

MMTCO$_2$e………..…………………………....Million Metric Tons of Carbon Dioxide Equivalents

PSC……………………………………..…………Nebraska Public Services Commission

NEPA…………………………………….......................National Environmental Policy Act

NPRC……………………………………………..……Northern Plains Resource Council

Rabbe Report………………………………………Expert Rebuttal Report of Matt Rabbe

Reilly Decl. ……………………...…………………...……………Declaration of Jill Reilly

Runge Report……………………………………....Rebuttal Expert Report of Jeff Runge

SEIS…..……………………...………………Supplemental Environmental Impact Statement

PHMSA...…………………………….....Pipeline and Hazardous Material Safety Administration

**INTRODUCTION**

Over the course of nearly a decade, the U.S. Department of State ("State Department") has studied, evaluated, and reviewed the potential environmental impacts of the Keystone XL Pipeline.  Despite lengthy briefs that try to pick apart the analyses in the Supplemental Environmental Impact Statement ("SEIS"), the Plaintiffs have failed to identify any environmental impact that was not given sufficient attention in accordance with the National Environmental Policy Act ("NEPA").  Similarly, the Endangered Species Act ("ESA") claims fail because the agencies' determinations are based on the "best available data" standard and rational evaluations of project impacts on protected species.  Accordingly, summary judgment should be granted for Defendants on all claims.

**ARGUMENT**

**I.    The State Department Satisfied NEPA**

**A.    The SEIS Contains a Valid Purpose and Need Statement and Analyzes a Reasonable Range of Alternatives**

The SEIS appropriately states the purpose and need for action and analyzes a reasonable range of alternatives.  *See* Mem. in Supp. of Defs' Mot. for Summ. J. ("Def. Mem.") at 8-15 (ECF No. 173).  Contrary to the Network's assertions, IEN Pls' Reply Mem. in Supp. of Mot. for Summ. J. ("IEN Reply") at 16-19 (ECF No. 182), the SEIS analyzes the State Department's need for action, as well as the needs of other agencies.  *See* Def. Mem. at 9-11.  The Network is also incorrect

1

that the SEIS should have analyzed in detail alternatives relating to energy

conservation and renewable energy.  IEN Reply at 21-22.  As previously

explained, the State Department was not required by NEPA to analyze such

alternatives in detail.  Def. Mem. at 13.  Nonetheless, the SEIS considered such

alternatives and reasonably determined that energy from renewable energy

resources and energy conservation would not reduce the demand for heavy crude

from Canada over the next two decades.  *Id.* at 14.  Further, simply arguing that the

State Department should have analyzed a "renewable energy alternative" is not

enough to show that the State Department violated NEPA.  IEN Reply at 22.  It is

the plaintiff's burden to demonstrate that there are actual, feasible alternatives that

the agency did not consider.  *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969,

978 (9th Cir. 2006).  The Network has failed to do so.

In addition, the circumstances here are distinguishable from this Court's

recent decision in *Western Organization of Resource Councils v. U.S. Bureau of

Land Management*, CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26,

2018).  In that case, the Court found that BLM, in developing land use plans, had

failed to consider a sufficient range of alternatives with respect to the identification

of lands as potentially available for coal leasing because none of the alternatives

considered a reduction in lands open to coal leasing.  *Id.* at *9.  Here, in contrast,

the Under Secretary is not a land manager and has no authority to consider

2

alternatives involving varying degrees of oil sands production because oil sands production is regulated by the Canadian government.

**B.      The SEIS Appropriately Analyzes the Planned Route through Nebraska, and No Additional Analysis Is Necessary to Support the Under Secretary's Determination**

Plaintiffs argue that, at the time of the Under Secretary's determination, the Nebraska route was not established.  IEN Reply at 58; N. Plains Pls' Reply in Supp. of Mot. for Partial Summ. J. ("NPRC Reply") at 9-10 (ECF No. 180).  But at the time of the decision, there was no reason to believe that the Nebraska Public Services Commission ("PSC") would select a different route.  The route through Nebraska had previously been revised to avoid the Sand Hills Region, with input from the Nebraska Department of Environmental Quality ("DEQ") and maps supplied by the EPA.  DOS 5963, 9418-20.  That route was designed to avoid other areas in Nebraska that the Nebraska DEQ deemed to be similar to the Sand Hills Region.  DOS 2498.  Even the Nebraska PSC recognized that the preferred route (the route analyzed in the SEIS) had been "previously reviewed by NDEQ and approved by the Governor."  Nebraska PSC Nov. 20, 2017 Order at 49 (ECF No. 147-1).  At the time the Under Secretary made his determination, the Nebraska PSC proceedings had not begun, *see id.* at 3, and there was no way for the State Department to know the PSC would ultimately approve a different route.

3

Nor is the State Department required to prepare a supplemental NEPA analysis to address a determination that the Under Secretary has already made. Northern Plains argues that the Under Secretary retains significant discretion over the entire pipeline because there are "*other* federal approvals" that remain. NPRC Reply at 49. But the actions of the other agencies do not create continuing obligations for the State Department. They also argue that the State Department's authority extends beyond the border segment, NPRC Reply at 49 & n.17, but the language of the Presidential Permit clearly limits the State Department's ongoing oversight to circumstances where there is a "substantial change in the United States facilities," which are defined to include only the 1.2 mile border segment. DOS 2485-86.

Further, the notion that the State Department's ongoing authority extends to the Nebraska route is belied by the fact that the route is clearly within the authority of the Nebraska PSC. Northern Plains also points to the NEPA process that the State Department has begun to analyze the new Nebraska route, *see* NPRC Reply at 51, but that analysis is being conducted to support the "Bureau of Land Management's right-of-way decision." *See* Reilly Decl. ¶ 6 (ECF No. 176). No analysis is required to support a future action by the Under Secretary or other delegated official regarding the Keystone XL Pipeline because there is no action

left for him to take.  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095

(9th Cir. 2013); *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004).

Northern Plains' attempts to distinguish the relevant cases fail.  They argue

that *Center for Biological Diversity* is distinguishable because TransCanada still

must get "federal approvals," NPRC Reply at 53, but the approvals are required

from *other* agencies, not from a State Department official.  They also claim that

*Cold Mountain* is distinguishable on the grounds that the agencies in that case did

not maintain ongoing regulatory control, *see id.*, but the same is true of the State

Department here.  Just as in *Cold Mountain*, "the Permit has been approved and

issued," and no NEPA obligation remains.  375 F.3d at 894.[1]

### C.   The SEIS Contains an Appropriate Analysis of the Oil Markets and the No Action Alternative

Northern Plains is incorrect that the SEIS simply assumes that the

construction of the Keystone XL Pipeline would be unlikely to significantly impact

the rate of extraction of oil sands in Canada, and, in fact, that conclusion is

supported by an extensive analysis in the SEIS.  Northern Plains is also incorrect

---

[1] *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931 (N.D. Cal. 2006), is distinguishable because the court found that the Forest Service retained ongoing regulatory authority over the timber harvest.  *Id.* at 939.  *Bundorf v. Jewell*, 142 F. Supp. 3d 1138 (D. Nev. 2015), also is distinguishable because the right-of-way at issue had not yet been issued, and the agency conceded that it maintained discretion over the right-of-way.  *Id.* at 1150-51.

that the SEIS does not analyze a status quo baseline, and its criticisms of the no action alternative are without merit.

### 1. The State Department's Findings Regarding the Oil Market Are Based on Analysis of Data, Not Assumptions

As previously explained, the State Department conducted an extensive analysis of how the Keystone XL Pipeline would impact the oil market. DOS 5760-908, 9466-649; *see also* Def. Mem. at 15-23. The analysis relied, in part, on a study prepared for the U.S. Department of Energy and was based on data from a variety of sources, including the U.S. Energy Information Administration, Canada's National Energy Board, and the Canadian Association of Petroleum Producers. Def. Mem. at 15-17. One of the conclusions of the analysis was that the construction of the Keystone XL Pipeline was not likely to significantly increase the rate of extraction of oil from the oil sands in the long term due to the demand for heavy crude and the multiple means of transporting crude oil from the Canadian oil sands. DOS 5890-91.

In response, Plaintiffs make no attempt to critique the market analysis in the SEIS. Instead, their response is: "it hardly takes an expert to know that there is a global demand for oil." NPRC Reply at 15. The irony is striking. Northern Plains has accused the State Department of failing to adequately analyze the oil markets in the SEIS, and their response to the over 500 pages of analysis in the SEIS is to simply ignore it. Given Plaintiffs' failure to even suggest any deficiencies in the

analysis in the SEIS, summary judgment should be granted to Defendants for this reason alone.

