JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
        PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

Attorneys for Plaintiffs
INDIGENOUS
ENVIRONMENTAL
NETWORK and NORTH
COAST RIVERS ALLIANCE

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:     svolker@volkerlaw.com
           akrieg@volkerlaw.com
           sclarke@volkerlaw.com
           jvolker@volkerlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | | |
|---|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, | ) ) ) ) | CV 17-29-GF-BMM |
| Plaintiffs, | ) ) ) ) ) | **IEN AND NCRA PLAINTIFFS' MEMORANDUM IN OPPOSITION TO TRANSCANADA'S MOTION FOR STAY PENDING APPEAL** |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) ) ) ) | Hearing:  January 14, 2019 Time:      1:30 p.m. |
| Federal Defendants, | ) ) ) ) | Judge:    Hon. Brian M. Morris |

and                                          )
                                             )
TRANSCANADA KEYSTONE                         )
PIPELINE and TRANSCANADA                     )
CORPORATION,                                 )
                                             )
      Defendant-Intervenors.                )
_____     )

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

**MEMORANDUM IN OPPOSITION TO TRANSCANADA'S MOTION FOR STAY PENDING APPEAL**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

**FACTUAL AND PROCEDURAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . .  2

**LEGAL STANDARD**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

**I.**  **TRANSCANADA IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    **A.**  **THIS COURT CORRECTLY RULED THAT STATE'S DECISION TO ISSUE THE PRESIDENTIAL PERMIT IS SUBJECT TO REVIEW UNDER THE APA AND THE ESA.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    **B.**  **THIS COURT CORRECTLY RULED THAT STATE'S DECISION TO ISSUE A PRESIDENTIAL PERMIT WAS NOT COMMITTED TO THE AGENCY'S DISCRETION, AND THEREFORE IS SUBJECT TO JUDICIAL REVIEW.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    **C.**  **THIS COURT CORRECTLY RULED THAT NEPA SUPPLEMENTATION IS WARRANTED.**. . . . . . . . . . . . . . . .  9

    **D.**  **THIS COURT CORRECTLY RULED THAT STATE'S CUMULATIVE IMPACTS ANALYSIS VIOLATED NEPA.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

    **E.**  **THIS COURT CORRECTLY RULED THAT STATE FAILED TO ANALYZE IMPACTS TO CULTURAL RESOURCES.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    **F.**  **THIS COURT CORRECTLY RULED THAT STATE FAILED TO ADEQUATELY EXPLAIN ITS POLICY CHANGE ON GHG IMPACTS.**. . . . . . . . . . . . . . . . . . . . . . . .  17

      **G.**    **THIS COURT CORRECTLY RULED THAT THE U.S. FISH AND WILDLIFE SERVICE SHOULD UPDATE ITS PREVIOUS REVIEW UNDER THE ESA** ...... 19

**II.**    **TRANSCANADA IS NOT ENTITLED TO A STAY** ............... 21

      **A.**    **THIS COURT HAS AUTHORITY TO ENJOIN ANY ACTIVITIES RELATED TO PIPELINE CONSTRUCTION.** ...................................... 21

      **B.**    **TRANSCANADA WILL NOT BE IRREPARABLY INJURED ABSENT A STAY.** ............................. 22

      **C.**    **ISSUANCE OF A STAY WILL SUBSTANTIALLY INJURE PLAINTIFFS.** ................................ 25

      **D.**    **THE PUBLIC INTEREST FAVORS DENIAL OF A STAY.** ................................................. 27

**CONCLUSION.** ............................................... 28

**CERTIFICATE OF COMPLIANCE.** ............................. 29

**CERTIFICATE OF SERVICE.** .................................. 30

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Alaska Survival v. Surface Transportation Board*
704 F.3d 615 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Barnes v. U.S. Department of Transportation*
655 F.3d 1124 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Churchill County v. Norton*
276 F.3d 1060 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*City of Alexandria v. Slater*
198 F.3d 862 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Cold Mountain v. Garber*
375 F.3d 884 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Colorado River Indian Tribes v. Department of Interior*
No. ED CV14-02504 JAK, 2015 WL 12661945 (C.D. Cal.). . . . . . . . . 16, 17

*Colorado Wild Inc. v. U.S. Forest Service*
523 F.Supp.2d 1213 (D.Colo. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Davis v. Mineta*
302 F.3d 1104 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Detroit International Bridge Co. v. Government of Canada*
189 F.Supp.3d 85 (D.D.C. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Friends of Capital Crescent Trail v. Federal Transit Administration*
877 F.3d 1051 (D.C. Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Great Basin Mine Watch v. Hankins*
456 F.3d 955 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*HonoluluTraffic.com v. Federal Transit Administration*
742 F.3d 1222 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*James River Flood Control Association v. Watt*
    680 F.2d 543 (8th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*Jensen v. National Marine Fisheries Service*
    512 F.2d 1189 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kern County Farm Bureau v. Allen*
    450 F.3d 1072 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lair v. Bullock*
    697 F.3d 1200 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
    *Connaughton*
    752 F.3d 755 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Marsh v. Oregon Natural Resources Council*
    490 U.S. 360 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12

*National Audubon Society v. Department of Navy*
    422 F.3d 174 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Native Ecosystem Council v. U.S. Forest Service*
    418 F.3d 953 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Natural Resources Defense Council v. U.S. Department of State*
    658 F.Supp.2d 105 (D.D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Nken v. Holder*
    556 U.S. 418 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Northern Idaho Community Action Network v. U.S. Department*
    *of Transportation*
    545 F.3d 1147 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Norton v. Southern Utah Wilderness Alliance*
    542 U.S. 55 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Organized Village of Kake v. U.S. Department of Agriculture*
    795 F.3d 956 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Oregon Natural Desert Ass'n v. Bureau of Land Management*
    625 F.3d 1092 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Protect Our Communities Foundation v. Chu*
      214 WL 1289444 (S.D. Cal. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