Moreover, Plaintiffs are wrong to suggest that the SEIS finds that "no infrastructure project can have significant climate impacts as long there is a global demand for oil." *Id.* at 15. Instead, based on an analysis of existing infrastructure, the SEIS found that even if the oil sands production increases at expected levels and pipeline capacity remains static, more oil would be transported by rail. DOS 5892; *see also* DOS 5811-49. In other words, the analysis shows that for the particular circumstances surrounding the Canadian oil sands and the avenues for transporting the oil, the Keystone XL Pipeline is not likely to significantly affect the rate of extraction of that oil. Plaintiffs fail to rebut that analysis.

Due to the extensive analysis of oil markets in the SEIS, this case is unlike the cases relied upon by Northern Plains in which agencies conducted no market analysis and simply assumed a particular market outcome. *See* NPRC Reply at 16-17. They point to *WildEarth Guardians v. U.S. Bureau of Land Management*, 870 F.3d 1222 (10th Cir. 2017), where BLM made an *assumption* in its no action alternative—which the court referred to as the "perfect substitution assumption"—that the same amount of coal would be consumed nationwide regardless of whether BLM issued the particular coal leases challenged in that case. *Id.* at 1234-36. The court explained that BLM's assumption that the coal would be replaced by coal

produced from other sources "lacks any support in the administrative record." *Id.* at 1234. Thus, the court's ruling was based on the lack of analysis conducted by the agency.

Plaintiffs next posit that, even if there had been an appropriate analysis of market conditions in the *WildEarth Guardians* case, BLM's analysis still would have been found to be insufficient. NPRC Reply at 16-17 (citing *WildEarth Guardians*, 870 F.3d at 1236). The language Plaintiffs rely on is dicta, and not persuasive here, because the court could not have found BLM's conclusion to be arbitrary and capricious if it had in fact been supported by record evidence. Further, the case is distinguishable because the SEIS here does not make a perfect substitution assumption, *i.e.*, the assumption that if oil is not produced in one place it will be produced elsewhere. Instead, the market analysis examined the production of oil from oil sands, demand for the oil, and alternative means of transporting oil produced in the Canadian oil sands. Def. Mem. at 15-19.

Similarly, in *High Country Conservation Advocates v. U.S. Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014), the court rejected the agency's conclusion that exploration activities related to coal mining would have no impact on greenhouse gas emissions because the agency made an "assumption" that overall coal production would not increase. *Id.* at 1197. The same unsupported assumption was made in *Montana Environmental Information Center v. U.S.*

8

*Office of Surface Mining*, 274 F. Supp. 3d 1074, 1098 (D. Mont. 2017). And a

similar assumption was made in *Center for Biological Diversity v. U.S.*

*Department of the Interior*, 623 F.3d 633, 641-42 (9th Cir. 2010) ("[W]e hold that

the BLM's assumption that mining would occur on the selected lands in the same

manner regardless of the land exchange was arbitrary and capricious."). But no

such assumption is being made in this case. The State Department's conclusion

regarding the capacity to transport oil by rail was based on extensive analysis.

DOS 5811-49.

Plaintiffs also ignore the D.C. Circuit's decision in *Sierra Club v. U.S.*

*Department of Energy*, 867 F.3d 189 (D.C. Cir. 2017). In that case, the Sierra

Club argued that the Department of Energy ("DOE") had inadequately analyzed

the indirect impacts of authorizing liquefied natural gas exports, including impacts

on greenhouse gas emissions. *See id.* at 197-98, 201-02. But the court rejected

those arguments because DOE's analysis if greenhouse gas emissions associated

with liquefied natural gas exports was complemented by an analysis of the market

dynamics that would likely result from those increase exports. *Id.* at 194-96, 198-

99, 201-02. Likewise here, the State Department prepared an appropriate analysis

of the oil markets, as well as an analysis of the greenhouse gas emissions

associated with the oil that would be transported through the pipeline, and the

analysis should be upheld.

Finally, the notion that the analysis of the oil markets "deceived decision makers," NPRC Reply at 17, is unfounded.  As Plaintiffs acknowledge, the SEIS discloses the lifecycle emissions associated with producing, transporting, refining, and combusting 830,000 barrels per day ("bpd")—the total amount that could be transported through the pipeline.  NPRC Reply at 14-15.  The analysis shows that there would be an incremental increase of 1.3 to 27.4 million metric tons of carbon dioxide equivalents ("MMTCO$_2$e") annually.  DOS 7200.  The Secretary of State in the prior administration decided to deny a permit for the project based on this analysis and relevant policy considerations.  DOS 1182-87.  Therefore, the notion that the SEIS somehow hid the potential impacts of the project on climate change is not credible.

> ## 2. The SEIS Appropriately Analyzed a Status Quo Baseline Alternative and Three Other No Action Alternatives to Account for the Predictable Actions of Third Parties

The SEIS analyzed four no action alternatives—a status quo alternative, which reflected existing baseline conditions, and three other no action alternatives reflecting the predictable actions of third parties.  Def. Mem. at 21-22.  Northern Plains claims that the analysis of the status quo baseline was limited to "three sentences." *Id.* at 22.  But they are simply mischaracterizing the SEIS, which makes clear that the status quo baseline is analyzed in the entirety of Section 3 of the SEIS.  DOS 7456; *see also* DOS 6132-642.  Northern Plains argues that the

analysis of the no action alternative should have ended with an analysis of the status quo baseline, NPRC Reply at 22-26, but their view does not comport with NEPA.

While Plaintiffs rely on a district court decision for the proposition that "there can be only one baseline" in a NEPA analysis, NPRC Reply at 23 (quoting *Conservation Northwest v. Rey*, 674 F. Supp. 2d 1232, 1247 (W.D. Wash. 2009)), the Ninth Circuit has reached the opposite conclusion. *See Mont. Wilderness Ass'n v. McAllister*, 460 Fed. Appx. 667, 671 (2011) ("We find nothing unreasonable about the formulation of these no action alternatives."); *see also Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453-564 (9th Cir. 1984).

Plaintiffs argue that *McAllister* is distinguishable because there was only one no action alternative that would have continued the "agency's present course of action." NPRC Reply at 24 (quoting *Mont. Wilderness Ass'n v. McAllister*, 658 F. Supp. 2d 1249, 1264 (D. Mont. 2009), *aff'd*, 460 F. Appx. 667 (9th Cir. 2011)). But a closer reading of the district court's opinion reveals that both no action alternatives would have continued the current course of action. *See* 658 F. Supp. 2d at 1264 ("Contrary to Multiple-Use Plaintiffs' argument, the record shows the Service formulated Alternative 2, like Alternative 1, as a scenario reflecting a continuation of the current course of action."). Plaintiffs are simply incorrect that an agency must analyze only one no action alternative.

Moreover, Plaintiffs necessarily concede that NEPA, as interpreted by CEQ guidance, NEPA requires agencies to analyze the predictable actions of third parties. NPRC Reply at 23 (citing 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981)). If the Keystone XL Pipeline is not built, oil sands producers will find other ways to bring the oil to markets, which will result in greater amounts being transported by rail. DOS 5811-49. The SEIS analyzes the environmental impacts of transporting additional amounts of oil by rail and tanker, and, in fact, those impacts would be significant. DOS 7458-557. Plaintiffs claim that these alternatives are "unrealistic," NPRC Reply at 23, but they offer no basis for that conclusion. And their claim that the analysis in the SEIS "stack[ed] the deck" in favor of approval of the pipeline, *id.* at 24, is belied by the fact that two different administrations reached different conclusions about whether to approve the pipeline.

### D. The SEIS Adequately Analyzes Cumulative Greenhouse Gas Emissions and Climate Change Impacts

The analysis of climate change impacts satisfied NEPA. Contrary to the Network's new argument, an analysis of greenhouse gas emissions using a social cost of carbon protocol was not required by NEPA.

#### 1. The Analysis of Climate Change Impacts Satisfied NEPA

The Network argues that the analysis of greenhouse gas emissions was insufficient. IEN Reply at 42-45. They are wrong. As previously discussed, the SEIS analyzes emissions on a "wells-to-wheels" basis, thus accounting for all of

12

the greenhouse gas emissions associated with producing, transporting, refining, and combusting 830,000 bpd of crude oil from the Canadian oil sands.  Def. Mem. at 27-28.  The Network concedes that courts have allowed an analysis of greenhouse gas emissions as a proxy for the environmental impacts of climate change, *see WildEarth Guardians v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013), but they argue that an analysis of emissions was insufficient in this instance because the SEIS did not compare the emissions associated with the pipeline with local, national, and global emissions.  IEN Reply at 43-45.

The Network's attempt to distinguish the relevant case law fails.  They claim that the SEIS did not provide "enough information to allow decisionmakers and the public to gauge the magnitude of the project's (direct and cumulative) emissions." IEN Reply at 43.  To the contrary, the SEIS provides ample context regarding the magnitude of the emissions.  Def. Mem. at 27-28.  The SEIS estimated that the emissions associated with the crude oil transported through the Keystone XL Pipeline would result in an incremental increase in emissions of 1.3 to 27.4 $MMTCO_2e$ annually.  DOS 7200.  On a wells-to-wheels basis, this amounts to up to a 19% increase over current emissions, and on a well-to-tank basis (excluding combustion), this amounts to up to a 102% increase.  DOS 7226-27.