*Save Our Sonoran, Inc. v. Flowers*
      408 F.3d 1113 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Sierra Club v. Clinton*
      689 F.Supp.2d 1147 (D. Minn. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sierra Club v. Marsh*
      872 F.2d 497 (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Sierra Club v. U.S. Army Corps of Engineers*
      645 F.3d 978 (8th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sierra Club v. U.S. Department of Energy*
      867 F.3d 189 (D.C. Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sisseton-Wahpeton Oyate v. U.S. Department of State*
      659 F.Supp.2d 1071 (D.S.D. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Stewart v. Potts*
      996 F.Supp.668 (S.D. Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Thomas v. Peterson*
      753 F.2d 754 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*White Earth Nation v. Kerry*
      No. 14-4726, 2015 WL 8483278 (D. Minn. Dec. 9, 2015). . . . . . . . . . . . . 6

## STATUTES

United States Code, Title 5
      §§ 701-706 ("APA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
      § 701(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States Code, Title 16
      §§ 1531 *et seq.* (Endangered Species Act). . . . . . . . . . . . . . . . . . . . . . *passim*
      § 1536(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21
      § 1536(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States Code, Title 42
  §§ 4321 *et seq*. ("NEPA")................................... *passim*

# REGULATIONS

Code of Federal Regulations, Title 22
  § 161.7................................................... 5
  § 161.7(c)(1)............................................. 5

Code of Federal Regulations, Title 40
  § 1502.16(g)............................................. 17
  § 1508.7................................................ 13
  § 1508.8................................................ 17

Code of Federal Regulations, Title 50
  § 402.14............................................... 20

# RULES

Federal Rules of Civil Procedure
  Rule 62(c).............................................. 1

# OTHER AUTHORITIES

83 Fed. Reg. 62398...................................... 23

## MEMORANDUM IN OPPOSITION TO
## TRANSCANADA'S MOTION FOR STAY PENDING APPEAL

Plaintiffs Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA" and, collectively with IEN, "Plaintiffs") respectfully submit this memorandum in opposition to the Motion filed by TransCanada Corporation and TransCanada Keystone Pipeline LP (collectively, "TransCanada") under Rule 62(c) to stay this Court's November 8, 2018 Order (ECF 218) and November 15, 2018 Order (ECF 219) granting summary judgment to Plaintiffs and enjoining any activity in furtherance of construction or operation of the Keystone XL Pipeline project ("Keystone XL"), as modified by this Court's December 7, 2018 Supplemental Order Regarding Permanent Injunction (ECF 231) clarifying the scope of the allowable preconstruction activities, while TransCanada pursues an appeal.

This Court correctly balanced the equities when it decided to issue its carefully-crafted injunction barring those construction and preconstruction activities that would cause irreparable harm to environmental and cultural resources.  TransCanada's alleged harm, by contrast, is limited to speculative and temporary monetary loss which, by definition, cannot be "irreparable."  None of the grounds advanced by TransCanada's motion presents any valid basis for reversal of this Court's thoughtfully formulated and legally unassailable injunction, which is absolutely necessary to protect the public interest in compliance with this nation's paramount environmental laws pending the Federal

Defendants' correction of the unlawful conduct that prompted Court's entry of summary judgment and a permanent injunction in Plaintiffs' favor.

This Court properly found that issuance of a Presidential Permit is subject to review under the Administrative Procedure Act (APA), 5 U.S.C. § 702 and that the U.S. Department of State (State) failed to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. and the Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq.  November 8, 2018 Order (ECF 218) and December 7, 2018 Order (ECF 231).  Accordingly, this Court should deny TransCanada's Motion.

## FACTUAL AND PROCEDURAL BACKGROUND

This Court's November 22, 2017 Order denying the Federal Defendants' and TransCanada's motions to dismiss for lack of jurisdiction (ECF 99), August 15, 2018 Partial Order on Summary Judgment Regarding NEPA Compliance (ECF 210), and November 8, 2018 Order on Summary Judgment (ECF 218) set forth the pertinent facts and procedural background.  Plaintiffs summarize the salient facts and history below.

On March 23, 2017, State issued, on behalf of the President, a Record of Decision/National Interest Determination ("ROD/NID") and a Presidential Permit that purportedly authorized TransCanada to construct, connect, operate, and maintain a cross-border oil pipeline known as Keystone XL between Morgan, Montana, and Steele City, Nebraska.  (ECF 99:2-6.)  IEN and NCRA filed suit challenging those approvals on March 27, 2017.  (ECF 1.)  Northern Plains

Resource Council, et al. filed suit on March 30, 2017.  On October 4, this Court ordered the actions consolidated for briefing and hearing.  (ECF 82.)

On June 9 and 16, 2017, State and TransCanada, respectively, filed motions to dismiss the complaints on the grounds they challenged Presidential action not subject to review under the APA or NEPA.  (ECF 44-1, 49.)  This Court denied the motions on November 22, 2017 (ECF 99), and thereafter State and TransCanada filed answers (ECF 107 (State) and 108 (TransCanada).)  Following State's lodging of its Administrative Record on December 8, 2017 (ECF 111), Plaintiffs filed their summary judgment motion on February 9, 2018 (ECF 145-154).  State and TransCanada filed their cross-motions on March 30, 2018.  (ECF 176, 178.)  On August 15, 2018 the Court granted partial summary judgment to Plaintiffs, and ordered State to supplement its NEPA review with an analysis of Keystone XL's revised "Main Line Alternative" route through Nebraska (ECF 210).  That review is ongoing.  On November 8, 2018, the Court decided the remaining claims, ruling for Plaintiffs on some (ECF 218) and vacating State's ROD/NID and permanently enjoining Federal Defendants and TransCanada "from engaging in any activity in furtherance of the construction or operation of Keystone and associated facilities" until specified supplemental reviews are completed and State renders a new ROD/NID.  (ECF 218:54.)

TransCanada then moved the Court to clarify or modify the injunction to allow TransCanada to conduct certain "preconstruction activities."  (ECF 221.)  The Court allowed some of the "preconstruction" activities, but not those

involving direct irreparable harm to cultural and environmental resources and the public interest. (ECF 232.)  On December 21, 2018, TransCanada filed a notice of appeal.