As the SEIS explains, the incremental increase on a wells-to-wheels basis is the equivalent of the emissions from 270,833 to 5,708,333 passenger vehicles, the

energy for 64,935 to 1,368,631 homes, or the annual emissions of 0.37 to 7.8 coal fired power plants.  DOS 7241.  The SEIS also explains that the United States accounts for 16% of global greenhouse gas emissions, and Canada accounts for 1.7%.  Further, the SEIS explains that, in 2011, Canadian emissions were 702 $MMTCO_2e$, with the oil and gas sector accounting for 163 $MMTCO_2e$, but which is expected to increase to 200 $MMTCO_2e$ by 2020.  The Network faults the SEIS for focusing on the share of Canadian emissions, IEN Reply at 44-45, but given that the increase in greenhouse gas emissions associated with the project would be due to the production of oil in Canada, this focus was reasonable.  The information in the SEIS provided more than enough information to the public and the decisionmakers to gauge overall impacts of the project on greenhouse gas emissions, and therefore the Network's arguments have no merit.

### 2.      An Analysis of the Social Cost of Carbon Was Not Required

Relying on the *High Country* case, the Network asserts that the SEIS was required to include an analysis of the social cost of carbon.  IEN Reply at 45-52. As this Court has recognized, however, the court's ruling in *High Country* was based on the fact that the agency had quantified the benefits of the proposed action but had claimed—without adequate justification—that a similar effort to quantify the costs would be impossible.  *W. Org. of Res. Councils*, 2018 WL 1475470, at *14.  Even the *High Country* court acknowledged that "NEPA does not require a

14

cost-benefit analysis." *Id.* (quoting *High Country*, 52 F. Supp. 3d at 1191). Other courts have agreed that a social cost of carbon analysis is not required by NEPA. *See Wildearth Guardians v. Jewell*, No. 1:16-cv-605-RJ, 2017 WL 3442922, at *12 (D.N.M. Feb. 16, 2017). Moreover, any such analysis would be speculative and arbitrary because economists cannot agree on the appropriate cost to apply to carbon dioxide emissions. *See High Country*, 52 F. Supp. 3d at 1191. Accordingly, no social cost of carbon analysis was required.[2]

### 3. A Specific Analysis of the Greenhouse Gas Emissions Associated with the Alberta Clipper Pipeline Expansion Was Not Required

Northern Plains' argument that additional analysis of the cumulative impacts of greenhouse gas emissions was required, NPRC Reply at 26-34, should be rejected. Climate change impacts of greenhouse gas emissions are necessarily cumulative, and therefore it is sufficient for NEPA purposes to analyze the greenhouse gas emissions associated with a project and provide a qualitative discussion of the effects of climate change, as the SEIS did. No court has required the more expansive analysis Plaintiffs seek, and courts have instead allowed agencies to analyze the incremental contribution of the project to greenhouse gas

---

[2] *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (9th Cir. 2008) is inapposite because the court held that a cost-benefit analysis was required to comply with the Energy Policy and Conservation Act in setting fuel economy standards, not NEPA. *See id.* at 1198-1203, 1215-17.

emissions.  *See WildEarth Guardians*, 738 F.3d at 309; *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011).  Accordingly, this argument has no merit.

Plaintiffs also argue that additional analysis of the cumulative emissions associated with the Alberta Clipper Pipeline should be conducted.  NPRC Reply at 28.  As previously demonstrated, the cumulative emissions associated with the Keystone XL Pipeline and the Alberta Clipper Pipeline expansion project were analyzed in the Alberta Clipper SEIS.  Def. Mem. at 36.  Under Ninth Circuit law, given that it was expected that the combined emissions for both projects would be analyzed in the NEPA process for the Alberta Clipper Project (and in fact were analyzed), it was not necessary for the State Department to analyze the combined emissions in the SEIS for the Keystone XL Pipeline.  *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1010-11 (9th Cir. 2011); *N. Alaska*, 457 F.3d at 980.

Northern Plains' attempts to limit these Ninth Circuit cases to their facts are to no avail.  They argue that both cases involved large planning processes, whereas this case involves two separate projects, NPRC Reply at 30-31, but that is a distinction without a difference.  The key issue is "one of timing."  *N. Alaska*, 457 F.3d at 980.  When two actions are proposed in overlapping timeframes, one NEPA analysis must precede the other, and the cumulative impacts of both may

16

"have to be addressed at a later stage."  *Id.*  Moreover, in *Center for Environmental Law and Policy*, the court found that the analysis for a particular drawdown project (not another planning stage) could be conducted later in the environmental assessment for the project.  655 F.3d at 1010-11.  Accordingly, Plaintiffs' attempts to distinguish Ninth Circuit precedent fail.

Finally, even if the Court were to conclude that State technically violated NEPA by not analyzing cumulative emissions associated with the Alberta Clipper Pipeline, any such error was harmless.  Def. Mem. at 37-38.  Northern Plains responds that the analysis of emissions was "central" to the Under Secretary's decision.  NPRC Reply at 33.  But they cannot rebut the fact that the emissions considered in the Keystone XL SEIS (1.3 to 27.4 MMTCO$_2$e annually) and the combined total for both pipelines analyzed in the Alberta Clipper SEIS (2.1 to 49.9 MMTCO$_2$e annually) overlapped substantially.  The lack of this information did not "materially impede[]" the Under Secretary's decisionmaking process, and therefore any error was harmless.  *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017).

### E. The State Department's Analysis of Environmental Impacts in Canada Was Sufficient to Satisfy NEPA

NEPA does not apply extraterritorially, and the SEIS's reliance on the environmental review conducted by the Canadian authorities was sufficient to meet any such requirement in NEPA.

### 1.    NEPA Has No Extraterritorial Application

The Network does not refute that statutes are not presumed to apply outside of the United States absent "a plain statement of extraterritorial statutory effect." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991).  They claim, however, that this "plain statement" appears in NEPA, which states generally that the government should recognize the "worldwide and long-range character of environmental problems."  IEN Reply at 24 (quoting 42 U.S.C. § 4332(2)(F)).  As explained by the D.C. Circuit nearly four decades ago, the section that the Network cites "looks toward cooperation [with foreign countries], not unilateral action, in a manner consistent with our foreign policy."  *Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 647 F.2d 1345, 1366 (D.C. Cir. 1981).  This section on "international cooperation" is unrelated to the requirement that agencies prepare a report regarding environmental impacts for major federal actions.  42 U.S.C. § 4332(2)(C).

The Network's reliance on *Environmental Defense Fund v. Massey,* 986 F.2d 528 (D.C. Cir. 1993), is misplaced.  *Massey* involved the National Science Foundation's decision to ship waste to Antarctica.  *Id.* at 529-30.  In light of the United States' "legislative control over the region [of Antarctica] at issue" and the "status of Antarctica as a sovereignless continent," the court found that the application of the presumption against extraterritorial application was "particularly

inappropriate." *Id.* at 533-34. Subsequent Supreme Court decisions have rejected the notion that the presumption against extraterritorial application is weaker if no conflict with the law of other nations would arise, and thus undermined this central tenet of *Massey*. *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 173-74 (1993); *Smith v. United States*, 507 U.S. 197, 204 (1993). Accordingly, the continued validity of the ruling in *Massey* is questionable, and its holding has been limited to instances in which the action and environmental impacts would occur in a sovereign-less area. *See Basel Action Network v. Maritime Admin.*, 370 F. Supp. 2d 57, 71-72 (D.D.C. 2005); *NEPA Coal. of Japan v. Aspin*, 837 F. Supp. 466, 467 n.3 (D.D.C. 1993). The holding has no application here because the production of oil from Canadian oil sands is not occurring in a sovereignless area.

*Government of Manitoba v. Salazar*, 691 F. Supp. 2d 37 (D.D.C. 2010), also does not support Plaintiffs' arguments because it involved "transboundary effects" of a water project that could spread foreign biota across the border into Canadian waters. *Id.* at 51 (citing Council on Environmental Quality ("CEQ") Guidance on NEPA Analyses for Transboundary Impacts (July 1, 1997) (available at: https://ceq.doe.gov/guidance/guidance.html)). In contrast, the Network seeks additional analysis no of transboundary effects at the border, but impacts hundreds of miles across the Canadian border, which will be caused by oil extraction projects authorized by the Canadian government.

19

The Network also places great weight on *Backcountry Against Dumps v.*

*U.S. Dep't of Energy*, No. 3:12-cv-3062-L-JLB, 2017 WL 2988273 (S.D. Cal. Jan.