## LEGAL STANDARD

This Court applies a four-factor test in deciding motions for stay pending appeal:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies."  (*Nken v. Holder*, 556 U.S. 418, 434 (2009).)  TransCanada must show that all four factors favor the stay.  (*Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).)  Because TransCanada has not done so, its motion must be denied.

## ARGUMENT

### I.   TRANSCANADA IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL.

#### A.   THIS COURT CORRECTLY RULED THAT STATE'S DECISION TO ISSUE THE PRESIDENTIAL PERMIT IS SUBJECT TO REVIEW UNDER THE APA AND THE ESA.

TransCanada is not likely to succeed in its appeal of this Court's decision that issuance of the Presidential Permit constitutes agency action subject to review under the NEPA and the ESA.  (ECF 99:12-14, 27-40; ECF 218:52.)  This Court's Orders finding jurisdiction under NEPA and the ESA are correct.

TransCanada repeats the arguments from its motion to dismiss which this

Court already rejected.  (ECF 99:7-15.)  State's approval of its Presidential Permit was "'a major Federal action that may have a significant impact upon the environment within the meaning of NEPA'" and "[t]he APA waives the government's sovereign immunity and provides a private right of action."  (ECF 99:7, citing 5 U.S.C. §§ 701-706.)  Based on State's own Notice to Prepare an EIS in the Federal Register, "[t]he logical conclusion to be drawn is that the State Department intended for the publication of the ROD/NID and the issuance of the accompanying Presidential Permit to be reviewable as final agency action."  (ECF 99:8.)

    This Court properly applied the two-factor test for determining whether Keystone's approval constitutes presidential action:  (1) whether the President carries out the final action himself, and (2) whether Congress has curtailed his authority to direct the "agency."  (ECF 99:10, citing *Natural Resources Defense Council v. U.S. Department of State*, 658 F.Supp.2d 105, 111 (D.D.C. 2009).  The Court correctly concluded that "[t]he President waived any right . . . to review State's decision under Executive Order 13337" and "[t]he State Department's obligation to study the environmental impacts of its decision fundamentally does not stem from the foreign relations power assigned to the President."  (*Id*.)  Rather, "State['s] own NEPA regulations recognize that . . . a Presidential Permit represents a 'major Departmental action' subject to . . . NEPA."  (*Id.* at 10, citing 22 C.F.R. §§ 161.7, 161.7(c)(1).")  Accordingly, State prepared an FSEIS and published a subsequent ROD/NID based on the premise that this was final agency

- 5 -

action subject to NEPA.  (*Id.*)

TransCanada cites the same district court rulings from its previous motion to dismiss:  *Natural Resources Defense Council v. U.S. Department of State*, 648 F.Supp.2d 105 (D.D.C. 2009); *Sisseton-Wahpeton Oyate v. U.S. Department of State*, 659 F.Supp.2d 1071 (D.S.D. 2009); *White Earth Nation v. Kerry*, No. 14-4726, 2015 WL 8483278 (D. Minn. Dec. 9, 2015).  (Motion:6).  This Court already distinguished these cases, pointing out that *NRDC* and *Sisseton-Wahpeton* relied on the President's retention of his "ultimate authority to settle any interagency dispute" – which he expressly *waived* here – and *White* relied on those two inapposite cases.  (ECF 99:12.)  Here, "[t]he President remains the final actor in determining the issuance of the Presidential Permit . . . [since he] specifically waived, in his Memorandum, authority that he retained to make the final decision regarding . . . the Presidential Permit."  (ECF 99:12.)  "This distinction proves persuasive."  (*Id.*)

And, *Sierra Club v. Clinton*, 689 F.Supp.2d 1147 (D. Minn. 2010), "declined to follow *NRDC* and *Sisseton-Wahpeton*."  (*Id.*)  *Sierra Club* "expressed particular skepticism at the notion of shielding from judicial review under the EPA 'the preparation of an EIS for a major federal action.'"  (*Id.*)  *Protect Our Communities Foundation v. Chu*, 214 WL 1289444 at *6 (S.D. Cal. 2014), agreed with *Sierra Club*.  (ECF 99:13.)  This Court concluded that "[t]he reasoning of *Sierra Club* and *Chu* applies here.  The State Department took final agency action when it published the ROD/NID for the Keystone XL Pipeline and issued the

accompanying Presidential Permit."  (ECF 99:14.)  Moreover, "[t]he Ninth Circuit

has determined that 'once an EIS's analysis has been solidified in a ROD, the

agency has taken final agency action, reviewable under [APA section]

706(2)(A).'"  (ECF 99:14-15, quoting *Oregon Natural Desert Ass'n v. Bureau of

Land Management*, 625 F.3d 1092, 1118-19 (9th Cir. 2010).)

And, finally, "[a] strong presumption exists that Congress intends judicial

review of administrative action," and neither NEPA nor the ESA bars review.

(ECF 99:15.)

### B.   THIS COURT CORRECTLY RULED THAT STATE'S DECISION TO ISSUE A PRESIDENTIAL PERMIT WAS NOT COMMITTED TO THE AGENCY'S DISCRETION, AND THEREFORE IS SUBJECT TO JUDICIAL REVIEW.

TransCanada also repeats its previous failed argument that "[t]he APA also

does not apply because a national interest determination is committed to agency

discretion and thus exempt from review."  (Motion:11, citing *Detroit International

Bridge Co. v. Government of Canada*, 189 F.Supp.3d 85, 101 (D.D.C. 2016).)

But as this Court already ruled, "Congress commits agency action to agency

discretion in those rare instances where Congress draws statutes in such broad

terms that no law exists to apply in a given case."  (ECF 99:15, citing 5 U.S.C. §

701(a)(2).)  Here, by contrast, "Congress has provided a meaningful standard in

the form of NEPA against which to judge the State Department's conduct."  (*Id*. at

16.)  "Congress enacted NEPA to 'protect the environment by requiring that

federal agencies carefully weigh environmental considerations and consider

potential alternatives to the proposed action before the government launches any major federal action.'"  (ECF 99:16, quoting *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124, 1131 (9th Cir. 2011).  And, "[t]he Ninth Circuit has made clear that the State Department cannot avoid judicial review simply by invoking its consideration of 'foreign policy' or 'security' factors."  (*Id*., citing *Kerry*, 803 F.3d at 1069.)