30, 2017), but they ignore the fact that the wind facility at issue in that case was

only a mile from the border and the purpose of the facility was to provide

electricity to customers in the United States.  *See Backcountry Against Dumps v.*

*Chu*, 215 F. Supp. 3d 966, 972 (S.D. Cal. 2015).  No such circumstances exist

here.  *Backcountry*, if anything, undermines Plaintiffs' arguments because the

court's remedy order directed the agency to incorporate the Mexican

environmental analysis.  *Backcountry Against Dumps v. Perry*, No. 3:12-cv-3062-

L-JLB, 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017).  Likewise, the CEQ's

1997 guidance recommends that agencies should use "reasonably available

information" and "rely on available professional sources of information and should

contact agencies in the affected country with relevant expertise."  CEQ Guidance

on Transboundary Impacts at 2, 3.  The SEIS here already does so, and therefore

the Network's arguments that the analysis is insufficient are meritless.

>    **2.    The Analysis in the SEIS Satisfies the Standards in
>           Executive Order 12,114, the State Department's
>           Regulations, and CEQ's Guidance**

Assuming that some degree of NEPA analysis of impacts outside of the

Untied States was necessary, the analysis in the SEIS satisfies the requirements of

Executive Order 12,114, 44 Fed. Reg. 1,957 (Jan. 4, 1979), and State Department

regulations that refer to the executive order.  *See* 22 C.F.R. § 161.12.  The Network

argues that the executive order does not "control" because it does not apply to

"major federal actions *within* the United States" that have impacts across borders.

IEN Reply at 28-29.  This is simply false.  The executive order is directed both

towards actions occurring within the United States, *see* Exec. Order § 2-3(a)-(c),

and actions outside of the United States.  *Id.* § 2-3(d).

Defendants agree, however, that no analysis of impacts in Canada was

required for the Keystone XL Pipeline under Executive Order 12,114 because

Canada is "participating" in the action.  *Id.* § 2-3(b).  And, in fact, the SEIS

analyzes environmental impacts abroad, not because they were required, but as a

matter of policy.  DOS 7358.  The analysis in the SEIS is more than sufficient to

meet the requirement in Executive Order 12,114 to include a "concise review[] of

the environmental issues involved."  Exec. Order 12,114 § 2-4(a)(iii); *see also*

DOS 7358-81.[3]

### 3.    The Keystone XL Pipeline Is Not a Proximate Cause of the Impacts of Oil Sands Production in Canada

Even aside from the fact that NEPA does not apply extraterritorially, no

analysis of the impacts of oil sands extraction was required because the Keystone

XL Pipeline is not a proximate cause of oil sands extraction in Canada.  *See Sierra*

---

[3] Conservation measures have been developed to avoid impacts to the swift fox.
Def. Mem. at 102; DOS 6899-900.

*Club v. Clinton*, 746 F. Supp. 2d 1025, 1045-46 (D. Minn. 2010) (finding an insufficient "causal relationship" between the Alberta Clipper Pipeline and oil sands production). The Network makes no attempt to distinguish *Sierra Club*, which involved virtually the same issue. And here, the lack of a causal connection is thoroughly substantiated by the extensive market analysis in the SEIS. *See* DOS 5760-908. Therefore, no analysis of the impacts of oil sands production in Canada was required.

### F.   The SEIS Adequately Analyzes Potential Impacts to Water Resources, Impacts to Water Cultural Resources, and Mitigation

#### 1.   Water Resources

Plaintiffs claim that the use of the EPA's Hydrocarbon Spill Screening Model ("HSSM") to evaluate impacts to water resources from potential spills of dilbit was insufficient. *See* IEN Reply at 32-34. As explained in the SEIS, however, the purpose of using the HSSM model was to analyze the impacts of a "dissolved phase plume" after the crude oil has broken down. DOS 7117. Plaintiffs offer no basis for their conclusion that the HSSM model is unsuitable for this purpose.

They also claim that the model is inadequate because, as explained the SEIS, it was not designed for "dynamic conditions such as fluctuating groundwater, changing gradient, or specific design conditions," DOS 7117, but they fail to show that a model that attempted to consider such individual variations would have been

more valuable in evaluating the potential environmental effects on groundwater.

The use of a 10-mile impact zone to evaluate impacts to water resources oil spill

plumes was reasonable based on the prediction in the modeling that plumes would

travel up to 10 miles.  DOS 7069, 7114-16.  The modeling parameters were

reasonable and should be upheld.  *See Tri-Valley CAREs v. U.S. Dep't of Energy*,

671 F.3d 1113, 1126 (9th Cir. 2012); *Sierra Forest Legacy v. Sherman*, 646 F.3d

1161, 1182-83 (9th Cir. 2011).

Plaintiffs' criticism of the analysis of impacts caused by dilbit is also

unfounded.  They point out that dilbit may sink below the water's surface and mix

with bottom sediment, but the discussion they cite is in the SEIS.  IEN Reply at 33

(citing DOS 6026).  Likewise, their assertion that the SEIS analyzed only the

impacts of a non-dilbit crude oil spill on water resources in Holt County, IEN

Reply at 34-35, is incorrect.  DOS 6743.  Similarly, they argue that the SEIS

"concedes" that crude oil may become separated and dissolve in the water column.

IEN Reply at 34 (citing DOS 6743).  But the purpose of NEPA is to analyze

potential environmental impacts, which is precisely what the SEIS does here.

Further, in its 2015 letter, the U.S. EPA stated that the analysis of oil spill

mitigation had been "strengthened" and while "spills of diluted bitumen can have

different impacts than spills of conventional oil," the SEIS included mitigation

measures to "decrease the risk of spills and leaks, and provide for necessary

remediation should spills occur." DOS 972-73. Therefore, the impacts of diluent have been sufficiently analyzed.

In addition, the SEIS appropriately analyzes the potential impacts to the Assiniboine and Sioux Rural Water Supply System ("ASRWSS"). DOS 6276, 6750-51. The Network argues that they argue that there are multiple intakes for the ASRWSS that are closer than 70 miles. IEN Reply at 36-37. Specifically, a declaration submitted for the first time in this litigation states that the intake for the drinking water is "58 river miles downstream of the Fort Peck Dam." Declaration of Bill Whitehead ¶ 4 (ECF No. 152). Even if this is true, it is still well outside the expected 10-mile impact zone for a potential oil spill. DOS 6750. The declaration also states that intakes for agricultural purposes would be 10 and 14 miles downstream of the pipeline's crossing of the Missouri River. Whitehead Decl. ¶ 6. The SEIS does not refer to those intakes specifically, but it identifies the streams and rivers crossed by the pipeline in Montana that are used for agricultural purposes, including the Missouri River and Milk River, DOS 6274-75, and analyzes potential impacts to the ASRWSS, DOS 6276, 6750-51, and impacts to surface water. DOS 6750-51, 7123-25, 7135-45. The SEIS also includes extensive mitigation to avoid and minimize the impacts of spills. DOS 7157-86, 942265 (App. B), 12800-39 (App. Z). The analysis of impacts to water resources satisfied NEPA.

24

Finally, referring to the failure of a spillway in California, the Network

claims that an analysis of the potential failure of the Fort Peck Dam was required

by NEPA.  IEN Reply at 38.  The "layman's perspective" offered by the Network,

Declaration of Frank Eggers ¶11 (ECF No. 154), is insufficient to show that such a

catastrophic failure is not remote and speculative, and therefore an analysis of such

an occurrence is not required by NEPA.  *See Ground Zero Ctr. for Non-Violent*

*Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1089-90 (9th Cir. 2004).

### 2.    Cultural Resources

There is no requirement in NEPA to have surveyed for cultural resources all

of the potential acreage that may be disturbed by the pipeline.  *See Te-Moak Tribe*

*of W. Shoshone. v. U.S. Dep't of the Interior*, 608 F.3d 592 (9th Cir. 2010).  In *Te-*

*Moak*, the court explained that the agency had complied with NEPA by imposing

"effective avoidance and mitigation measures" to protect cultural resources,

specifically, by requiring cultural resource surveys to be conducted "before

beginning exploration activities" if cultural resources had been previously

identified in the area.  *Id.* at 600-01.  Similarly here, TransCanada is required to

conduct cultural resource surveys on *all* areas that would be impacted by the

project.  DOS 6522.  The SEIS contains a thorough analysis of prior surveys of

cultural resources and, through consultation with State National Historic

Preservation Offices, a process has been developed to ensure that any additional

cultural resources are appropriately identified and protected through the construction phase of the project.  *See* Def. Mem. at 51-52; DOS 6520-70, 7000-20.  This satisfied NEPA.

### 3.    Mitigation

The Network claims that it was improper for mitigation measures relating to pipeline safety measures to rely on the development of future plans to be approved by the Pipeline and Hazardous Materials Safety Administration ("PHMSA").  IEN Reply at 53-54.  NEPA, however, does not require mitigation plans to be fully developed; rather, it is sufficient that they be developed to a reasonable degree. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989) (an agency is not required to have "a fully developed plan that will mitigate environmental harm before [it] can act."); *see also Bering Strait Citizens for Responsible Res. Devel. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 950 (9th Cir. 2008).  The argument that the SEIS was required to analyze the impacts of tailing ponds in Canada is without merit for the reasons discussed in section I.E., *supra*.