TransCanada once again relies on *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189 (9th Cir. 1975) to argue that "'[s]ince presidential action in the field of foreign affairs is committed to presidential discretion by law . . . it follows that the APA does not apply to' [an] agency's approval, pursuant to delegation of presidential authority." (Motion:12).  Not so.  "Plaintiffs in *Jensen* challenged . . .  a specific halibut fishing regulation adopted by the International Pacific Halibut Commission" pursuant to a Treaty between the United States and Canada which granted the Commission authority to enact fishing regulations with the approval of the President and the Governor General of Canada.  (ECF 99:20.)  As the *Chu* Court explained, *Jensen* is distinguishable because the Treaty specifically delegated to the Commission authority to enact fishing regulations *subject to the approval of the President and the Governor General of Canada*.  (ECF 99:21, citing *Chu*, 214 WL 1289444 at 8.)  Here, by contrast, "Plaintiffs do not challenge the Secretary of State's approval of a regulation enacted by an international Commission."  (*Id*.)  "Plaintiffs seek, by contrast, to *enforce* the State Department's *compliance with its own regulations*."  (*Id*., emphasis added.)  And,

"[n]o statute prohibits review here," "State . . . acknowledged the need for NEPA review throughout TransCanada's previous applications," and NEPA provides detailed standards to guide judicial review.  (ECF 99:22.)

### C.    THIS COURT CORRECTLY RULED THAT NEPA SUPPLEMENTATION IS WARRANTED.

TransCanada next argues "[t]he Court erred in holding that 'new information' related to Keystone XL requires State to supplement its NEPA analysis.  (Motion:13, citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373-74 (1989), *Northern Idaho Community Action Network v. U.S. Department of Transportation*, 545 F.3d 1147, 1155 (9th Cir. 2008) and *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004).  But this Court has already rejected TransCanada's arguments.  They have not improved with age, nor through repetition.  As this Court previously ruled, the "Federal Defendants did not properly analyze Keystone's environmental impacts" on Nebraska since they "did not know Keystone's final route through Nebraska" when they purported to "consider" them.  (ECF 210:4-12.)

TransCanada again claims that the new route through Nebraska did not present "new information provid[ing] a *seriously* different picture of the environmental landscape."  (Motion:13, quoting *Friends of Capital Crescent Trail v. Federal Transit Administration*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (emphasis added).  But this Court already ruled that the new "Mainline Alternative" route *does* pose substantially different impacts:

> "The Mainline Alternative route differs from the route analyzed in the EIS. [It] crosses five different counties. [It] crosses different water bodies. [It] would be longer. [It] would require an additional pump station and accompanying power line infrastructure."

(ECF 210:10.)  It ill behooves TransCanada to proclaim – *sans* any record support – that this changed route's impacts are not "serious" when State has never even evaluated them under NEPA.

Settled law requires State to evaluate the impacts of this fundamentally changed route since it is a "connected action" even more than logging roads were connected to timber sales in *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985), and State retains ample authority to make appropriate adjustments to its approval decision since Keystone's construction has not yet started.  (ECF 210:9-11, citing *Marsh*, 490 U.S. at 367-372 and distinguishing *Cold Mountain v. Garber*, 375 F.3d 884, 891-894 (9th Cir. 2004). "The Mainline Alternative route represents an interdependent part of the larger action of Keystone," and "[t]he entire pipeline . . . requires one EIS to understand the functioning of the entire unit."  (ECF 210:11.)

TransCanada next attacks this Court's ruling that ongoing changes in oil markets necessitated a revised NEPA analysis.  (Motion:15-16.)  TransCanada claims this Court "failed to identify how low oil prices correlated to significantly different environmental impacts."  (Motion:15.)  But TransCanada ignores the fact "that the Environmental Protection Agency [had] called upon [State] to revisit the EIS's conclusions after the 2015 oil prices drop."  (ECF 218:17, citing DOS973-

74.)  And, TransCanada also overlooks this Court's observation that "[s]uch an analysis proves material . . . to [State's] consideration of Keystone's impact on tar sands production."  (ECF 218: 18.)  Higher oil prices could mean greater tar sands production (and its associated impacts), whereas lower oil prices might reduce production and the related economic benefits that State forecast.  Both factors are pertinent to State's National Interest Determination and compliance with NEPA.

TransCanada next challenges this Court's ruling that post-FSEIS pipeline spills "qualify as significant," and that State "would have evaluated the spills in the 2014 SEIS had the information been available."  (ECF 218:30.)  TransCanada argues that "[w]hether an agency would have evaluated information had it been available is not the proper legal standard for evaluating new information under NEPA."  (Motion:16.)  But TransCanada ignores this Court's explanation that "the risk of spills likely would affect Keystone's potential impact on other areas of the ROD's analysis, including risks to water and wildlife."  (ECF 218:30.)  This Court's reasoning is spot-on.  Clearly, this new information regarding the frequency and severity of pipeline spills is highly relevant to State's assessment of the oil spill risks that Keystone XL would pose "to water and wildlife."  (ECF 218:30.)

TransCanada also challenges this Court's finding that State "acted upon incomplete information by failing to consider the National Academy of Sciences (NAS) study on dilbit."  (Motion:16, citing ECF 218:29-31.)  TransCanada claims this Court's conclusion "is not supported by the record," citing the fact that the

FSEIS did disclose that "dilbit reacts differently from other crude oils when released into water" and that "the ROD/NID addressed the NAS study." (Motion:16.)  But TransCanada ignores the fact that the FSEIS did not address the detailed and authoritative findings set forth in the NAS study on dilbit, and thereby failed to provide both decisionmakers and the public with this critical information in the manner that NEPA mandates.  As this Court explained, the NAS study "found that diluted bitumen presents more challenges for cleanup response than other types of oil moved by pipeline," and that "responders need more training and better communication to address these spills adequately."  (ECF 218:30, citing the NAS study at 1391.)  Moreover, TransCanada overlooks this Court's discussion regarding how the ROD's analysis was likewise deficient, holding that (1) it "fails to show how the 2014 SEIS adequately addressed the NAS study," (2) it "merely asserts that Keystone has agreed to consult with local emergency responders and update its mitigation response plans as new information becomes available" – a "conclusory statement [that] fails to meet NEPA's 'hard look' requirement" – and (3) the "absence of this information from the 2014 SEIS's mitigation measures demonstrates that the agency acted upon incomplete information in setting forth its mitigation measures."  (ECF 218:30-31, citing *Marsh*, 490 U.S. at 371.  Because this Court adequately explained the detailed basis for its ruling, TransCanada's attack fails, and its motion must be denied.