### G.    The State Department Is Not Required to Prepare a Supplemental NEPA Analysis

Plaintiffs have failed to identify significant new information regarding environmental impacts that would require a supplemental NEPA analysis.

### 1. Change in Oil Prices

Northern Plains argues that the SEIS did not sufficiently analyze a low-price oil scenario, and therefore supplemental NEPA analysis is required. NPRC Reply at 35-38. Yet they ultimately acknowledge that such an analysis was included in the SEIS, *id.* at 37, and fail to explain why it was inadequate. *See* DOS 5884-87, 5895-97. They point to the statement in the SEIS that the extraction rate is not likely to significantly change in most market scenarios, NPRC Reply at 37, but, in fact, the SEIS also discloses that if oil prices were to stay in the range of $65 to $75, "higher transportation costs could have a substantial impact on oil sands production levels." DOS 5896. Thus, the scenario that Northern Plains is concerned about has already been anticipated and analyzed in the SEIS.

Northern Plains also claims that the State Department ignored the recommendations of the EPA. NPRC Reply at 36. In fact, the February 2015 letter from the EPA recognized that the SEIS already included a "low price scenario" and requested only that the low price scenario "be given additional weight during decision making." DOS 974. The Under Secretary appropriately considered the current price of oil in the record of decision. DOS 2502-04.

### 2. Transportation of Crude Oil by Rail

Northern Plains argues that transportation of oil sands by rail has remained flat since 2014. NPRC Reply at 39. While it is true that—after rising by 600%

27

from 2012 to 2014—transportation by rail has decreased, DOS 2129, the analysis in the SEIS shows that if there is a need for additional capacity, such capacity could be supplied by rail.  DOS 5811-49.  In response to demand for additional capacity, transportation of crude oil by rail from Western Canada increased from virtually zero in January 2011 to approximately 160,000 bpd by April 2013.  DOS 5813-14.  Over a similar time period, rail transport from the Bakken in the United States has increased from 50,000 bpd to 700,000 bpd.  DOS 5820-22.  The rapid increase in rail capacity to transport coal from the Powder River Basin also indicates that rail capacity could be expanded to meet demands for additional capacity.  DOS 5833-39.  Thus, the analysis in the SEIS shows that rail capacity could increase to meet an increase in demand for the transport of oil from Canada.  Plaintiffs have failed to show that there is significant new information that the SEIS does not already consider.

### 3.    Oil Spills

Northern Plains argues that information regarding two oil spills that occurred after the SEIS arises to the level of significance and thus requires yet another supplemental NEPA analysis.  NPRC Reply at 40-42.  But they have failed to show that the Keystone XL Pipeline would "significantly impact the environment in a way not previously considered."  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157-58 (9th Cir. 2008).  While

28

mitigation measures are in place to avoid leaks, it is anticipated that leaks will, nevertheless, occur and the SEIS analyzes the impacts of small, medium, and large leaks.  DOS 7102-94.  Plaintiffs dispute that past response efforts on the previously permitted Keystone Pipeline have been effective, but, in fact, 11 of the 12 spills in the first year were small and were contained in the landowner's property.  And as to the one medium-sized spill, a response was initiated immediately and remediation was completed in nine days.  DOS 7095-96, 7173-74.

### 4. Greenhouse Gas Emissions

The State Department was not required to re-create the analysis of greenhouse gas emissions using the Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation ("GREET") model used for the Alberta Clipper SEIS.  DOS 2501.  Northern Plains argues that the 5-20% increase in emissions estimated by the GREET model would be a significant change, NPRC Reply at 43-45, but they fail to explain why that analysis would be significant for the decision-maker.  Further, the GREET model has already been used to analyze the cumulative emissions for both the Alberta Clipper Pipeline and the Keystone XL Pipeline.  *See* section I.D.3., *supra*.  At the time of the national interest determination, the Under Secretary was aware of the use of the GREET model for analyzing the Alberta Clipper Pipeline and therefore could factor in the 5-20% increase in emissions under that model into the decision-making process.  DOS

2500-02.  Therefore, requiring the State Department to go back and incorporate the GREET model and come up with higher estimates for emissions would serve no purpose.

## II.   The Claim that the State Department Did Not Give a Reasoned Explanation for Its Policy Change Is Not Legally Cognizable and Lacks Merit

Plaintiffs argue that the Under Secretary failed to provide a sufficient explanation for changing position on the permit from the prior administration.  IEN Reply at 74-79; NPRC Reply at 53-67.  These arguments fail because the decision was committed to the Under Secretary's discretion by law, and the Ninth Circuit does not recognize a stand-alone APA claim.  Even if the Court reaches the merits of the claim, the Under Secretary has adequately explained the basis for his decision.

### A.   The Under Secretary's National Interest Determination Was Committed to Agency Discretion by Law

The national interest determination—which is based solely on the constitutional authority of the President and rests solely on whether the Under Secretary determines that issuing a permit would "serve the national interest," Exec. Order 13,337 § 1(g)-(h), 69 Fed. Reg. 25,299, 25,300 (Apr. 30, 2004)—is committed to agency discretion by law.  Def. Mem. at 69-70.  This is a narrower argument than Defendants made in their motion to dismiss.  In its prior order, the Court found that there were sufficient standards to apply to Plaintiffs' NEPA

claim.  November 22, 2017 Order at 15-22 (ECF No. 99).[4]  But the issue raised here is whether a challenge to the substance of the national interest determination itself is committed to agency discretion by law.  *See* 5 U.S.C. § 701(a)(2).  Given that there are no statutory provisions that apply to the determination and the only standard given by the President is that the issuance of a permit "serve the national interest," the determination is committed to agency discretion by law.  Def. Mem. at 69-70.

Northern Plains claims that they are not challenging the substance of the national interest determination.  NPRC Reply at 55.  But by challenging the basis for the Under Secretary's decision—and whether he adequately explained that basis—that is exactly what they are doing.  They further claim that they are merely arguing that the agency "procedurally erred," NPRC Reply at 55, but as discussed below, a procedural error under the APA must be tied to some underlying substantive standard against which the agency's decision can be judged.  No such standard exists here.

---

[4] Defendants are not precluded from making arguments that were made in their motions to dismiss.  In its order, the Court stated only that Defendants had failed to demonstrate that the decision to issue the permit was committed to agency discretion by law "at this stage."  November 22, 2017 Order at 22.  Defendants do not concede that the Court's ruling was correct and preserve all issues raised in the motions to dismiss for appeal.

This issue was squarely addressed by the D.C. Circuit, which found that the decision whether to issue a presidential permit for an international bridge based on a national interest determination was committed to agency discretion by law. *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903-04 (D.C. Cir. 2018).  Plaintiffs' only response is that they are not challenging the "substance" of the Under Secretary's decision.  NPRC Reply at 57.  But by arguing that the Court should evaluate the bases for the 2017 decision and compare them to the basis for the 2015 decision, their claim goes to the substance of the decision.  The decision was committed to agency discretion by law, and therefore the claim fails.

## B.    The Ninth Circuit Does not Recognize a Stand-Alone APA Claim

Northern Plains implicitly concedes that the Ninth Circuit does not recognize a stand-alone pleading, but argues instead that the claim arises under both the APA and NEPA.[5]  NPRC Reply at 57-58.  This argument is belied by Northern Plains' original pleading, which pled only an APA claim—a fact that Plaintiffs would prefer that the Court overlook.  *See id.* at 58 n.18.  In any event, the argument fails because a claim that an agency has changed positions without adequate explanation must be tied to "relevant substantive statute."  *Or. Natural*

---

[5] Notably, the Network makes no pretense that this is a NEPA claim and instead argues the claim directly under the APA.  IEN Reply at 74.  Contrary to the Network's assertion, *id.*, Defendants did not make this argument in their motion to dismiss.

*Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996).  Northern Plains

responds that "substantive" simply means "relevant," NPRC Reply at 58, but they

offer no support for that position or any case in which a court decided such a claim

where the only underlying statute alleged to have been violated was NEPA.

Further, the claim does not relate in any way to any NEPA standards—the claim is

that the Under Secretary did not adequately explain the reasons for the change in

position regarding the permit.  This claim is not tied to any substantive statute that

would supply standards for judging whether the decision was adequately

explained, and therefore it fails.  *See Or. Natural Res. Council*, 92 F.3d at 798

("Whether an agency has overlooked 'an important aspect of the problem' . . .

turns on what a relevant substantive statute makes 'important.'") (quoting *Motor*

*Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)).