TransCanada next challenges this Court's conclusion that "State must supplement its NEPA analysis with a revised calculation of potential GHG

emissions using the GREET model" on the grounds "the Court offered no analysis suggesting the potential impacts of Keystone XL would be significantly different if State used the GREET model." (Motion:17-18, referring to ECF 218:19-23.) Again, TransCanada ignores what this Court did, and why. For example, this Court explained that although State "analyzed the cumulative emissions of Keystone and the Alberta Clipper [pipeline expansion from 450,000 bpd to 880,000 bpd] in the Alberta Clipper EIS" – and importantly, the latter "EIS also used the updated Greenhouse Gas, Regulated Emissions, and Energy Use in Transportation ("GREET") model to analyze greenhouse gas emissions" – the 2014 SEIS failed to address *either* the Alberta Clipper expansion *or* the new GREET model." (ECF 218:20.) The GREET model constitutes "new and relevant information that warrants supplement[ation]" because it "results in estimates of greenhouse gas emissions that are up to 20% higher than the model used in the 2014 SEIS." (*Id.*)

And, this Court explained that "NEPA requires that an EIS consider the cumulative impacts of the proposed action," citing 40 C.F.R. § 1508.7 and *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006). (*Id.*) Since this Court fully explained the factual and legal basis for its correct ruling, TransCanada's attack is without merit, and its motion must be denied.

### D.   THIS COURT CORRECTLY RULED THAT STATE'S CUMULATIVE IMPACTS ANALYSIS VIOLATED NEPA.

Relatedly, TransCanada next argues that this "Court erred in holding that

State should have considered the cumulative impacts from the Alberta Clipper pipeline expansion project in the Keystone XL NEPA analysis," claiming that this "Court reasoned that State was unaware of the cumulative impacts of both projects notwithstanding the fact that it disclosed in the 2017 EIS for the Alberta Clipper the potential cumulative GHG emissions of both pipelines." (Motion:19.)  But that was never the basis for this Court's reasoning.  To the contrary, as this Court carefully detailed, the 2014 SEIS was itself deficient because it failed to address the cumulative impacts from the Alberta Clipper.  (ECF 218:22.)  As the Order explains, the SEIS's omission "left out significant information from the climate analysis in the Department's possession:"

> "The Keystone SEIS indicated that greenhouse gas emissions associated with the pipeline would range generally from 1.3 to 27.4 $MMTCO_{2e}$.  The Alberta Clipper EIS determined that combined greenhouse gas emissions associated with both pipelines would range generally from 2.1 to 49.9 $MMTCO_{2e}$.  A difference of this magnitude cannot be dismissed simply as harmless error."

(ECF 218:22.)

The Court further explained that it was aware that State had decided to issue the permit for the Alberta Clipper expansion in 2017 notwithstanding its apparent knowledge that the combined greenhouse gas emissions from both projects would be nearly double those from the Keystone project alone.  (*Id*.)  Indeed, as the Court pointed out, State admits "that the 2014 SEIS failed to analyze greenhouse gas emissions associated with the Alberta Clipper," and "therefore, ignored its duty to take a 'hard look'" at the "whole picture of emissions for these connected actions."

(ECF 218:21, citing *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001).)  As the Court explained, it "cannot assume without reasoned analysis [in the Keystone XL SEIS], however, that the Department [of State] would reach the same conclusion for the Keystone permit."  (*Id*.)

Accordingly, this Court properly ruled that State "must supplement this analysis to include the same information," and, as discussed above, must also "include the same updated GREET model analysis used in the Alberta Clipper EIS."  (ECF 218:22-23.)  Because the Court fully explained its correct conclusion – a conclusion that TransCanada misstates – TransCanada's motion is without merit and must be denied.

### E.   THIS COURT CORRECTLY RULED THAT STATE FAILED TO ANALYZE IMPACTS TO CULTURAL RESOURCES.

TransCanada next attacks this Court's ruling "that State's failure to conduct cultural resources surveys on 1,000 acres of land violates NEPA," on the grounds that "the Court completely overlooked the Programmatic Agreement covering the project and TransCanada's obligation to complete cultural surveys prior to any construction activity."  (Motion:20.)  TransCanada argues that "State was able to complete a review of potential impacts to cultural resources" without actually knowing what those resources might be, and where they might be located, "because the Programmatic Agreement imposed a variety of mitigation measures that would prevent adverse impacts to cultural resources."  (Motion:21.) TransCanada then argues that "[n]umerous federal agencies follow the same

procedure," citing *HonoluluTraffic.com v. Federal Transit Administration*, 742
F.3d 1222, 1234 (9th Cir. 2014), *City of Alexandria v. Slater*, 198 F.3d 862, 873
(D.C. Cir. 1999), and *Colorado River Indian Tribes v. Department of Interior*, No.
ED CV14-02504 JAK, 2015 WL 12661945, at *19 (C.D. Cal.).

TransCanada is mistaken both factually and legally.  Contrary to its
argument, this Court was fully aware, as its Order states, "that [State] entered into
[the Programmatic] [A]greement with other federal agencies and state historic
preservation officers." (ECF 218:26, citing DOS6553-54.)" (ECF 218:26.)  And,
this Court recognized that "[t]his agreement governs identification of historic
properties and consultation regarding potential adverse impacts." (*Id.*)  However,
this Court also noted, as Plaintiffs had pointed out that "[t]he 2014 SEIS states . . .
that '[a]s of December 2013, approximately 1,038 acres remained unsurveyed and
are the subject of ongoing field studies.'" (ECF 218:26, citing DOS6522.)
Importantly, "[t]he Department [of State] offered no supplemental information on
the unsurveyed acres before it issued the 2017 permit," but rather simply
"describe[d] the surveys as 'ongoing.'" (*Id.*, quoting from State's summary
judgment memorandum at 68.)  As this Court correctly concluded, "[t]his
explanation proves outdated." (ECF 218:26.)