Northern Plains argues that, in the cases it relies on, the claim that an agency

changed position without adequate explanation was not tied to a substantive

statute.  NPRC Reply at 59-60.  That is simply false.  *Organized Village of Kake v.*

*U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015), involved the Alaska

National Interest Lands Conservation Act ("ANILCA") and the Tongas Timber

Reform Act ("TTRA").  *Id.* at 961; *see also id.* at 967 (the record of decision

"asserts that 'the new policy is permissible' under the relevant statutes, ANILCA

and TTRA") (citation omitted).  *FCC v. Fox Television Stations*, 556 U.S. 502

(2009) involved a change in policy in applying the Communications Act.  *See id.* at

505-06.  And *California v. Bureau of Land Management*, 286 F. Supp. 3d 1054

(N.D. Cal. 2018), involved a change to substantive regulations regarding the

prevention of waste from natural gas production.  *Id.* at 1064.  In all of those cases

there were substantive standards against which to judge the agency's change in

position, and such standards do not exist in this case.

### C.    The Under Secretary Provided a Reasoned Explanation for His Decision

Assuming that the claim is reviewable, the Under Secretary provided a

reasoned explanation, which is all that is required.  *See* Def. Mem. at 72 (citing

*Fox*, 556 U.S. at 515).  Plaintiffs insist that a greater degree of explanation is

required because the Under Secretary purportedly contradicted prior factual

findings made by the Secretary in 2015.  NPRC Reply at 61-62; IEN Reply at 76-

79.  But the "findings" they point to are not factual findings, but rather policy

choices.  The 2015 record of decision spends three pages discussing policy

considerations relating to climate change, DOS 1182-85, and in the basis for

decision section, emphasizes the importance of "U.S. leadership on climate

change."  DOS 1187.  While the Plaintiffs characterize this statement as a "factual

finding," it is no such thing; rather, it is a statement of the prior administration's

policy objectives, which do not bind the current administration.  The 2017 record

34

of decision indicates that, while the importance of climate change was considered, the interests of energy security and economic development outweighed those concerns.  DOS 2518.  Thus, the 2017 decision was merely a change in policy.

Further, Plaintiffs can point to no factual findings relating to climate change that were changed.  Both records of decision find, based on the SEIS, that the full lifecycle emissions associated with the 830,000 bpd that would flow through the pipeline would range from 147 to 168 MMCO$_2$e.  DOS 1166, 2501.  And both decisions also referred to the finding in the SEIS that the construction of the pipeline would be unlikely to significantly increase the rate of extraction of oil from the oil sands.  DOS 1167, 2502.  The Under Secretary did not change the factual underpinnings of his decision—he simply made a different policy decision.

Northern Plains also alludes to new information included in the Under Secretary's decision, including more frequent disruptions in international crude oil supply and the possibility that oil from the Canadian oil sands will be shipped to China.  NPRC Reply at 65; *see also* DOS 2517.  These facts are not entirely new; nor do they contradict prior factual findings.  The concerns about the disruptions in the international oil supply were discussed in the 2015 record of decision, DOS 1180, and the potential for oil to be shipped from Canada to China was analyzed in the SEIS.  DOS 5891-92.  To the extent the 2017 decision relies on new factual information, however, those facts and the Under Secretary's reliance on them are

35

adequately explained in the record of decision, and therefore Plaintiffs' APA claim

fails. *See Fox*, 556 U.S. at 515-16.

Finally, the Plaintiffs' nitpicking of the Under Secretary's national interest

determination serves to underscore that they are, indeed, challenging the

substantive bases of that decision.  Their claims should be rejected.

## III.    The Agencies' Analyses Satisfy the ESA

### A.    The Agencies Reasonably Assessed Impacts to Whooping Cranes

#### 1.    The "Not Likely to Adversely Affect" Conclusion is Reasonable and Formal Consultation Was Not Required

Plaintiffs' argument focuses on certain fine-grained location data, which

they claim the agencies were required, but failed, to consider.  However, FWS has

broad discretion in structuring its Section 7 analysis.  Here, the agencies undertook

informal consultation, which does not compel any particular analysis or findings,

provided the Service appropriately considers the effects of the proposed action.

*Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1056 (9th Cir. 2013);

*Earth Island Inst. v. Carlton*, 626 F.3d 462, 472 (9th Cir. 2010) (courts may not

impose procedural requirements not explicitly enumerated in the pertinent statute).

While Plaintiffs clearly believe that formal consultation was required here, the

record supports the agencies' reasonable assessment of project impacts to the

whooping crane population.

Here, despite Plaintiffs' objection, the agencies' habitat-based analysis sufficiently captured the areas where power lines would present a potential risk to migrating cranes.  NPRC Reply at 75.  Not only did the agencies utilize the location of power lines within the sighting corridor,[6] but they engaged in site-specific assessments with the power providers regarding the line locations, potential crane conflicts, and mitigation measures, as discussed in our opening brief.  Def. Mem. at 75-76, 81-84.  Furthermore, the Region 6 guidance for minimizing effects from power line projects are built into the project's crane conservation measures outline in the Biological Assessment.  *Id.* at 81.  Simply because Plaintiffs question whether these measures will be correctly applied does not mean that FWS improperly relied on their inclusion.

Furthermore, FWS did not merely provide recommendations; it followed up with the power providers to ensure it received commitments to implement relevant conservation measures.  *E.g.,* DOS 10453, 10488, 10531, 10572.  The Service thus reasonably relied on the benefits of these measures to offset the potential for adverse impacts.  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012) (when mitigation measures are part of the project

---

[6] The sighting corridor, also referred to as the central flyway, is based on the historical sighting data.  Rabbe Report at 7; DOS 6412.  Thus, Plaintiffs incorrectly argue that the agencies did not consider the sighting data. What they mean is that the agencies did not perform, with the data, the type of analysis Plaintiffs believe necessary.

design, the ESA's procedural provisions ensure recourse if the measures are not applied); *Rock Creek All. v. FWS*, 663 F.3d 439, 443 (9th Cir. 2011) (approving biological opinion where mitigation plans were expected to offset adverse effects to endangered species); *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523-24 (9th Cir. 1998) (upholding biological opinion predicated on future commitments to acquire mitigation parcels even though the parcels were not presently known).

Plaintiffs continue to attack the value of the conservation measures, arguing that bird flight diverters are ineffective. NPRC Reply at 84-85. But line-marking devices like bird flight diverters are recommended by experts in the field to reduce collisions. *See* Def. Mem. at 84 (citing APLIC 2012 and FWS Region 6 guidance). Those recommendations are based upon numerous studies, including studies on whooping crane surrogates like Sand Hill cranes, rebutting the Network's suggestion that the record does not disclose how whooping cranes would respond to bird flight diverters. *See* Def. Mem. at 85. And of course, bird flight diverters are not the only conservation measure, as discussed above. Neither agency ever claimed that bird flight diverters will completely eliminate the risk of collision. Instead, the agencies recognize that their installation, along with other conservation measures, would mitigate this risk to a level "not likely to adversely affect" the crane.  .

At bottom, Plaintiffs' critique of the agencies' determinations rests on their belief that only the fine-grained locational assessment with the telemetry and sighting data will suffice.  Though a party may cite studies that support a conclusion different from the one that the expert agency reaches, it is not the role of the reviewing court to instruct the agency how to validate hypotheses, to choose among competing scientific analyses, or to explain every possible scientific uncertainty.  *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc).  When presented with conflicting scientific views, the reviewing court must generally defer to the agency evaluation because "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).  If evidence is susceptible of more than one rational interpretation, the reviewing court must uphold the agency's findings.  *Bear Lake Watch v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003).  In other words, Plaintiffs cannot prevail by simply showing that the scientific evidence could support different conclusions.  Rather, to prevail, Plaintiffs must show that the evidence "compels it." *Immigration and Naturalization Servs v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).  That is not the case here where FWS reasonably engaged in a detailed, site-specific exchange with each power provider to ensure commitments to mitigate crane impacts where found.

### 2.    The Expert Report Does Not Undercut the Agencies' Analysis

We previously explained why the Court does not need to accept, at face value, arguments that Plaintiffs' expert report demonstrates a significant risk of power line collision.  Def. Mem. at 76-79.  Plaintiffs take issue with several of these points, arguing that FWS is required to assess any issues with the data as part of a new consultation effort.[7]  NPRC Reply at 80.  Defendants agree that FWS should be allowed to assess the data in the first instance.  Indeed, because State and FWS are, in fact, considering this data as part of the reinitiated consultation, Plaintiffs' claim is moot.  And setting aside mootness, given the deference that the Court owes to the expert agencies when resolving the prototypical "battle of the experts," Plaintiffs' expert report does not actually undercut the agencies' determinations in any meaningful way.