Further, none of the cases TransCanada cites is germane.  In
*HonoluluTraffic.com*, the defendants could not conduct the required surveys
because the "exact route" of the project was unknown. (742 F.3d at 1234.)  In
*Slater*, the required cultural surveys could not occur "until the design stage" of the

project.  (198 F.3d at 873.)  In *Colorado River*, the FEIS concluded that ground-disturbing searches would harm the very resources sought to be protected.  (2015 WL 12661945 at *19.)  No such factors restrict State's ability to complete required cultural resource surveys here.  And, none of these cases excuses State from providing a "full and fair discussion of the potential effects of the project to cultural resources" as NEPA requires.  (ECF 218:27, quoting *Native Ecosystem Council v. U.S. Forest Service*, 418 F.3d 953, 965 (9th Cir. 2005).)  Contrary to NEPA, State "jumped the gun when it issued the ROD in 2017 and acted on incomplete information regarding potential cultural resources along 1,038 acres of unsurveyed route."  (ECF 28:27.)

Accordingly, this Court correctly concluded that State "must supplement the information on the unsurveyed acres . . . in order to comply with its obligations under NEPA."  (*Id.*, citing 40 C.F.R. §§ 1502.16(g), 1508.8.)  TransCanada's challenge is without merit, and its motion must be denied.

## F.   THIS COURT CORRECTLY RULED THAT STATE FAILED TO ADEQUATELY EXPLAIN ITS POLICY CHANGE ON GHG IMPACTS.

TransCanada next claims this Court "erred in two respects" in holding that "State was required to justify its policy change regarding GHG impacts and . . . that State disregarded prior factual findings."  (Motion:21.)  TransCanada argues that "[the] APA does not authorize review of a NID because it is a purely discretionary decision."  (Motion:22, citing *Sierra Club v. U.S. Department of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017).)  Not so.  An agency never has

- 17 -

"discretion" to ignore its prior factual findings.  As this Court ruled, "[a]n agency must provide a detailed justification for reversing course and adopting a policy that 'rests upon factual findings that contradict those which underlay its prior policy.'" (ECF 218:31, quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and citing *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015).)

This Court detailed why State's 2017 ROD failed to provide an adequate explanation for its abrupt reversal despite factual findings by Secretary of State Kerry that this project would *not* serve the public interest:

> "Section 6.3 of the 2015 ROD determined that the United States's climate change leadership provided a significant basis for denying the permit.  The Department acknowledged science supporting a need to keep global temperature below two degrees Celsius above pre-industrial levels. [DOSKXLDMT0001182-83.] The Department further recognized the scientific evidence that human activity represents a dominant cause of climate change . . . .
>
> The 2017 ROD initially tracked the 2015 ROD nearly word-for-word.  The 2017 ROD, without explanation or acknowledgment, omitted entirely a parallel section discussing 'Climate Change-Related Foreign Policy Considerations.'  The 2017 ROD ignores the 2015 ROD's conclusion that 2015 represented a critical time for action on climate change.  The 2017 ROD avoids this conclusion with a single paragraph [. . . . and] simply states that since 2015, there have been 'numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so.'  *Id*. at 2518.  Once again, this conclusory statement falls short of a factually-based determination, let alone a reasoned explanation, for the course reversal."

(ECF 218:35.)  Quoting *Fox*, 556 U.S. at 573, this Court concluded that "[a]n agency cannot simply disregard contrary or inconvenient factual determinations

that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.'" (*Id*.)

Because State failed to provide the required "reasoned explanation" and "instead simply discarded prior factual findings related to climate change to support its course reversal," TransCanada's challenge is without merit and its motion must be denied.  (*Id*., citing *Kake*, 795 F.3d at 968.)

### G.   THIS COURT CORRECTLY RULED THAT THE U.S. FISH AND WILDLIFE SERVICE SHOULD UPDATE ITS PREVIOUS REVIEW UNDER THE ESA.

Finally, TransCanada argues that this Court "also erred in setting aside State's 2012 Biological Assessment (BA) and the U.S. Fish and Wildlife Service's (FWS) 2013 Biological Opinion (BiOp) and concurrence."  (Motion:22-23.) TransCanada advances two reasons for its challenge: that "neither the APA nor the ESA provides a right of review for Plaintiffs' claim that State violated Section 7 of the ESA," and "the Court pointed to no FWS statements identifying oil spills as a potential source of adverse effects to the listed species nor does the order contain any support for such a finding."  (Motion:23.)

TransCanada is wrong on both counts.  First, both the APA and the ESA provide a right of review for Plaintiffs' claim that State violated Section 7 of the ESA.  As this Court explained, "[s]ection 7(a)(2) [of the ESA] requires agencies, in consultation with the expert wildlife agency (here, . . . FWS . . .), to insure "that any action authorized, funded, or carried out by [an] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of habitat[.]'"  (ECF 218:35-36, quoting 16 U.S.C. § 1536(a)(2), (4).)  And, to satisfy this duty State "must initiate formal consultation" with FWS if its proposed "actions may adversely affect listed species."  (*Id.* at 36, citing 50 C.F.R. § 402.14.)  State must use "'the best scientific and commercial data available'" and may not "'disregard[] available scientific evidence that is in some way better than the evidence [it] relies on.'"  (*Id.*, quoting *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006).  As discussed above, this Court has jurisdiction under the APA to enforce these ESA provisions.