---

[7] Plaintiffs also take issue with FWS' expert's consideration of a conversation with a U. S. Geological Survey colleagues concerning crane site fidelity.  NPRC Reply at 82-83.  But as Plaintiffs recognize, experts may rely on such material in forming their opinion if it is the type of information reasonably relied on by experts in that field.  *Id.* at n.26.  Here, it is common for biologists to rely on personal communications when assessing the impacts of an action on a species, as demonstrated by the Biological Opinion here.  *See* FWS 2121 (eight personal communications).  Even if the Court discounts Mr. Rabbe's opinion of whether Plaintiffs' expert report appropriate represents site fidelity, the sites identified by the report do not prevent as significant a risk as Plaintiffs argue, as discussed further below.

For example, Plaintiffs' expert report highlights Holt County, Nebraska as an area of concern. ECF No. 118 at 21. But the location for power lines to serve Pump Stations 22, 23, 24, and 26 in Nebraska were not finalized. DOS 10559. Because the route was not yet determined, the map at Figure 6 cannot accurately represent any risk of power line collision for the cranes, especially because the map shows lines associated with the Sand hill route, abandoned in 2011.[8] ECF No. 118 at 21. What the record does show is that the area where the line is likely to be constructed consists primarily of agricultural properties with a mix of irrigated, dryland operations, and pasture areas, DOS 10560; in other words, not the type of stopover habitat typically used by cranes. The power provider worked with FWS and the Nebraska Game and Parks Commission ("NGPC") to analyze potential impacts to species in the areas, and committed to complete a field review with FWS and NGPC to determine if the line will cross any areas of higher probability of use and to install bird flight diverters as appropriate. DOS 10563.

For South Dakota, Plaintiffs' report focuses on the Big Bend to Witten line, which is no longer part of the project. ECF No. 176 ¶ 4. The two other South Dakota locations highlighted in the report do not undermine the agencies'

---

[8] The lines in the other Nebraska areas flagged in the report were also abandoned after 2011, as acknowledged in the expert report. ECF No. 118 at 22. Thus, these portions of the expert report cannot undercut the agencies' analyses in 202 and 2013.

conclusions.  The first, in Harding and Perkins counties, is noted as having 3 stopover locations between 4.2 to 6.7 miles from the proposed line.  ECF No. 118 at 28-29.  But Plaintiffs' experts state earlier that most crane movements between overnight roost and day use locations are generally less than five kilometers apart (3.1 miles).  *Id.* at 9.  The second South Dakota location concerns lines for two pump stations.  The power cooperative provided FWS with a route map and agreed to incorporate measures to minimize impacts to cranes, terns, and plovers.  DOS 10544.  FWS responded that the lines are on the outer edges of the crane migration corridor and that few wetlands exist near the pumping station that would attract cranes.  DOS 10546.  While Plaintiffs' experts assert there are 14 and 21 historical and telemetry records around these power lines, their map shows only about four locations within five kilometers of the lines.  ECF No. 118 at 27.  Thus, FWS reasonably advised the power provider that mitigation measures for cranes were not required.

Finally, with respect to Montana, the expert report recognizes that many pump stations are outside the delineated migratory corridor, but highlights four stopover locations ranging between four to eight miles from proposed power lines.  ECF No. 118 at 30.  Again, this is further than the five kilometer roosting/day use radius.  *Id.* at 9.  Nonetheless, Montana power providers committed to installing bird flight diverters around identified riparian areas.  FWS 2060.  The expert report

does not undermine FWS' reasonable conclusion that such measures would avoid adverse species impacts.

### 3.   Reinitiation of Consultation Moots the Whooping Crane Claims

Finally, while the Plaintiffs' arguments and expert reports do not undermine the agencies' reasonable determination that the project, with conservation measures, is "not likely to adversely affect" the whooping crane, should the Court find otherwise, the agencies' January 2018 reinitiation of consultation moots this challenge.  Def. Mem. at 79-81.  Plaintiffs respond that a reinitiated consultation must be complete in order to moot a claim, attempting to distinguish *Alliance for the Wild Rockies v. U.S. Dept. of Agriculture*, 772 F.3d 592, 601 (9th Cir. 2014). NPRC Reply at 94.  At least one other district court in this circuit has rejected this purported distinction, dismissing a case because the reinitiation of consultation, though ongoing, mooted the claim.  *All. for the Wild Rockies v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d 1079, 1084-86 (D. Or. 2017).

Plaintiffs argue their claim is not moot because they also request declaratory relief.  NPRC Reply at 94.  But this is not a case where a request for declaratory relief remains live.  While the Ninth Circuit has previously held that a request for declaratory relief was not moot even though the agencies reinitiated ESA consultation, that holding concerned a continuing practice (grazing) that was subject to annual reconsideration; furthermore, the disputed issue (failure to

comply with monitoring standards) was likely to recur.  *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006)*.*  The Ninth Circuit has since clarified that a request for declaratory relief remains live only where there is evidence that the action agency is uncooperative in the consultation process and there is an annual obligation to consult.  *All. for the Wild Rockies*, 772 F.3d at 601 n.4.  Here, State has voluntarily reinitiated ESA consultation several times, as appropriate, and this is not a situation with annual consultation obligations.  There is simply no "'controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007) (citations omitted).

Plaintiffs also argue that their claim is not moot because the specifics of the ongoing reinitiation have not been described to their satisfaction.  NPRC Reply at 95.  But their request that the Court retain jurisdiction to instruct the agencies to complete a "valid" consultation is not the type of declaratory relief that preserves a claim.  *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 04-cv-3096-PA, 2007 WL 1072112, at *5 (D. Or. Apr. 3, 2007) (rejecting "vague justifications" that declaratory relief would be "helpful to 'ensure'" that the product of reinitiated consultation complies with the law and would "'clarify and settle' defendants' legal

obligations").[9]  Thus, Plaintiffs' premature speculation that the agencies' ongoing consultation will run afoul of the ESA's requirements cannot save their claim from mootness.

### B.    The Agencies Reasonably Assessed Impacts to Terns and Plovers

While the agencies recognized the possibility of increased cumulative predation on piping plovers from raptors perching on power lines, and addressed it accordingly, Plaintiffs continue to overstate the significance of this potential impact.  However, Plaintiffs fail to rebut the Service's expert testimony that predation associated with power lines is not an identified threat to recovery or significant source of mortality.  Def. Mem. at 85-86 (citing Rebuttal Expert Report of Jeff Runge, ECF No. 136-2).  Instead, Plaintiffs continue to insist that the agencies failed to consider generalized statements in a 2006 guidance document focused on preventing the electrocution of eagles and other raptors.  NPRC Reply at 91-92.  This document does not support the weight placed on it by Plaintiffs.

Addressed only as a side issue in the introduction, the 2006 guidance simply notes making power lines safer for raptors may raise concerns about increased

---

[9] Likewise, Plaintiffs' request that the Court order a consultation that addresses the issues *Plaintiffs* believe to be salient does not present a valid remedy to save their claim from mootness.  *See Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (upon remand, a court may not dictate "the methods, procedures, and time dimension of the needed inquiry . . . Such a procedure clearly runs the risk of 'propelling the court into the domain which Congress has set aside exclusively for the administrative agency.'" (citation omitted))

predation on some protected species (the list of which does not include piping

plovers).  ECF No. 143-1 at 36.  First, the guidance caveats the perceived predation

problem by stating that "the actual impact of raptors hunting from poles on

populations of these species has not been adequately studied, quantified, or

verified."  *Id.*  Second, even if applicable to plovers, the generalized

recommendations simply cautions that perch deterrents cannot entirely prevent

perching.  *Id.*  The guidance simply does not support Plaintiffs' proposition, which

is that it makes a blanket recommendation against the use of perch deterrents as a

conservation measure.

The consultation here was consistent with the recommendation in the 2006

guidance for agencies to work together to identify the risk and appropriate

conservation measures.  Def. Mem. at 87.  In response, Plaintiffs incorrectly assert

the agencies simply deferred any analysis to the future.  NPRC Reply at 92; IEN

Reply at 68.  These arguments ignore the conservation measures specified in the

Biological Opinion as well as other perch deterrent methods being implemented by

providers, as discussed in our opening brief.  In addition, the record shows FWS

engaged in site-specific analyses of the potential risks of power lines on plovers

and other species.[10]  For the lines serving four pump stations in Nebraska, the

---

[10] *E.g.,* DOS 10489 (letter to FWS from power provider noting that consultation
with Montana Fish Wildlife and Parks confirms no known plover nesting sites in
power line area); FWS 1967 (letter to power provider for Pump Station 14 that

crossing of the Platte River was noted as the only area of potential impact, but surveys revealed no suitable nesting habitat within ¼ mile of the river crossing location.  DOS 10563.  Nonetheless, the power provider committed to plover conservation measures in the area.  *Id.*  And one power line route in Montana was moved to avoid impacts to plovers, ensuring the line is three miles away from nests or habitat areas.  DOS 10453.  FWS reasonably relied on these analyses and conservation measures to conclude that the project is not likely to adversely affect the plover.