Second, this Court fully explained why State had failed to use "the best scientific and commercial data available" in approving the ROD/NID, because its consultation with FWS in 2012 did not reflect significant subsequent changes and improvements in that data, including its "list[ing] as threatened the northern long-earred bat and the rufa red knot," its identification of "the American burying beetle as the only listed species likely to be adversely affected by Keystone after it was proposed again in 2017," and Nebraska's approval of the new Mainline Alternative route.  (ECF 218:37.)  This Court properly concluded that State and FWS "failed to consider properly the potential impacts of pipeline oil spills on listed species," other than the American burying beetle, and therefore State "must supplement new and relevant information regarding the risk of spills" and, together with FWS, "must use the 'best scientific and commercial data available' in all respects, including the effects of potential oil spills on endangered species."

(ECF 218:43-44, citing 16 U.S.C. § 1536(a)(2).

Since State and FWS must accordingly reexamine the potential adverse impacts of oil spills on listed species, TransCanada's contrary argument is without merit and its Motion must be denied.

## II.      TRANSCANADA IS NOT ENTITLED TO A STAY

### A.     THIS COURT HAS AUTHORITY TO ENJOIN ANY ACTIVITIES RELATED TO PIPELINE CONSTRUCTION.

TransCanada contends that this Court's "authority to enjoin actions by TransCanada 'extends only so far as the [presidential] permitting authority,'" and that the Court therefore lacks authority to enjoin "preconstruction" activities. (Motion:24 (quoting *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1123 (9th Cir. 2005)).)  Wrong.  This Court has authority to enjoin any activities related to pipeline construction.

TransCanada attempts to draw a nonexistent distinction between the various activities that constitute the Project.  It erroneously argues that State's Presidential permitting authority over the "construction" of pipelines that cross United States borders does not extend to "transport[ing] or refurbish[ing] pipe, mow[ing] grass, fabricat[ing] materials, or construct[ing] a labor camp or storage yard." (Motion:24.)  To the contrary, those activities are part and parcel of pipeline construction, and thus subject to State's permitting authority.

Dr. Ramsay, the TransCanada executive "responsible for the Project's engineering, procurement, construction, testing, commissioning and start-up,"

- 21 -

admits that those "preparatory activities . . . are necessary" for "constructing a project the magnitude of Keystone XL." (ECF 222-1 ¶16.) State likewise makes clear that "[c]onstruction of the proposed Project would include the pipeline itself plus various aboveground ancillary facilities (e.g., access roads, pump stations, and construction camps) and connected actions." (DOS5652 (quote), 2497, 5968-86 (SEIS description of ancillary facilities).) As this Court has already held, "TransCanada's proposed preconstruction activities" are so intertwined with pipeline construction that allowing them to continue "could skew the Department's future analysis and decision-making regarding the project." (ECF 232:10.)

TransCanada's so-called "preconstruction" activities are "so interrelated and functionally interdependent" with project construction "as to bring the entire project within" State's – and thus this Court's – "jurisdiction." (*Stewart v. Potts*, 996 F.Supp.668, 683 (S.D. Tex. 1998) (quoted with approval in *Save Our Sonoran*, 408 F.3d at 1124).)

### B.   TRANSCANADA WILL NOT BE IRREPARABLY INJURED ABSENT A STAY.

TransCanada erroneously argues that the stay on "preconstruction" activities is causing it irreparable harm, including threatening its workforce investment and ability to begin construction in 2019. (Motion:25-26.) TransCanada's argument fails as discussed below.

First, TransCanada's claimed harms are speculative. TransCanada fails to

demonstrate that it would be able to start construction in 2019 even if it were allowed to continue "preconstruction" activities.  This Court vacated State's NID/ROD and enjoined Project construction pending compliance with NEPA and the APA.  (ECF 218:54.)  Until State complies with NEPA, the ESA and the APA, and re-issues a Presidential permit, TransCanada may not proceed with construction.  TransCanada has not shown that State is likely to complete those actions in 2019, if at all.  State did not issue a notice of intent to prepare a supplemental EIS until December 2, 2018.  (83 Fed. Reg. 62398.)  And even Dr. Ramsay acknowledges that supplemental environmental review "is likely to take at least well into the first quarter of 2019 . . . , if not longer."  (ECF 222-1:8, ¶20.)  In addition, "TransCanada is continuing discussions with both the Bureau of Land Management regarding its right-of-way application and with the U.S. Army Corps of Engineers with respect to federal permits required by the Clean Water Act." (Id. at 4.)

Second, regardless of the cause of TransCanada's claimed harms, they would only be *temporary*, not *irreparable*.  (*Cf. League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) ("plaintiffs' irreparable environmental injuries outweigh the temporary delay intervenors face in receiving a part of the economic benefits of the project").)  TransCanada attempts to paint a delay in preconstruction activity as a permanent loss of jobs, but that is simply incorrect.  (Motion:25.)  If the Project is approved after adequate environmental review, TransCanada could

- 23 -

begin construction one year later.  Similarly, TransCanada's claim that its "skilled workers are likely to find other employment" during a delay fails to address TransCanada's ability to hire skilled workers if and when preconstruction activities commence.  (Motion:25.)

Third, TransCanada's claimed potential harms are self-inflicted. TransCanada knows its project approvals have been ruled invalid, and is well aware of the uncertainties associated with future pipeline permitting.  (ECF 222-1 ¶¶7-16.)  Yet it voluntarily chose an aggressive timeline for project construction and made related investments.  TransCanada cannot rely on the harm resulting from *its own* voluntary commitment of resources to claim irreparable injury from this Court's injunction.  (*Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997 (8th Cir. 2011); *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).)

Finally, all of the cases that TransCanada cites to support its position are inapposite.  In *Alaska Survival v. Surface Transportation Board*, 704 F.3d 615 (9th Cir. 2012), the Court recognized defendant's economic harms only in deciding whether to dissolve a stay after determining that the Surface Transportation Board had complied with NEPA, and "allow[ing] the project to move forward."  (*Id*. at 616; Motion:26.)  Here, by contrast, Project construction is *barred* until State complies with NEPA and the ESA.  The temporary economic impacts that enjoining preconstruction activities might cause are not a foreordained conclusion.