The Network's remaining argument on the Interior least tern is a generalized objection that the agencies insufficiently considered potential power line collisions. IEN Reply at 67. As discussed above, the impacts of power lines, and potential collisions therewith, were analyzed and FWS reasonably found that the power providers had sufficiently committed to conservation measures that will ensure that the project is "not likely to adversely affect" impacted species, including the tern. This conclusion is reasonable, especially in light of the recovered biological status of the tern and the fact that power line collisions are not identified as a major threat to the species.  Runge Report at 3, 8.

---

piping plover does not occur in power line area); DOS 10568 (routes for power lines serving Pump Station 25 personally inspected by FWS and provider, revealing no potential impacts to protected bird species).

**C.     The Agencies Reasonably Assessed Potential Oil Spill Impacts**

The Network argues that the agencies "ignored" the potential impacts of a

spill on whooping cranes.  IEN Reply at 61-62.  To the contrary, this possible

impact was analyzed in the Biological Assessment and found to be insignificant

due to "the low probability of a spill, low probability of the spill coinciding with

the presence of migrating whooping cranes or migration habitats, and low

probability of a whooping crane contacting the spilled product."  Def. Mem. at 88

(citing FWS 670).  Based on the length of pipeline in the migratory corridor and

the calculated incident spill risk of 0.00025 incident/ mile-year, State concluded

that the estimated spill risk occurrence within the flyway migration corridor is 39

years or 0.026 incidences per year.  *Id.*  State found that the potential for crane

exposure was reduced by the distance between the pipeline and riparian habitat, the

crossing of which would require a significant spill greater than 80% of historical

spill volumes.  *Id.*  The Biological Assessment includes a similar discussion of the

potential risk for spill or leak impacts on the pallid sturgeon, FWS 679-80, another

species highlighted by Plaintiffs.  IEN Reply at 64.

The Network ignores these carefully-calculated risk assessments, detailed in

Appendix G to the Biological Assessment (FWS 1203-84), in favor of its own

extrapolation of data from the historical pipeline incident analysis (DOS 11312-

37).  In our opening brief, we explained why the use of this historical data is not a

good predictor of spill risk for the Keystone XL Pipeline. Def. Mem. at 90 n.41. Instead, the agencies reasonably relied on the risk assessment specifically calculated for this project, which started with the same historical baseline incident frequencies then applied adjustment factors, including improved technologies and safety practices, to account for project- and site-specific conditions.[11] FWS 1265. The Network's cherry-picking of the record provides no reason to discount this careful analysis.

Finally, the Network completely ignores our explanation of the agencies' analysis of dilbit spill response measures and the reasonable reliance on the federal and state requirements for cleanup and remediation of oil spills. Def. Mem. at 91-92. Vague repetition of the dangers of a potential spill, without a meaningful response to the agencies' assessment of these issues, does not advance Plaintiffs' arguments. IEN Reply at 64.

### D. The Network's Extra-Territorial Impacts Argument Fails

As with their NEPA arguments, the Network continues to push for an overbroad scope of the ESA Section 7 consultation process. Plaintiffs claim that the agencies insufficiently analyzed impacts of Canadian portions of the project, or more generally, the very existence of tar sands mining projects in Canada, on the whooping crane and the northern swift fox. IEN Reply at 61-62, 73-74. Although

---

[11] As these factors were applied conservatively, the results overestimate risk. *Id.*

Plaintiffs recognize the ESA's "action area" limitation on the scope of the consultation duty, *id.* at 61, 74, it fails to rebut our showing that FWS reasonably concluded that the "action area" here terminates at the Canadian border.  Def. Mem. at 92-94.  Nor does the Network address our arguments about the domestic focus of ESA Section 7.

Similarly, Plaintiffs fails to rebut our point that their overbroad interpretation of ESA Section 7 would meaninglessly duplicate the analyses and mitigation already required by the Canadian government for species protection, including the crane and the fox.[12]  Def. Mem. at 95.  Restatement of the Network's earlier points, with nothing more, does not save these unsuccessful arguments.

### E.    The Agencies Properly Analyzed the Remaining Species

#### 1.    Black-Footed Ferret

We previously explained that the agencies reasonably assessed any impact to the endangered black-footed ferret from potential impacts to prairie dog towns.  Def. Mem. at 96-98.  Nonetheless, Plaintiffs argue that FWS ignored potential impacts to prairie dogs – in South Dakota, where black-footed ferrets unfortunately have been eliminated, and in areas of Nebraska lacking suitable ferret habitat – and

---

[12] IEN also repeats its assertion that State "admitted" that domestic project construction activities would crush dens and injure individual foxes.  IEN Reply at 73.  This mischaracterizes the SEIS, which discloses potential impacts without mitigation.  IEN does not dispute the effectiveness of the adopted conservation measures to avoid these impacts.

any role they may play in eventual ferret recovery, although the basis for this argument is unclear.  IEN Reply at 66.  The record shows that "the blacktailed prairie dog colonies that would be crossed by the proposed Project were determined to be too small to support black-footed ferrets," FWS 654, and that the areas around these prairie dog towns are unsuitable for ferret reintroduction.  FWS 653, 2045.  Plaintiffs' speculation to the contrary does not undermine the agencies' reasonable conclusions about project impacts on ferrets.

### 2. Rufa Red Knot and Northern Long-Eared Bat

We previously explained that since the rufa red knot and Northern long-eared bat were added the list of threatened species after the conclusion of ESA Section 7 consultation in 2013, the agencies reinitiated Section 7 consultation as appropriate.  Def. Mem. at 98-100.  In reply, Plaintiffs do not allege any deficiency with the results of the reinitiated consultations, but seems to insist that the process was deficient because State did not prepare a separate Biological Assessment.  IEN Reply at 69-71.  But reinitiated consultation necessarily incorporates the 2012 Biological Assessment; there was no need for State to repeat all of the earlier information.  If Plaintiffs are arguing that the agencies should have undertaken formal, instead of informal, consultation, not only do they fail to factually support an argument but the valid use of informal consultation, where appropriate, is repeatedly recognized by courts nationwide.  *See, e.g., Forest Guardians*, 450 F.3d

at 458; *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 835 F.3d 1377,

1387 (11th Cir. 2016); *In re Am. Rivers & Idaho Rivers United,* 372 F.3d 413, 415

n.5 (D.C. Cir. 2004).  The Court should reject Plaintiffs' insistence on additional

procedure for procedure's sake.

### 3.    Western Prairie Fringed Orchid

In our opening brief, we addressed the Network's concerns with the possibility that

the plant would not be adequately identified in pre-construction surveys as to be

avoided.  Def. Mem. at 100-01.  Plaintiffs' reply seems to morph from questioning

the sufficiency of pre-construction surveys to arguing that the use of such surveys

constitutes a deferral of the actual analysis of project impacts.  IEN Reply at 71-73.

But the analysis was done, including surveys in 2009, 2011, and 2012, and the

agencies' concluded that with the conservation measures in place, including

additional pre-construction surveys, the project is not likely to adversely affect the

orchid.  FWS 721-23.  The Network seems to argue that all conservation measures

must be implemented prior to FWS' concurrence, but this nonsensical approach

would eliminate the value of pre-construction surveys, which ensure avoidance of

plant populations in real time.

## IV.   The Court Should Not Vacate the Presidential Permit

Northern Plains urges the Court to vacate the Presidential Permit if the

Court finds any legal violation.  *See* NPRC Reply at 96-99.  Vacatur, however, is

not a presumptive remedy, and the type of remedy that may be appropriate will depend on the seriousness of the legal errors, if any, found by the Court and the disruptive consequences of vacatur. *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Accordingly, if the Court finds a legal error, the Court should allow the parties an opportunity to conduct remedy briefing, as it did in *Western Organization of Resource Councils*, 2018 WL 1475470, at *19.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of Defendants on all claims.

Respectfully submitted this 11th day of May, 2018,

JEFFREY H. WOOD, Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

SETH M. BARSKY, Section Chief
_____*/s/ Bridget K. McNeil*_____
BRIDGET KENNEDY McNEIL (CO Bar 34299)
Senior Trial Attorney
Wildlife and Marine Resources Section
999 18th St., South Terrace, Suite 370
Denver, Colorado 80202
Ph: 303-844-1484
bridget.mcneil@usdoj.gov

_____*/s/ Luke Hajek*_____
LUTHER L. HAJEK (CO Bar 44303)
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Ph: 303-844-1376

luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2)(E), the foregoing brief is proportionately

spaced, has a typeface of 14 points, and contains 12,592, excluding the tables,

caption, signature, certificate of compliance, and certificate of service.


*/s/ Luther L. Hajek*
LUTHER L. HAJEK
U.S. Department of Justice

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 11, 2018, a copy of the foregoing Defendants'

Memorandum in Support of Motion for Summary Judgment and in Opposition to

Plaintiffs' Motion for Summary Judgment was served on all counsel of record via

the Court's CM/ECF system.

<u>*/s/ Luther L. Hajek*</u>
LUTHER L. HAJEK
U.S. Department of Justice