TransCanada's reliance on *James River Flood Control Association v. Watt*,

- 24 -

680 F.2d 543, 544 (8th Cir. 1982), likewise fails.  (Motion:26.)  There the court

found no "factual basis for the conclusion that the [plaintiff] or the public will

suffer irreparable harm if construction proceeds."  (*Id.*)  That contrasts sharply

with the facts here, where the record shows that preconstruction activities will

substantially and irreparably harm the environment.  (DOS5969, 5983, 6781,

6800, 6801.)

## C.   ISSUANCE OF A STAY WILL SUBSTANTIALLY INJURE PLAINTIFFS.

TransCanada erroneously asserts that a stay will not harm Plaintiffs because

Plaintiffs will only suffer "injuries from the building [and operation] of the actual

pipeline."  (Motion:26.)  But TransCanada ignores the substantial injuries

Plaintiffs will suffer from preconstruction activity as well.

TransCanada plans to mow 11,666 acres of the right-of-way, causing

"[p]ermanent loss of wetlands," "permanent modification of surface and

subsurface flow patterns," "permanent modification of wetland vegetation," and

"[l]oss or alternation of wetland soil integrity," among other harms.  (ECF 221-1

¶ 18; DOS5952, 6782-6784, 6809-6811; FWS2062.)  Preconstruction activities

will also require clearing of 1,916 to 2,316 acres, including 1,037.6 acres for pipe

storage yards, 479 acres for contractor yards, and between 400 and 800 acres for

construction camps.  (DOS5979-5980.)  Despite this uncontroverted evidence,

TransCanada claims that preconstruction would impact a much smaller area.  (ECF

230 at 2-3.)  But neither the record nor TransCanada provide any evidence

supporting this assertion.

TransCanada also claims that any injury "caused by 'bureaucratic momentum' is legally erroneous and devoid of factual support."  (Motion:26-28.)  To the contrary, this Court correctly ruled that the preconstruction activities "go beyond 'design, planning, and permit application[.]'" (ECF231:9 (citing *National Audubon Society v. Department of Navy*, 422 F.3d 174, 206 (4th Cir. 2005)).)  TransCanada ascribes the Court's conclusion to a single line from the Court's five-page analysis of *National Audubon*.  (ECF 231 at 6-11.)  But this Court reviewed *National Audubon* in detail, and based its conclusion that preconstruction activities "go beyond simply 'integrating the NEPA process with other planning'" on a thorough analysis of that case.  (*Id.*)

As this Court previously held, the proposed preconstruction activities are "more analogous to those enjoined in *Colorado Wild* ."  (ECF 231:10; *Colorado Wild Inc. v. U.S. Forest Service*, 523 F.Supp.2d 1213, 1221 (D.Colo. 2007).)  Indeed, allowing preconstruction activities *would* "'skew the analysis and decision-making' toward approving a pipeline route" because all of those activities will have occurred along one particular route.  (Motion:28 (citing *Colorado Wild*, 523 F.Supp.2d at 1221).)  As in *Colorado Wild*, the preconstruction activities here are all "in furtherance of the decision that is being challenged."  *Colorado Wild*, 523 F.Supp.2d at 1221.)  "Each step taken . . . in reliance on this decision 'represents a link in the chain of bureaucratic commitment that will become progressively harder to undo the longer it

- 26 -

continues.'" (*Id.* (citing *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)).)

Furthermore, if this Court grants a stay pending appeal, it is possible that TransCanada will complete much more than preconstruction activity during the pendency of this appeal.  The appeals process can take years, and TransCanada must not be allowed to irreparably destroy environmental resources while the court of appeal adjudicates TransCanada's appeal.

### D.     THE PUBLIC INTEREST FAVORS DENIAL OF A STAY.

TransCanada relies upon State's NID findings regarding the *completed* Keystone XL Pipeline to argue that the injunction is against the public interest. (Motion:28-29.)  Yet TransCanada has not asked this Court to permit construction and operation of the Keystone XL Pipeline pending State's compliance with NEPA.  Thus, even if State's national interest findings were lawful, they would be irrelevant to the preconstruction activities contemplated here.

Moreover, this Court *set aside* State's NID findings, ruling that State failed to analyze the cumulative climate impacts of the Pipeline, and acted arbitrarily when it ignored the 2015 ROD's NID finding that the project was *not* in the national interest.  (ECF 218:21-23, 34-35.)

As shown, TransCanada's preconstruction activities will scrape away 1,916 to 2,316 acres of vegetation for pipe storage yards, construction yards and worker camps, and clear 11,666 acres of right-of-way that would otherwise provide wildlife habitat.  If the project is not reapproved, the harm stemming from these preconstruction activities will continue as the stripped lands will take decades (if

ever) to recover.  Therefore, the public interest favors denial of TransCanada's Motion.

## CONCLUSION

For these reasons, TransCanada's Motion is without merit and must be denied.


Dated:  January 4, 2019            Respectfully submitted,

                                   PATTEN, PETERMAN, BEKKEDAHL &
                                   GREEN, PLLC
                                   s/ *James A. Patten*
                                   JAMES A. PATTEN

Dated:  January 4, 2019            LAW OFFICES OF STEPHAN C. VOLKER
                                   s/ *Stephan C. Volker*
                                   STEPHAN C. VOLKER (Pro Hac Vice)

                                   Attorneys for Plaintiffs
                                   INDIGENOUS ENVIRONMENTAL NETWORK
                                   and NORTH COAST RIVERS ALLIANCE

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2) of the District of Montana Local Rules, and the Court's March 3, 2018 Order Regarding Combined Briefs and Word Limits (ECF 166), I certify that this Brief contains 6,456 words, excluding caption, certificates of service and compliance, table of contents and authorities, and exhibit index, as counted by WordPerfect X7, the word processing software used to prepare this brief.

Dated:  January 4, 2019                    s/ *Stephan C. Volker*
                                           STEPHAN C. VOLKER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2019, a copy of the foregoing

**IEN AND NCRA PLAINTIFFS' REPLY MEMORANDUM IN**

**OPPOSITION TO TRANSCANADA'S MOTION FOR STAY PENDING**

**APPEAL** was electronically served on all counsel of record via the Court's

CM/ECF system.

s/ *Stephan C. Volker*
Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE
